# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| STEVEN VERONA, MYGALLONS LLC, AND ZENACON LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 7:09-cv-00057-BR |
| v. | ) ) | |
| U.S. BANCORP, U.S. BANK VOYAGER FLEET SYSTEMS INC., and K.E. AUSTIN CORP., | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ` | |

## AMENDED COMPLAINT

Plaintiffs Steven Verona, MyGallons LLC, and Zenacon LLC, (collectively, the "Plaintiffs"), by their undersigned attorneys, allege the following based upon personal knowledge as to their own acts, documents, and communications, and on information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included a review of contracts and communications by and between Plaintiffs and the defendants, relevant press releases, websites, news articles, and documents and testimony obtained during discovery.

### Overview of the Action

1.      This action is brought to remedy damages suffered by Plaintiffs due to (i) defendants' failure to honor agreements and understandings with Plaintiffs; and (ii) certain defendants' false and defamatory statements to the media regarding Plaintiffs, in connection with

defendants' wrongful refusal to make the Voyager Fleet Systems network available to MyGallons LLC ("MyGallons") in accordance with such agreements and understandings.

2.     MyGallons is the brain-child of Steven Verona.   To help consumers combat rising and/or fluctuating gasoline prices, Steven Verona created the MyGallons program, enabling consumers to purchase "tomorrow's gas at today's prices."

3.     The MyGallons program was designed to allow consumers to pre-purchase gasoline on the MyGallons website at current prices and have the gallons accrue in their MyGallons accounts.   Consumers would be issued MyGallons cards, similar to debit cards. They could then redeem their gallons in the future at any service station where the MyGallons card was accepted, without regard to the future price of gasoline, thus protecting themselves from rising gasoline prices.   MyGallons would use a portion of the pre-paid gasoline revenues to hedge the price of gasoline in the financial markets, such that the company would break even on the gas, whether it rose or fell in price.   MyGallons would charge consumers an annual membership fee ($29.95 - $39.95 depending on whether gasoline purchases were automated), much like a Costco or Sam's Club membership fee.   MyGallons also stood to earn interest on the portion of pre-paid gasoline revenues not needed to hedge the price of gasoline, as well as from advertisements on the MyGallons website.

4.     In order for the MyGallons program to work as envisioned, the company needed to secure a payment processing network, so that the MyGallons cards would be accepted as payment at the pump.   Towards that end, in the spring of 2008, Verona approached U.S. Bancorp ("US Bank") to negotiate a contract for use of its Voyager Fleet Systems network ("Voyager"), which is accepted at about 95% of service stations throughout the country.

2

5. Verona discussed the MyGallons concept with the Senior Vice President of U.S. Bank Voyager Fleet Systems Inc., Regan Hutton ("Hutton"), as well as with Senior Vice President of Business Development for U.S. Bank Voyager Fleet Systems Inc., Ken Kral, and U.S. Bank Voyager Fleet Systems Inc. Channel Partner Sales Manager, Dennis Maxson, early in the spring of 2008, and described the consumer fuel card program to all three men. Verona presented them with an overview of the program, including specifically the fact that the program was at all times intended for consumers.

6. As set forth below, those US Bank / Voyager executives directed Verona to work with K.E. Austin Corp., d/b/a GoGas Universal ("GoGas"), an authorized reseller of US Bank's Voyager Fleet Systems network, which would act as US Bank's representative and agent. The US Bank / Voyager executives told Verona that GoGas was an authorized reseller of Voyager, and indicated that GoGas had the requisite authority to resell access to Voyager for the MyGallons consumer card program.

7. The US Bank / Voyager executives told Verona to work with GoGas' Phil Dorroll ("Dorroll"), and to enter into an agreement with GoGas for the purpose of utilizing Voyager to process payments. Dorroll is the K.E. Austin Corp. (GoGas) National Fleet Director. Verona was told that US Bank uses GoGas to support fuel fleet cards, and that GoGas would handle account management as a reseller of Voyager, acting as a sales agent and providing first line customer support.

8. GoGas had authority to resell access to the Voyager network, and Voyager had an obligation to maintain accounts established by GoGas, pursuant to a contract by and between Voyager and GoGas dated June 2, 2005 with amendments thereto dated August 15, 2007.

3

9.      At no time did US Bank ever state that MyGallons would be required to work directly with US Bank to obtain access to Voyager.   To the contrary, US Bank indicated that GoGas had specific authority to make Voyager available for the MyGallons consumer card program, and that US Bank and Voyager would support the program.   The relationship was such that GoGas arranged for use of the Voyager network and provided sales and administrative support, while US Bank provided financing (where applicable), payment and other services.

10.      However, the MyGallons program did not require that US Bank extend any credit to consumers whatsoever.   Instead, the program envisioned consumers signing up for the MyGallons program and then prepaying for gasoline, such that MyGallons could use the cash received from these prepayments to collateralize its obligations to US Bank.   US Bank was not extending any credit – MyGallons was to have collateralized 100% with cash on deposit at US Bank, such that there was no risk to the bank whatsoever.

11.      Plaintiffs proceeded to execute a contract with GoGas that was specifically approved by US Bank following its own due diligence, as represented by Dorroll, and began working with GoGas throughout the spring of 2008, as instructed by US Bank.   As detailed below, some of these dealings involved the design of the cards (including specifically a mandate from US Bank that the Voyager logo appear on the cards), back-end administrative support for the program, and the successful completion of a pilot program.

12.      The MyGallons program was launched to the public on or about June 30, 2008, when national gasoline prices averaged $4.095/gallon.   In connection with its launch, Verona appeared on Good Morning America and the CBS Early Show, and had inquires from 60 Minutes,

4

20/20, and Oprah, among other extensive major media opportunities.   The story was covered by CNN, ABC Evening News, Time Magazine, and U.S. News and World Report among others.

13.     Within days of its launch, at various times on July 2nd and July 3rd 2008, "MyGallons" and "my gallons" were the number one and two most searched for terms on Google, and approximately 6,000 paying members signed up and paid for the program within a few days. Based on Verona's pro forma financial projections, MyGallons stood poised to become a substantially large and extremely profitable operation.   Plaintiffs' expert, Dr. Anca Micu, has opined that MyGallons could reasonably have expected over 3.3 million paying members within three years of its launch, absent defendants' wrongful conduct described herein.

14.     Despite having valid contracts in place with GoGas for use of US Bank's Voyager network, shortly after MyGallons was launched with great fanfare, on or about July 1, 2008, US Bank refused to honor the contracts and agreements and denied MyGallons access to the Voyager network.   Two days later, on July 3, 2008, US Bank falsely denied – to the press and the Better Business Bureau – that US Bank or Voyager had any contract or relationship with MyGallons or Steven Verona while fully aware that MyGallons was an approved customer of GoGas and that US Bank itself had instructed Verona to work through GoGas at the outset.

15.     The refusal of US Bank, Voyager, and GoGas to honor their commitments to MyGallons, and the defamatory statements to the media that no relationship, dealings, or contract existed, had devastating effects.   MyGallons was forced to stop signing up members, and to refund to consumers all monies previously collected.

16.     Moreover, the intense media focus was turned on its head.   Based on US Bank's false and misleading public and, upon information and belief, private statements that MyGallons

had no deal with US Bank or Voyager, the Better Business Bureau of Southeast Florida promptly assigned an "F" rating to MyGallons, issued a press release warning consumers about MyGallons, and warned other better business bureaus across the nation of the possible "scam". A plethora of articles and internet postings soon followed, suggesting that MyGallons was a "scam" or "fraud." Several Attorneys General began investigations and/or served subpoenas on MyGallons, and MyGallons' and Verona's good names were dragged through the mud.

17. Rather than reaping the benefit of the enormous media interest in MyGallons, the company's launch was instead interrupted and destroyed. Following its launch, MyGallons was among the biggest media stories in the nation. Defendants' wrongful conduct not only disabled MyGallons' launch, but it also impugned the reputations of the company, its founder, and its products, such that MyGallons became one of the biggest scandals in the country. The story was picked up by virtually every major news outlet and was front page news. To date, defendants' wrongful conduct has also prevented Plaintiffs from procuring a comparable alternative payment network despite Plaintiffs' intensive efforts, which included discussions with a host of alternative companies, including various credit card processors, banks, and payment networks. Accordingly, the business remains dormant to this day.

18. As a result of the wrongful actions of US Bank, Voyager, and GoGas, Plaintiffs have suffered substantial damages, including the value of their investments in MyGallons, the value of their time, and reasonably foreseeable lost profits, in amounts to be proven at trial.

6

**Parties**

19.     Plaintiff MyGallons LLC ("MyGallons" or the "Company") is a Florida limited liability company, originally headquartered at 1221 Brickell Avenue, Suite 900, Miami, Florida 33131.   The Company is now headquartered at 4646 Umbria Street, Philadelphia, PA 19127.

20.     Plaintiff Zenacon LLC ("Zenacon") is a corporate entity through which Steven Verona develops entrepreneurial endeavors.   It is an Ohio limited liability company, with its headquarters in Philadelphia, Pennsylvania.

21.     Plaintiff Steven Verona ("Verona") is the founder and CEO of MyGallons and Zenacon.   At all times relevant, Verona was a resident of the State of Florida and/or the Commonwealth of Pennsylvania.

22.     Defendant U.S. Bancorp ("US Bank") is a Delaware corporation and has headquarters in Minneapolis, MN.   US Bank has over 2,500 banking offices in at least twenty states.   With $247 billion in assets, US Bank is one of the largest commercial banks in the United States.

23.     Defendant Voyager Fleet Systems, Inc. ("Voyager") is a wholly-owned subsidiary of U.S. Bancorp.   It was founded in 1995 and is based in Houston, TX.

24.     Defendant K.E. Austin Corp. (d/b/a "GoGas") is a North Carolina Corporation, with headquarters in Wilmington, North Carolina.

**Jurisdiction and Venue**

25.     This is a civil action over which this Court has jurisdiction pursuant to 28 U.S.C. §1332, in that the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

7

26.     This Court has personal jurisdiction over all defendants, as the defendants have extensive operations in North Carolina.

27.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2) in that many of the acts and transactions alleged herein occurred in substantial part in this District.

28.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and interstate e-mails.

<u>**Factual Allegations**</u>

*Implementation of the MyGallons Concept:*

29.     In order to implement the MyGallons concept Verona needed to develop a relationship with a payment processing network capable of transmitting "Level III" information. Whereas traditional credit card reporting is limited to the date and price of a transaction, the MyGallons program would require a processor that could process additional information from the pump, known as Level III information, such as the type or grade of gasoline and the number of gallons purchased.   The two major fuel fleet card Level III processors that own their own networks are Wright Express and US Bank's Voyager.   Verona approached and had discussions with both Wright Express and Voyager in early 2008.   At that time, Verona explained the consumer program to both companies.

*US Bank / Voyager Directs Verona to Work With GoGas:*

30.     At US Bank, Verona contacted Regan Hutton, Senior Vice President of U.S. Bank Voyager Fleet Systems Inc., Ken Kral and Dennis Maxson.   Verona gave the US Bank executives

8

an overview of the MyGallons program and explained it was for consumer use. The US Bank executives directed Verona to speak with Phil Dorroll and to proceed through GoGas, an authorized reseller of US Bank's Voyager network, which would act as US Bank's agent. It was expressly stated, discussed and understood by and between Hutton, Kral and Maxson, on behalf of US Bank and Voyager, and Verona, on behalf of MyGallons, that the Voyager network would be available for the MyGallons consumer card program through GoGas. Voyager characterizes GoGas as one of its nineteen "Channel Partners."

31. The fact that US Bank / Voyager directed Verona to GoGas is indisputable. *See, e.g.*, an email dated July 17, 2008, from Dorroll to Maxson at US Bank where Dorroll confirms that he had not solicited the MyGallons' account, but that it had been brought to GoGas by Voyager: ("does he know that I did not directly solicit mygallons [sic] – that mygallons was brought to me by Voyager"). This was not an unusual situation, as Voyager routinely referred relationships to Channel Partners, including GoGas.

32. At no time did anyone at US Bank or Voyager indicate to Plaintiffs that working directly with US Bank was preferable, or required, for MyGallons to have access to the Voyager network.

33. On or about March 17, 2008, Zenacon, the predecessor to MyGallons, submitted an application contract to GoGas. Dorroll represented to Verona that the application contract was specifically approved by US Bank. As described below, the application contract, executed by Verona, constituted a contract between Zenacon and defendants for use of the Voyager network.

9

34.     The Zenacon contract initially contemplated a $10,000 credit limit for purposes of testing a pilot program.   US Bank specifically approved the application and the line of credit for the pilot program.

### *All Parties Approve Plaintiffs' Re-Branding from Zenacon to MyGallons:*

35.     Prior to implementing the pilot program with GoGas and US Bank to test the back-end support, Verona decided to establish a new company – MyGallons LLC – specifically branded to handle the MyGallons program, as Zenacon, the predecessor entity, was an existing company with various other ventures.   Accordingly, in a May 14, 2008 e-mail to Verona, Phil Dorroll confirmed that GoGas would be "transitioning [Verona's] existing account (Zenacon, LLC) to the new level 1 for MyGallons."

36.     Further, Voyager's Loveridge received a request from GoGas in May of 2008 to change certain information on the Zenacon account to reflect the new name (MyGallons) and address.

37.     Voyager's Loveridge understood the account change occurred because Verona wanted to use the brand name MyGallons on its fuel cards rather than the name Zenacon.

38.     From mid-April through mid-June, 2008, GoGas worked with Verona to test a pilot program of approximately one dozen consumers to ensure that the administrative support would work as intended.   Pursuant to the pilot program, test cards were issued which were embossed with the MyGallons name, and which were used to successfully purchase gasoline at various locations that accept Voyager cards.

39.     MyGallons -- not Zenacon -- was invoiced for these purchases by GoGas, and MyGallons timely paid for the redemption of gallons of gasoline.   Defendants accepted payment

10

from both MyGallons and Zenacon.  The pilot program was supported by the Voyager network, evidencing that a relationship existed between MyGallons and defendants US Bank and Voyager. This directly belies US Bank's later denials.

40.    On or about May 20, 2008, Verona executed and submitted to GoGas a second application contract for the MyGallons program, this time on behalf of MyGallons LLC, the newly-formed entity.  The purpose of executing the second application contract was to maintain access to the Voyager network for the MyGallons program, under the MyGallons' brand.

41.    That contract, like the Zenacon contract, specifically referenced US Bank and Voyager as counter-parties to the contract, and constituted a contract between MyGallons and defendants for use of the Voyager network.

42.    Verona specifically asked GoGas whether re-branding from Zenacon to MyGallons would cause any disruption in light of the fact that MyGallons was being incorporated in Florida rather than Ohio.  Dorroll and Kat Garzione of GoGas assured Verona that there was no problem in doing so.

43.    Moreover, in later emails dated June 17, 2008 and July 7, 2008, Dorroll confirmed that the MyGallons application contract constituted a valid contract between GoGas and MyGallons for use of the Voyager network.  Responding to Verona's request for "a copy of the contract between MyGallons LLC and GoGas," Dorroll stated on June 17, 2008 that "[a] standard agreement between us and our customer is the application itself.  I will forward you a PDF of that application for your review . . .".

44.    On July 7, 2008, GoGas authorized use of the following admission: "GoGas had agreements in place with Zenacon LLC **and MyGallons LLC** in order to provide support for the

11

MyGallons program through the use of the Voyager payment processing network." (emphasis added).

45.     GoGas' Dorroll continues to believe that plaintiffs had valid contracts for use of the Voyager network.

**All Parties Worked Together Extensively to Set Up the Member Based Program:**

46.     GoGas and Voyager worked with Verona and MyGallons to design the cards consumers would use for the MyGallons program, providing MyGallons with card specifications and the Voyager logo.   The cards designed for MyGallons by GoGas on behalf of US Bank and Voyager prominently displayed both the "MyGallons.com" and "Voyager" logos.   As attached to a June 6, 2008 e-mail from Dorroll of GoGas to Verona, one design concept card looked as follows:



47.     It was understood by all parties at all times that MyGallons would be issuing fleet fuel cards to consumers.   However, the program did not require that US Bank extend any credit to

12

consumers whatsoever. Instead, the program envisioned consumers signing up for the MyGallons program and then prepaying for gasoline, such that MyGallons could use the cash received from these prepayments to collateralize its obligations to US Bank. US Bank was not extending any credit to consumers. MyGallons – the corporate entity – was to collateralize 100% with cash on deposit at US Bank.

48. Voyager was well aware that no credit was being extended and that the MyGallons account was being set up on a prepaid (collateralized) basis.

49. The cards were destined for consumers, and this was known to GoGas, US Bank, and Voyager at all times. *See, e.g.*, a May 30, 2008, email from Dorroll to Loveridge describing MyGallons as an "association of members of a club that are paying yearly fees for membership." Indeed, Dorroll specifically told Verona that this was known and that it did not present any problems or hurdles since the entire membership roster of MyGallons would be considered a commercial fleet unto itself by GoGas, Voyager, and US Bank, since the contract was with MyGallons itself (a commercial business), and since US Bank would not be extending credit to consumers.

50. Further, Dorroll's email asking when he and his staff could personally sign up themselves is indisputable evidence that defendants knew the cards were destined for consumers. *See* email, dated June 26, 2008, from Dorroll to Verona asking, "Can the GOGAS staff begin signing up through the website. I want to sign up ASAP." Indeed, Dorroll, as a consumer, personally signed up on the MyGallons website even before the public launch.

51. Dorroll's email to the card printer, dated on or about June 6, 2008, states that MyGallons would need over a million cards within twelve months. MyGallons' May 20, 2008

13

Application Contract stated that it had just 3 employees.   This is further proof that defendants were well aware the cards were destined for MyGallons' members, not its employees.

52.     Indeed, GoGas even referred a consumer to MyGallons on May 19, 2008, and had discussions with Verona regarding co-branded cards being sold in retail stores.

### *Card Design – Specifications, Language, and Logos are Approved by All Defendants:*

53.     The facts that GoGas was working on behalf of US Bank / Voyager, and was in communication with US Bank personnel on the set-up of the MyGallons program are indisputable. On or about May 29, 2008, Dorroll asked Amy Moon ("Moon"), also of GoGas, to send Dorroll the card specifications so that Dorroll could forward the specifications to Verona.   That day, Moon forwarded the card specification to Dorroll and mentioned that they "would also need to send [Verona] the Voyager logo."   In the e-mail, dated May 29, 2008, forwarding these card specifications to Verona, Dorroll told Verona that Dorroll "just got off a conference call with the bank on [Verona's] setup."

54.     On or about May 28, 2008, Eric Stebel ("Stebel") at Voyager sent to Moon of GoGas the Voyager logo in three formats.   Stebel copied US Bank / Voyager's Aaron Loveridge ("Loveridge") on the e-mail.   Moon forwarded the Voyager logo to Dorroll, who forwarded it to Verona on or about June 2, 2008.

55.     On or about June 9, 2008, Verona e-mailed Dorroll, among others, regarding proposed wording for the back of the MyGallons card.   Verona's proposed wording included the language: "This card will be honored at all participating Voyager locations."   Moon then forwarded the proposed wording to Loveridge and Stebel at US Bank / Voyager.   Stebel responded to Moon with minor suggestions.   US Bank / Voyager's Stebel, however, did not make

14

any changes to the language regarding Voyager. Moon forwarded Stebel's response to Dorroll, who sent it to Verona on or about June 11, 2008.

56. On or about June 12, 2008, Verona emailed GoGas to obtain permission to display on the MyGallons website the names and logos of the filling stations that accept Voyager. Dorroll responded to Verona advising that Dorroll thought it would not be a problem, but that he would check with Voyager. Thereafter, on June 17, 2008, Moon sent an email to Verona, copying Dorroll, which stated that "I verified with Voyager it is ok to put the fueling station logos on your website."

57. Throughout June of 2008, MyGallons and GoGas worked on the back-end support for the program with US Bank, including establishing protocols for allowing MyGallons to pull relevant "Level 1" files directly from US Bank's secure servers. *See, e.g.,* a June 20, 2008 e-mail from John Durba, US Bank Data Distribution Services, to Mac Liaw and Steve Verona: "I have a request to setup a new file transmission from 'USBank' to 'My Gallons LLC'. I would like to discuss the transmission protocol and call direction . . ."

58. Significantly, US Bank provided MyGallons – not Zenacon – with direct access to its secure servers. While Zenacon was provided with a $10,000 credit line, MyGallons was a distinct company with a pre-paid account. Dorroll confirmed that US Bank understood this distinction, and that MyGallons itself was reviewed separately. Loveridge also confirmed that a distinct account had been approved for MyGallons. This is further evidence that US Bank performed due diligence on MyGallons itself and of the direct relationship between Plaintiffs and US Bank and Voyager.

59.     In response to a media inquiry on June 20, 2008 – prior to the launch – Loveridge had a conversation about MyGallons with Kral and Stebel concerning the nature of the MyGallons program.   Following this call Voyager continued working on the MyGallons set-up of electronic links to transfer data and the card design.   An initial order of 10,000 cards had already been produced and shipped to US Bank in anticipation of MyGallons' launch.

### Further Negotiations and Agreements:

60.     In order to protect his rights concerning the unique MyGallons concept, Verona entered into confidential non-disclosure agreements with GoGas.   The agreements were executed by Dorroll for GoGas and Verona for Zenacon, and later for MyGallons LLC.   The Zenacon confidentiality agreement was executed on April 9, 2008.   The MyGallons confidentiality agreement was executed on June 10 and June 11, 2008, by Dorroll and Verona, respectively.   The Zenacon and MyGallons confidentiality agreements together constitute the "Confidentiality Agreements".

61.     On information and belief, the Confidentiality Agreements were also breached. US Bank Senior Vice President Regan Hutton ("Hutton"), who was quoted in an Oil Price Information Service ("OPIS") alert by reporter Edgar Ang acknowledging that Voyager provided the backbone to MyGallons, has since "retired" from US Bank and joined the Advisory Board of PriceLock, a competitor of MyGallons which is now working with US Bank and Voyager.   Also around this time, an additional competing entity, GasBank USA, radically changed its own business model to mimic MyGallons'.

62.     On or about June 27, 2008, shortly before the MyGallons launch, MyGallons and GoGas entered into a Rebate Agreement.   Service stations typically pay a small percentage fee to

16

the banking network to process transactions. For example, if a consumer were to purchase $100 of gasoline at the pump, and pay with a credit card, the service station might accept $97.50 from the bank as payment in full. Similar to the fee credit cards such as Visa and MasterCard collect from a service station, the $2.50 rebate would be profit to the bank. Here, GoGas was an authorized reseller of the Voyager network, such that GoGas received a percentage of US Bank / Voyager's rebate for acting as its agent.

63.     Under the June 27, 2008 Rebate Agreement, which was executed by Verona on behalf of MyGallons and Dorroll on behalf of GoGas, GoGas would pay MyGallons a percentage of its own monthly rebate, shortly after receiving its rebate payment from Voyager. The rebate to MyGallons increased at certain performance levels. In consideration of the Rebate Agreement, MyGallons agreed to use GoGas as its ***exclusive*** provider of network payment services for a period of two years. Moreover, the Rebate Agreement provided cancellation provisions to MyGallons, but not to GoGas. The Rebate Agreement, in relevant part, reads as follows:

> For good and valuable consideration, MyGallons as a marketer of card based membership services, and GoGas, as a provider of universal fuel card programs for fleets, agree to enter into this agreement under the conditions and terms as follows:
>
> Term: The term of this Agreement shall be for two (2) years from the effective date and shall automatically renew for subsequent one (1) year terms thereafter. MyGallons may terminate the Agreement upon any breach of this Agreement by GoGas with failure to remedy within thirty (30) days after written notice. If GoGas fails to cure within said thirty day period, MyGallons may terminate this Agreement and all amounts due to MyGallons shall be paid on the date of termination.
>
> Sole Provider: MyGallons agrees that GoGas will be the sole provider for fuel card services for land based vehicles that support the MyGallons program during the term of this agreement.
>
> Rebate: GoGas will pay MyGallons, within forty-eight (48) hours after GoGas

17

receives its rebate payment [from] Voyager each calendar month, a rebate based on the following schedule:

- For all dollars over $1,000,000 per calendar month in "Net monthly charge volume" a rebate of (.25%) will be paid.

- For all dollars over $5,000,000 per calendar month in "Net monthly charge volume" an additional (.15%) will be paid (a total of .40%).

- For all dollars over $10,000,000 per calendar month in "Net monthly charge volume" an additional (.10%) will be paid (a total of .50%).

***No Additional Contract Between US Bank / Voyager and MyGallons Was Needed:***

64.     The Rebate Agreement required MyGallons to work exclusively with GoGas for a period of two years.   While GoGas had indicated on June 23, 2008, that US Bank might want a direct or three-way contract at some point in the future, depending on the size of the program, Plaintiffs were never informed prior to executing the Rebate Agreement or prior to the Company's launch that US Bank or Voyager wanted to work directly with MyGallons at that time.

65.     US Bank never communicated to MyGallons that it was working on drafting a direct agreement.

66.     While an email from Loveridge states that Voyager's "finance group has completed its due diligence and has sent a note to the contracts group to move the process forward," Plaintiffs were never informed that another contract was being drafted or that US Bank even wanted such an additional contract.   Voyager's due diligence must not have included any effort to contact Plaintiffs.

67.     Similarly, GoGas was not aware of any dialogue between US Bank or Voyager and MyGallons regarding any proposed direct agreement.

18

68.     A June 20, 2008 email from Loveridge to Tracie Eckelberg ("Eckelberg"), Carol Barkley ("Barkley") and Kral confirms that " . . . as of yet, My Gallons has not been presented with anything . . ."

69.     Further, nothing was placed on hold while Voyager worked, unbeknownst to Plaintiffs, on a direct contract.

***The Launch of MyGallons and Defendants' Breaches of Contract:***

70.     On or about June 30, 2008, MyGallons announced the launch of the MyGallons program with a press release entitled: "MyGallons Provides Americans with a Solution to Fight Rising Gas Prices: Fixed Price Gas Savings Program Allows Consumers to Save Money by Buying Tomorrow's Gas at Today's Prices."   That press release specifically stated that the MyGallons program would be supported by the Voyager network, as agreed by all parties.

71.     The MyGallons concept was well-received by the American public and, subsequently, the MyGallons story was covered worldwide.   The MyGallons story was covered in virtually every major newspaper, magazine, and television news program, including specifically CNN, the CBS Early Show, the ABC Evening News, Time Magazine, and U.S. News and World Report.   Verona was interviewed on Good Morning America and had inquiries from several other major news outlets, including 60 Minutes, 20/20 and Oprah.

72.     As a result of the media attention, in the following days, the MyGallons website became one of the most popular websites in the world.   Significantly, "MyGallons" and "my gallons" were the number one and number two most searched terms on Google at various times on July 2nd and 3rd, 2008.

19

73.     On the morning *after the press release and launch*, Kenneth Kral ("Kral"), Senior Vice President of Business Development for U.S. Bank Voyager Fleet Systems Inc., e-mailed US Bank Voyager's Loveridge regarding the MyGallons press release.   In his e-mail, Kral asked Loveridge about when a direct contract would be presented to MyGallons.

74.     Kral's ignorance (whether deliberate or reckless) notwithstanding, *MyGallons already had a contract* with GoGas for use of Voyager – three contracts in fact – such that nothing further was required.   Whether US Bank, after seeing how tremendously successful the MyGallons program would be, desired a more direct relationship with MyGallons was irrelevant. Indeed, it is undisputed that GoGas had the requisite authority to contract with MyGallons for use of the Voyager network.

75.     Also on or around July 1, 2008, Andrew Toftey ("Toftey"), Vice President and Corporate Counsel of U.S. Bank – Corporate Payment Systems, e-mailed Verona, copying US Bank employees, including Robert Abele, President of U.S. Bank – Corporate Payment Systems and Senior Vice Presidents Kral, Hutton and Carol Barkley.   Toftey's e-mail to Verona was as follows:

Dear Steve -

It has come to our attention that MyGallons LLC ("MyGallons") has issued a press release, dated June 30, 2008, which states that MyGallons will be issuing Voyager Inc. ("Voyager") commercial fleet fuel cards to consumers; MyGallons has also made reference to Voyager and U.S. Bank National Association ND ("U.S. Bank"), Voyager's parent, and has used the Voyager trademark on the MyGallons' website (www.mygallons.com).

This communication is to inform you that there is no agreement in place between MyGallons and U.S. Bank or Voyager for such a program as described on the MyGallons website.   **MyGallons had not communicated to Voyager that any potential program between MyGallons and Voyager was or is for consumer use**.   **MyGallons also has no approval from U.S. Bank or Voyager to use**

20

**Voyager marks, or to issue a press release naming either U.S. Bank or Voyager**.

U.S. Bank therefore demands that you immediately remove all references to Voyager and U.S. Bank, including any trademarks or symbols, from MyGallons website, as well as any future MyGallons statements or press releases.   U.S. Bank further informs MyGallons that neither U.S. Bank nor Voyager will enter into any agreement with MyGallons as contemplated and described on MyGallons website.

We also understand you executed, as the president and chairman of a company called Zenacon, LLC, a GoGas Commercial Fleet Card application and agreement in April, 2008 (the "Agreement").   We further understand that Zenacon may be issuing cards to consumers, under a similar model to the program described on the MyGallons website.   This constitutes an unauthorized use of commercial fleet cards, and a breach of the terms and conditions set forth in the Commercial Fleet Card.   **We are terminating this Agreement immediately**.

We are planning on discussing this matter with you further at 3pm EDT/ 2pm CDT.

Regards,
Andrew

Andrew Toftey
VP and Corporate Counsel
U.S. Bank - Corporate Payment Systems
800 Nicollet Mall
BC-MN-H21N
Minneapolis, MN 55402
Phone: 612.303.4970
Fax: 612.303.7888

[Emphasis added].

76.     That letter came as a complete shock to Verona and MyGallons, since US Bank and Voyager had known from the outset that the program was for the benefit of consumers, US Bank / Voyager executives had directed Verona to enter into agreements with GoGas rather than the bank, and Voyager had previously verified permission to use the logos and had, in fact, mandated their use and supplied them to GoGas for use by MyGallons.

21

77.     Upon receipt of Toftey's July 1, 2008 letter, MyGallons immediately attempted to set up a conference call with the relevant people to straighten out what appeared to be a grievous error on the part of US Bank.

78.     On or around July 1, 2008, Loveridge sent out an e-mail inviting others at US Bank/Voyager, Dorroll of GoGas, Verona and MyGallons' in-house counsel Brent Levison ("Levison") to a conference call at 3:00 p.m. EDT that day.   According to the invitation, the "Meeting Purpose" was "Reach out to My Gallons Com and discuss US Bank's position regarding the prepaid fuel card program."

79.     A conference call took place on July 1, 2008 at 3:00 p.m.   On this call, for the first time, US Bank took the incredible position that it had no agreement in place with MyGallons, and it further advised MyGallons to cease and desist from publicizing the existence of the agreement or other support by US Bank for the MyGallons program.   MyGallons complied with that request.

80.     When queried as to why US Bank believed there was no longer an agreement, Robert Abele, President of U.S. Bank – Corporate Payment Systems, stated that US Bank's Charter and its arrangement with Voyager did not permit the support of a consumer based fuel program.

81.     This excuse was a pretense because it had specifically been discussed that the MyGallons membership roster was to be considered as a whole "fleet" and the program did not involve any credit to individual consumers, as the invoice for gas purchases was to be paid in full by MyGallons with cash collateral held at US Bank.

82.     In fact, Voyager is not constrained from supporting a membership-based program such as MyGallons, and Voyager has entered into agreements with America Connection, Inc., Pricelock, and Chrysler Corp. for comparable programs.

83.     The true reason for denying the existence or validity of MyGallons' contracts appears to be that US Bank and Voyager were working to develop a competing program with Pricelock – the competitor entity which engaged former US Bank Senior V.P. Regan Hutton to join its Advisory Board.   *See* July 1, 2008 email from Kral to Dorroll: "Phil – Please send me the contact information for the people at My Gallons.com   The bank wants to send them a letter requesting that the website be taken care [of] immediately as it is in conflict with another agreement that we have with Pricelock."

### US Bank / Voyager Make False and Misleading Statements to the Press:

84.     In connection with the intense media interest in the MyGallons story, US Bank fielded numerous calls from interested persons, including specifically the *Los Angeles Times* (the "*LA Times*"), the *Miami Herald* and the Better Business Bureau of Southeast Florida.   In response to inquiries, however, US Bank publicly denied any relationship with MyGallons whatsoever.

85.     Defendants compounded the problem by issuing a false and defamatory statement shortly thereafter, on Thursday July 3, 2008. As reported on the cover of the *LA Times*' business section on July 7, 2008, US Bank and Voyager claimed that "Neither U.S. Bank National Association N.D., nor Voyager Fleet Systems Inc. have a contract to do business with MyGallons.com LLC, [sic] and there are no ongoing negotiations to enter into any agreement with My Gallons."

86.     US Bank further refused to acknowledge to the *LA Times* – when queried specifically about GoGas -- that MyGallons had a contract with GoGas, the authorized reseller acting as its agent, and that US Bank had directed MyGallons to deal with GoGas, as Voyager's authorized reseller.

87.     Indeed, without regard to whether US Bank was aware of MyGallons' contract with GoGas (which it indisputably was) it was possible, and in fact was the case, that MyGallons had executed a valid contract with GoGas for use of Voyager.

88.     In fact, US Bank's media relations department was well aware of the truth when issuing their defamatory denials.   As set forth in an email dated July 3, 2008 from Terri Charest ("Charest"), US Bank Media Relations, to Richard Davis at US Bank:

> "My Gallons issued a news release stating that they are working with US Bank's Voyager card network.   The news release and their references to us were completely without our knowledge, however it triggered several media calls to which we have been responding with a very brief written statement that disassociates us from MyGallons. . . . That has satisfied the smaller TV stations and trade publications that have called, however, **today the LA Times called to get our statement and is also wondering whether MyGallons could have used our card without our knowledge through a relationship with a third-party marketer called 'GoGas Universal', which is part of the Voyager network.   Apparently it would be possible, and that is one of our concerns . . ."**

89.     Further, the false nature of the statements to the media were ***actually known*** to US Bank when they were made.   Charest sent an email to Eckelberg and Barkley on June 20, 2008 – prior to the launch – asking if either was aware of the relationship with MyGallons.   Eckelberg forwarded that email to Loveridge, Stebel, and Kral on that same day.   Loveridge's response says it all: **"*Yes, right now My Gallons is an approved Voyager fleet card account under the KE***

*__Austin GoGas channel partner program . . .__*".   Accordingly, the defamatory press release was issued intentionally.

90.     The intentional nature of the false and misleading defamatory statements is further evidenced by a prior draft of US Bank's July 3, 2008 press release.   In the prior draft, US Bank correctly identified the Company as "MyGallons LLC" and explained in a second paragraph that MyGallons was working with GoGas.   In the actual release, US Bank deliberately misstates the Company's name as "MyGallons.com LLC" (in a thinly veiled attempt to use truth as a defense to defamation, as no such entity exists) and eliminated the explanatory second paragraph which acknowledged that MyGallons did indeed have a contract to use the Voyager network.

91.     MyGallons contacted Andrew Toftey and Carol Barkley at US Bank on the morning of July 7, 2008, for the purpose of drafting a joint MyGallons / US Bank press release that would be factually accurate and correct the false impression created by US Bank's blanket denials to the press and its demand that MyGallons cease and desist referencing Voyager and US Bank.

92.     On this call, Verona and Brent Levison (in-house counsel for MyGallons) made it clear to US Bank that US Bank's failure to honor the agreements and related public statements were causing major damage to MyGallons, and that it was MyGallons' desire to resolve the situation amicably to set the record straight and curtail any further damage.   US Bank was receptive to the idea and promised it would work on drafting a statement and would speak with MyGallons again at 11:00 a.m. in order to allow enough time for a joint release to be issued that day.   However, at Ken Kral's direction, US Bank failed to deliver on its promise of a return phone call and draft statement.   Toftey and Barkley avoided Verona and Levison's repeated calls and messages much of that morning and afternoon.

93.     At 2:17 p.m. on July 7, 2008, after not hearing back from US Bank, Verona sent the

following e-mail to Toftey, copying Carol Barkley, Kenneth Kral, Phil Dorroll, and Brent Levison:

> Dear Andrew,
>
> I was very disappointed not to receive your call today at 11:00 AM EST as you had promised.   We have tried multiple times to reach you since then, but have not received a response.   Time is of the essence in addressing the outstanding issues jointly in the press, and each moment's delay causes further damages to MyGallons.   If we are unable to agree by 2:45 pm EST on language for a joint press release, MyGallons will have no choice but to issue its own statement without your input in order to clear up the confusion created by your inaccurate statements to the press and attempt to restore our reputation.
>
> I sincerely hope that we do not have to take this step unilaterally, and that all parties can proceed on a cooperative basis.   Please contact me as soon as possible at [ ] to resolve this matter.
>
> Sincerely,
> Steven Verona

94.     US Bank ultimately refused to participate on the conference call, and, by the end of

the day, stated that it was not going to issue a joint statement even knowing the damage it had

caused and was causing MyGallons.   MyGallons and GoGas were forced to issue a statement

without US Bank's involvement.

95.     The denial by US Bank to the *LA Times* was merely one of many false statements

denying the contractual relationship and the fact of negotiations and agreements with MyGallons.

For example, US Bank further denied to the South Florida Better Business Bureau and the *Miami

Herald*, among other media outlets, that it had a relationship with MyGallons or Verona, instead

falsely claiming that it had discussions with MyGallons, but had declined the opportunity.

96.     US Bank's materially false and misleading statements suggested that MyGallons'

June 30, 2008 press release was a lie and that MyGallons and Verona were somehow dishonest in

announcing that Voyager was going to be MyGallons' payment processing network, despite the fact that such an agreement was contemplated and agreed by all parties.

97. As discussed in the July 7, 2008 LA Times article, US Bank's denial of a relationship with MyGallons prompted the Better Business Bureau of Southeast Florida to assign an "F" rating to My Gallons. "It's just like in school, so 'F' is obviously bad," said Alison Preszler, a spokeswoman for the bureau. "We're not calling this a scam. . . . We just have serious concerns."

98. Similarly, as reported in the Consumerist on July 3, 2008:

The BBB says its concerned about gasoline-hedging company MyGallons.com and its ability to live up to the advertising claims on its website. A spokesperson for the BBB tells us that the biggest "red flag" they've discovered is that MyGallons claimed (in their press release) to have partnered with US Bank. However, **when the BBB called US Bank to confirm this, they found out that it wasn't true. US Bank had discussed the opportunity with MyGallons, but had declined**.

[Emphasis added].

99. The Better Business Bureau of Southeast Florida further told reporters, based on US Bank's denials, that MyGallons was selling something that did not exist. In addition, the Bureau's "F" rating was widely disseminated. The Better Business Bureau of Southeast Florida paid to put its "F" rating on a newswire service, and further notified all other Better Business Bureaus about MyGallons' purported lack of a relationship with US Bank and Voyager.

100. US Bank was aware of the assignment of an "F" rating by the Better Business Bureau, and was aware of its wide dissemination, yet did nothing to correct the false information despite having been given an opportunity by the BBB to do so prior to its release.

101.    Removal of the "F" rating, following discussions with Verona and the production

of contracts, did little to mitigate damages since it was not extensively covered, nor was it issued

by the Better Business Bureau on a newswire service.

102.    However, despite the July 3rd denials by US Bank and Voyager, the Oil Price

Information Service (OPIS) had issued a contradictory article on July 1, 2008 entitled "UPDATE:

MYGALLONS TO HEDGE ALL GASOLINE RETAIL SALES ON NYMEX, OTC SWAP

MARKETS."   Significantly, the article stated that **"Regan Hutton, senior vice-president of U.S.**

**Bank Voyager Fleet Systems Inc., confirmed with OPIS**" the **"MyGallons [] alliance with the**

**U.S. Bank's Voyager fleet network.**"   The OPIS alert directly quotes Hutton, declaring:

**"MyGallons will have access to our network.   We provide the backbone to their system."**

[Emphasis added].

103.    Aware of, and intimately involved with, the details of the dealings between

MyGallons, GoGas and Voyager, Dorroll provided Verona with a statement on behalf of GoGas

and authorized Verona to use the statement publicly.   Dorroll's GoGas statement was as follows:

> **GoGas had agreements in place with Zenacon LLC and MyGallons LLC in order**
> **to provide support for the MyGallons program through the use of the Voyager**
> **payment processing network**. We believe the MyGallons program is an innovative
> business and it could offer Americans relief at the pump. We were very excited that
> Steven Verona and his staff have developed a program that can help the American
> public and to give them a tool to manage their personal budget given the constant
> increase in prices at the pump.   We wish MyGallons and their members all the best
> as they move forward with another payment network. We feel certain there are
> other networks able to support their needs.
>
> "We believe Steven Verona to be a man of integrity and honesty based on our
> dealings with him.   In fact we truly enjoyed working with Steven and his staff."
> **We are sorry that MyGallons and their launch have been harmed by the release**
> **of incorrect information and confusing statements resulting in negative press.**
> GOGAS apologizes for any actions that may have resulted in any release of this

incorrect information.   MyGallons should be applauded for their ability to develop a program that is so positive for American drivers."

Phil Dorroll
Fleet Director, GOGAS Universal

[Emphasis added].   Unfortunately, however, the GoGas statement was not widely disseminated and the damage had been done.

### Fallout and Damages

104.     As a result of the refusal to honor MyGallons' contracts and agreements and the false and defamatory statements by US Bank and Voyager, MyGallons suffered tremendous harm – both financial and to the company's reputation.   Among many other difficulties, MyGallons has been forced to cope with:

·     Extensive and burdensome subpoenas and/or inquiries from the Attorneys General of several states;

·     Severe damage to both Verona's and the company's reputations;

·     Enormous PR costs and expenses of attempting to correct false and misleading information in the press;

·     Issuance of refunds to approximately 6,000 MyGallons' members, plus 2% merchant services fees on each transaction and each refund;

·     Waiver of approximately 6,000 membership fees for those refunded members;

·     Hundreds of customer service complaints;

·     Turning away at least 25,000 additional prospective members who, even after all the negative publicity, still wanted to sign up for the MyGallons program;

29

- Hundreds of dishonest and deceitful anonymous internet articles and commentary suggesting Verona and MyGallons were frauds and that the program was a "scam";

- An "F" rating by the South Florida Better Business Bureau and dissemination of that rating to every Better Business Bureau across the country;

- Threatening emails to Verona and MyGallons suggesting they were taking advantage of the American public in a time of crisis and that they would "burn in hell";

- Letters from businesses and gasoline companies demanding the removal of their marks from the MyGallons website;

- An inability to respond to overtures from potential strategic partners including Ford Lincoln Mercury;

- Publication of MyGallons' unique and innovative business model to potential competitors such that it now has lost its "first mover advantage"; and, most significantly,

- Enormous difficulty in obtaining an agreement with another processing network, despite intense efforts to do so, due to the negative publicity and "scam" allegations.

105. Based on a number of factors, including the approximately 6,000 paying subscribers on the first few days, the popularity on the Google search engine, the substantial media attention and opportunities, and inquiries from around the world for partnership opportunities, millions of additional consumers would have become members of MyGallons.

30

106.     Plaintiffs' experts have opined that MyGallons could have reasonably been expected to have over 3.3 million paying members within 3 years, and that a conservative expert estimate of lost profits over just three years would equal approximately $200 million.   Dorroll's email of June 6, 2008, in which he indicates a million cards would be needed within twelve months is entirely consistent with Plaintiffs' expert's analysis regarding the number of paying members. MyGallons was poised to become a substantially large and extremely profitable company absent defendants' wrongdoing alleged herein.

107.     Furthermore, the delay to the MyGallons program caused by defendants' wrongful conduct has forced a dilution to Verona's ownership interest in MyGallons, and has forced Verona to accelerate the vesting of equity in MyGallons to others.

108.     Verona had self-funded the early stages of MyGallons.   The business model contemplated that upon launch, the company would become financially viable from membership and processing fees.   Instead, because US Bank interfered with the successful launch of the MyGallons program, the launch was associated with an indefinite delay and negative, rather than positive, media scrutiny.

109.     Further, assuming MyGallons is able to eventually contract with a new payment network, it will be forced to incur duplicate costs for all the work already done with GoGas, Voyager and US Bank.   Potential replacement payment networks have indicated MyGallons would need to post substantial deposits in light of the newly perceived risk, due to the bad publicity.

110.     Verona and MyGallons have attempted to mitigate damages.   However, efforts to rectify the harm caused by defendants required the time and labor of several additional parties.

31

Verona and MyGallons had no choice but to offer or accelerate equity interests in MyGallons to these persons as payment for their services, having been disabled by defendants from funding these efforts with membership fees. As a result, Verona's ownership interest in MyGallons has been materially diluted since defendants' wrongful termination and related defamatory remarks.

111. Plaintiffs continuing efforts to mitigate damages by contracting with a comparable alternative payment network have been fruitless, predominantly because of the perceived "reputational risk" of working with MyGallons following the defamatory statements and related negative publicity.

**Count I:**

**<u>Breach of Contract</u>**
**<u>(against all Defendants)</u>**

112. The allegations of paragraphs 1-111 are incorporated herein by reference.

113. MyGallons fully performed all of its obligations under the May 20, 2008 application contract, the Confidentiality Agreements, and the June 27, 2008 Rebate Agreement (collectively the "Contracts"), except those obligations it was prevented from performing by the conduct of defendants.

114. Defendant GoGas had actual and apparent authority, as an agent of US Bank and as an authorized reseller of the Voyager network, to contract with MyGallons for access to US Bank's Voyager network.

115. Defendants breached their duties under the express and implied terms of the Contracts by, among other things:

 a. failing to provide required access to the Voyager payment processing network and related recordkeeping services;

32

b.      failing to provide the required assistance in the preparation, printing and distribution of fuel cards and promotional and marketing materials;

c.      failing to put forth their best efforts in developing the business of the venture and marketing its services;

d.      unreasonably crippling the business by denying access to Voyager and forcing MyGallons to turn away actual and prospective customers; and

e.      unilaterally terminating the Contracts.

116.    As a direct result of defendants' unilateral termination and other breaches of the Contracts, Plaintiffs have suffered damages in an amount far in excess of seventy five thousand dollars exclusive of costs and interest, which sum will be established more specifically at the time of trial.

## Count II:

### Promissory Estoppel
### (against all Defendants)

117.    The allegations of Paragraphs 1-111 are incorporated herein by reference. This Count is pled in the alternative to Count I.

118.    At all times material hereto, plaintiffs reasonably relied upon the repeated assurances given by GoGas, US Bank, and Voyager as set forth above.

119.    As a result of these assurances by defendants, and other conduct on their part to lead Plaintiffs to further reasonably rely upon them, Plaintiffs acted to their substantial detriment in forgoing opportunities with other payment networks such as Wright Express, as set forth above.

120.    The detrimental reliance of Plaintiffs creates the consideration necessary for the formation of a contract, which was breached by Defendants.

121.    As a result of the conduct of Defendants, Plaintiffs have suffered damages far in excess of seventy five thousand dollars exclusive of costs and interest, which sum will be established more specifically at the time of trial.

### Count III:

### Tortious Interference with Existing Contractual Relations
### (against US Bank and Voyager)

122.    The allegations of paragraphs 1-111 are incorporated herein by reference.

123.    As reflected in the facts above, MyGallons entered into a contractual relationship with GoGas on May 20, 2008 for the purpose of enabling MyGallons' access to the Voyager payment processing network, so MyGallons' members would be able to use their MyGallons cards as payment at the pump.   MyGallons further entered into contracts with GoGas on June 10/11, 2008 and June 27, 2008, for the purposes of confidentiality and rebates, respectively.

124.    Pursuant to the Contracts, MyGallons and GoGas designed cards, developed extensive marketing techniques, developed back-end administrative support for the MyGallons program, and successfully tested a pilot program.

125.    Plaintiffs had a reasonable expectation and probability of future economic benefits through this relationship.

126.    Defendants US Bank and Voyager intentionally disrupted and injured MyGallons' contractual relationship with GoGas, to the detriment of Plaintiffs without privilege or justification, including but not limited to:

a.    refusing to cooperate with MyGallons' agents and/or representatives;

b.    disabling GoGas from performing its contractual obligation to provide access to Voyager as an authorized reseller; and

34

c.      demanding that GoGas terminate the Contracts, and causing GoGas to do so.

127.     As a direct result of these defendants' conduct, Plaintiffs were damaged in a sum far in excess of seventy five thousand dollars, exclusive of costs and interest, which sum will be established more specifically at the time of trial.

128.     To the extent that these defendants acted intentionally, they also acted maliciously, fraudulently and oppressively, for which Plaintiffs are entitled to punitive damages.

## Count IV:

### Tortious Interference with Existing Contractual Relations
### (against all Defendants)

129.     The allegations of paragraphs 1-111 are incorporated herein by reference.

130.     As reflected in the facts above, MyGallons entered into contractual relationships with approximately 6,000 consumers during the period from June 30, 2008 until defendants' breach, for the purpose of implementing the MyGallons concept.   Consumers agreed to pay annual membership dues to MyGallons of $29.95 to $39.95, in consideration for their membership and so as to take advantage of the program's benefits.

131.     Plaintiffs had a reasonable expectation and probability of future economic benefits through these relationships.

132.     Defendants GoGas, US Bank and Voyager intentionally disrupted and injured MyGallons' contractual relationships with its customers, to the detriment of Plaintiffs without privilege or justification, including but not limited to:

a.   refusing to cooperate with MyGallons' agents and/or representatives;

b.   denying access to the payment processing network, Voyager; and

c. demanding that MyGallons remove logos and reference to Voyager and US Bank from its website and promotional materials.

133. As a direct result of these defendants' conduct, Plaintiffs were forced to issue refunds to approximately 6,000 customers, and were damaged in a sum far in excess of seventy five thousand dollars, exclusive of costs and interest, which sum will be established more specifically at the time of trial.

134. To the extent that these defendants acted intentionally, they also acted maliciously, fraudulently and oppressively, for which Plaintiffs are entitled to punitive damages.

**Count V:**

**Tortious Interference with Prospective Contractual Relations
(against all Defendants)**

135. The allegations of paragraphs 1-111 are incorporated herein by reference.

136. As reflected in the facts above, following its launch, MyGallons' website was one of the most popular sites in the world, and there was enormous interest in MyGallons from the public. Approximately 6,000 consumers entered into contracts with MyGallons in the first few days of the program, agreeing to pay annual membership dues to MyGallons of $29.95 to $39.95, in consideration for their membership and so as to take advantage of the program's benefits.

137. Following defendants' breach of the Contracts, MyGallons was forced to stop signing up additional members. Nevertheless, despite the program having been wrongly shut down, at least 25,000 additional prospective customers expressly indicated their desire to contract with MyGallons, submitting their names and information and requesting to be notified when they can become MyGallons members. Further, Plaintiffs believe, and Plaintiffs' expert has opined,

36

that millions of additional consumers would have entered into membership contracts with MyGallons absent defendants' wrongful conduct as described herein.

138.    Plaintiffs had a reasonable expectation and probability of future economic benefits through these relationships.

139.    Defendants GoGas, US Bank and Voyager intentionally disrupted and injured MyGallons' prospective contractual relationships with these consumers, to the detriment of Plaintiffs without privilege or justification, including but not limited to:

- refusing to cooperate with MyGallons' agents and/or representatives;

- denying access to the payment processing network, Voyager; and

- demanding that MyGallons remove logos and reference to Voyager and US Bank from its website and promotional materials.

140.    As a direct result of these defendants' conduct, Plaintiffs were forced to forego contracting with at least 25,000 additional consumers, and were damaged in a sum far in excess of seventy five thousand dollars, exclusive of costs and interest, which sum will be established more specifically at the time of trial.

141.    To the extent that these defendants acted intentionally, they also acted maliciously, fraudulently and oppressively, for which Plaintiffs are entitled to punitive damages.

**Count VI:**

**Defamation**
**(against US Bank and Voyager)**

142.    The allegations of paragraphs 1-111 are incorporated herein by reference.

143.    On July 3, 2008, US Bank and Voyager issued a statement in which they claimed that "Neither U.S. Bank National Association N.D., nor Voyager Fleet Systems Inc. have a

37

contract to do business with MyGallons.com LLC, [sic] and there are no ongoing negotiations to enter into any agreement with My Gallons."   US Bank further refused to acknowledge that MyGallons had a contract with GoGas, the authorized reseller, which provided access to the Voyager network.

144.    US Bank and Voyager provided further false statements to the Better Business Bureau of Southeast Florida, the *LA Times*, and the *Miami Herald,* among others, denying the facts of both a relationship and a contract with MyGallons and/or Verona.

145.    The statements did tremendous harm to the reputations of both Verona and MyGallons, in that they caused their reputations to be lowered in the estimation of the community and deterred third persons from associating with or dealing with Plaintiffs, as evidenced by, *e.g.,* the South Florida Better Business Bureau assigning an "F" rating to MyGallons, the investigations of multiple Attorneys General, and the difficulty in contracting with previously interested alternative payment networks such as Wright Express or contracting with a host of other potential partners, including various credit card processors, banks, and payment networks.

146.     The unprivileged statements were made to the press and published to the world at large via the Internet.

147.    The statements were materially false and misleading and suggested that Plaintiffs were dishonest or lacking in integrity.

148.    US Bank and Voyager knew at all times that MyGallons had a contract with GoGas, had been working with GoGas, and that GoGas was authorized to make Voyager available to Plaintiffs' program.   Thus, the July 3, 2008 statement quoted in the *LA Times* and related statements responding to other press coverage and the Better Business Bureau were made

38

negligently, if not recklessly or intentionally.

149.    As a direct result of defendants' conduct, Plaintiffs were damaged in a sum far in excess of seventy five thousand dollars exclusive of costs and interest, which sum will be established more specifically at the time of trial.

### Count VII:

### Disparagement / Injurious Falsehood
### (against US Bank and Voyager)

150.    The allegations of paragraphs 1-111 are incorporated herein by reference.

151.    The July 3, 2008 statement to the *LA Times* and related statements responding to other media inquiries and the Better Business Bureau were materially false and misleading.

152.    Defendants caused the statements to be published intending to cause pecuniary loss or should reasonably have recognized that publication would result in pecuniary loss.

153.    Pecuniary loss did in fact result, as evidenced by the fact that MyGallons was forced to stop signing up members and to issue refunds.

154.    Defendants acted with knowledge that the July 3, 2008 statement and related statements were false or acted in reckless disregard of their truth or falsity.

155.    As a direct result of defendants' conduct, Plaintiffs were damaged in a sum far in excess of seventy five thousand dollars exclusive of costs and interest, which sum will be established more specifically at the time of trial.

### Count VIII:

### Publicity Placing Persons In A False Light
### (against US Bank and Voyager)

156.    The allegations of paragraphs 1-111 are incorporated herein by reference.

39

157.    The July 3, 2008 statement in the *LA Times* and related statements responding to other media inquiries and the Better Business Bureau were materially false and misleading.

158.    The statements gave publicity concerning MyGallons and Verona which placed them in a false light to the public.

159.    US Bank and/or Voyager's denials of a contract or other relationship with MyGallons and/or Verona portrayed Plaintiffs as dishonest or lacking in integrity for having issued their own statement that Voyager would be the processing network for MyGallons.

160.    The public portrayal of Plaintiffs as dishonest would be highly offensive to a reasonable person.

161.    US Bank and Voyager had knowledge, or acted in reckless disregard, as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed.

162.    As a direct result of defendants' conduct, Plaintiffs were damaged in a sum far in excess of seventy five thousand dollars exclusive of costs and interest, which sum will be established more specifically at the time of trial.

**Count IX**

**Violation of the Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. Ann. § 75-1.1) (Against All Defendants)**

163.    The allegations of paragraphs 1-111 are incorporated herein by reference.

164.    The actions of the Defendants of (i) intentionally misrepresenting the authority of GoGas, (ii) intentionally misrepresenting that Plaintiffs would have access to the Voyager network, (iii) intentionally misrepresenting to the media and the Better Business Bureau that Plaintiffs had no contracts, (iv) repeatedly indicating that everything was in place for MyGallons' launch, (v) demanding that previously agreed upon language be removed from MyGallons'

40

website in favor of Pricelock, and (vi) falsely promising to participate in a corrective joint press release, among other actions, constitute unfair or deceptive acts or practices, or unfair methods of competition, in or affecting commerce.

165.    Defendants have engaged in a continuing course of conduct of unfair and deceptive business practices as set forth above.

166.    Defendants have committed common law fraud and fraud in the inducement, as set forth above.

167.    Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' violation of N.C. Gen. Stat. Ann. § 75-1.1, and continue to suffer financial loss in an amount far in excess of ten thousand dollars ($10,000.00).

168.    To the extent that these defendants acted intentionally, they also acted maliciously, fraudulently and oppressively, for which Plaintiffs are entitled to treble damages and attorneys' fees, pursuant to NCGS Sec. 75-16.

## PRAYER FOR RELIEF ON ALL COUNTS

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1.    An award of damages in excess of the jurisdictional amount to be established according to proof at trial;

2.    An award of punitive and exemplary damages in an amount commensurate with defendants' conduct and assets;

3.    Treble damages and attorneys' fees pursuant to NCGS Sec. 75-16;

4.    For costs of suit herein;

5.    Interest as provided by law; and

6.      For such other and further relief as the Court deems just and proper.


DATED:   December 4, 2009                     Respectfully submitted,
                                              s/      Gary W. Jackson
                                              **JACKSON & MCGEE**
                                              Gary W. Jackson, N.C. Bar No. 13976
                                              Sam McGee, N.C. Bar No. 25343
                                              521 East Boulevard
                                              Charlotte, NC 28203
                                              (704) 377-6680
                                              (704) 377-6690 (fax)

                                              **BERGER & MONTAGUE, P.C.**
                                              Sherrie R. Savett
                                              Douglas M. Risen
                                              Russell D. Paul
                                              Jacob M. Polakoff
                                              1622 Locust Street
                                              Philadelphia, PA   19103
                                              Tel:     215-875-3000
                                              Fax:     215-875-4604

                                              **Attorneys for Plaintiffs**


malta504452-001