UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:09-CV-0057BR

| | |
|---|---|
| STEVEN VERONA, MYGALLONS LLC, and ZENACON LLC, | |
| Plaintiffs, | **DEFENDANT U.S. BANCORP AND U.S. BANK VOYAGER FLEET SYSTEMS INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT PURSUANT TO** |
| vs. | |
| U.S. BANCORP, U.S. BANK VOYAGER FLEET SYSTEMS INC., and K.E. AUSTIN CORP., | **FED. R. CIV. P. 56; Local Civil Rules 7.1, 7.2, E.D.N.C.** |
| Defendants. | |

Defendants U.S. Bancorp and U.S. Bank Voyager Fleet Systems, Inc. (collectively "USB") submit this Memorandum in support of their motion for summary judgment as to all claims against them.

## NATURE OF THE CASE

In the summer of 2008 when gas prices were at their highest in the U.S., Plaintiff Steven Verona believed he could make millions by devising a scheme to persuade consumers across the country into signing up for a "membership" to lock in fuel prices. Verona's idea, known as "MyGallons," was advertised as a way for consumers to "pre-pay" for gasoline and protect themselves from future rises in gas prices. A membership included not only an initial annual fee, but numerous other fees as well. At least a portion of the consumer "pre-payment" was to be used for operating expenses of the company, and if gas prices went down rather than up (which is what actually happened over the ensuing year), it is undisputed that consumers would lose money. Verona's scheme would also likely <u>violate U.S. laws governing commodities trading</u> and its alleged profitability was wholly dependent on a "no-cost" hedging scheme which Verona has refused to produce in discovery. [1] In fact, he refused to explain his hedging scheme to his experts who must provide opinions on his alleged damages in this case.

---

[1] On February 5, 2010, Magistrate Judge David W. Daniel granted USB's Motion to Compel, ordering Plaintiffs to disclose their hedging plan on or before February 19, 2010. *See* Doc. No. 81.

In March 2008 Verona opened a credit account under the name "Zenacon LLC" through USB's subsidiary Voyager Fleet Systems, Inc. Voyager provides fuel cards to commercial and government fleets (but does not provide credit to consumers). Verona applied on-line for a small *commercial* vehicle fleet allegedly operated by Zenacon, LLC. The "drivers" identified in the fleet were actually friends and family of Verona, not employees. The application itself was filled with false data supplied by Verona regarding Zenacon's operations, sales and history. Although the Zenacon application does not say so, and although he never told anyone at USB of his plan, Verona apparently intended "Zenacon" to be the spring board to "MyGallons" where he planned to obtain fuel cards that could be provided to <u>consumers</u> (not the commercial Zenacon fleet comprised of "employees" as represented on the application).

USB executives did not learn about the true nature of the program until the end of June, 2008, when Verona issued a press release and media began reporting on his claim that USB supported the program, even though there was no such agreement in place. After USB advised certain members of the media that no contract was in place, Verona attempted to locate another bank with which to work on his scheme. After spending a few weeks unsuccessfully attempting to find such a bank, he commenced this lawsuit, alleging that USB and Voyager were not only obligated through some imagined contract to participate in the scheme, but that they defamed Plaintiffs and interfered with contracts simply by succinctly explaining to the media that there was no contract in place (which statement did not include any criticism regarding the nature of the MyGallons program).

Plaintiffs' claims fail as a matter of law, because no contract existed, USB made no false promises to Plaintiffs, and USB's statements to the media were true and did not proximately cause any harm to Plaintiffs. In addition, Plaintiffs' damage claims are speculative, based on inadmissible expert testimony, and are barred by the terms of the one agreement that did exist with USB. Plaintiffs' flawed damages claim provides an independent basis on which to dismiss this case and is addressed separately in Defendants' Joint Motion to Exclude the Proposed Expert Testimony of Anca Christina Micu and Paul Seitz.

**STATEMENT OF FACTS**

<u>***DEFENDANTS***</u>

Voyager is a Houston, Texas based company which provides fleet cards and a payment network to commercial and governmental vehicle fleets for gas purchases. (Ex. 8, p. 23-27).[2]  Voyager assists commercial businesses and government entities in providing, controlling and tracking fuel purchases and maintenance for their respective fleet of vehicles.

In 1999 Voyager was acquired by USB. (*Id.*, p. 18).  Voyager typically contracts directly with large commercial fleets and government units, and serves smaller commercial fleets through 19 different "channel partners." (*Id.*, p. 32-33). These channel partners are small businesses dispersed throughout the country, who market the Voyager fuel card to small commercial fleets. (*Id.*)  Occasionally, a channel partner will do business with "submarketers", which have relationships with even smaller commercial fleets.  In that situation, the channel partner would assist the submarketer with marketing, billing and whatever other functions they had negotiated. (Ex. 8, p. 108-09).  A submarketing agreement between Voyager, the channel partner and the submarketer is created.  (*Id.*)

One of Voyager's 19 channel partners is K.E. Austin, Inc. d/b/a GoGas ("K.E. Austin"). (Ex. 8, p. 22-23; Ex. 85). K.E. Austin is a company based in Wilmington, NC, which owns gas stations throughout Eastern North Carolina, and which also markets the Voyager fleet fuel card. (Ex. 5, p. 19-20).  The Voyager Fleet Card Program Agreement between K.E. Austin and Voyager explains that Voyager "issues charge cards and has established a transaction processing, reporting and payment system with respect to purchases of motor fuels and other products and services by ***commercial and government organization fleet vehicle operations***." (Ex. 85) (emphasis added).  The agreement permits Voyager to establish one or more fleet accounts for K.E. Austin's "Conversion Customers," defined as the "Existing Customers" that terminate their "existing Austin private label, co-branded ***or other commercial or government fleet card agreements***" and convert to Voyager's Fleet Card Program.  (*Id.* at 3(D) (emphasis added)).

---

[2] All citations refer to the Exhibits listed in Defendants' Joint Index of Exhibits In Support of Motions for Summary Judgment, attached as Exhibit A to the Affidavit of Christopher R. Morris.

_**PLAINTIFFS**_

Steven Verona is a 41 year old, self-styled "Renaissance Man", who has a history of short-term employment, marketing and selling various types of products (mostly in the computer and apparel industries), and attempting to start small businesses and promote various personal inventions, with at best marginal success. (Ex. 1, p. 34-44).[3]  Although he claims to have made over 80 inventions, few have generated any revenue apart from a light used for the inside of a purse (_Id._, p. 38-43).  It appears his most successful venture to date was "Verona Racing" which he temporarily dropped out of college to pursue, and which was sold in 1992 or 1993 for an insubstantial amount.  (_Id._, p. 16).  His only experience in fuel hedging is trading commodities on his own account (_Id._, p. 43-45), and in conjunction with a friend, which resulted in net losses. (Ex. 2, p. 40-41).

_**THE HOOK:  PURCHASE GAS TOMORROW AT TODAY'S PRICES**_

Verona claims to have first thought up the idea to devise a business to help consumers hedge gas prices "almost five years ago."  (Ex. 1, p. 73-75).  His friends and acquaintances were skeptical that the program could succeed. Robert Racusin, a friend and advisor to MyGallons, wrote to Verona on March 25, 2008 raising a number of "issues" including interstate use, how to calculate the discount when using the cards in different areas, and the intended scope of the program.  (Ex. 55).  In an April 1, 2008 email Racusin says, "If I save an average of 10 cents each time I fill up, then I save 85bux a year, net 60bux after fees.  That's assuming a lot.  It assumes prices remain hi and I use my card every time I fill up.  Also assumes I bot [sic] all my gas in state.  That's a lot of assumptions to save 60 bux."  (Ex. 56).

MyGallons' premise was to permit people to buy fuel at the retail price on any given day and then "save" those gallons to be redeemed when gas prices went higher.  The daily price was set based on the _average_ price in a given zip code, thus there could always be some gas stations higher and some lower, so whether a consumer actually saved money, and how much depended on where they purchased their fuel

---

[3] Verona filed personal bankruptcy in 1999. (Bankr. S.D. Ohio (Columbus) Bankruptcy Petition #: 2:99-bk-58738; Ex. 1, p. 56).

and when. (Ex. 35). Even Verona's test group was concerned about how the fees and prices actually benefited the consumer over time:

> Having driven past my corner gas station today and seeing $4.11, if we weren't your friends and part of this, I doubt I'd want to pay $4.17 to buy more fuel at your today's price. Jon says for him, this is the biggest concern he's had for the business since it's started and frankly, he's concerned about the potential for consumer fraud lawsuits.

(*Id*.)

In order to take advantage of the MyGallons program, an individual would sign up by paying either a $29.95 or $39.95 membership fee. (Ex. 1, p. 204). From the time of sign-up there was a delay in getting the card, and then upon receipt of the card there would be an additional 72-hour delay in use of the card allegedly to permit the financial transactions to clear. (Ex. 1. 205-06). To "reload" their MyGallons card, members would be charged a flat fee of $1.95 every time they added gallons to the account. (*Id*., p 204-05). A member signing up for the $29.95 membership would be automatically "reloaded" with a minimum of 25 additional gallons when the account dropped to 15 gallons, with the charges going directly to the member's credit card. (*Id*., p. 204, 213-14). With the $39.95 membership if a member went "over" the gallons available on their card, there was an overdraft fee and they were required to pay the actual price of the gas purchased, so they realized no savings.[4] (*Id*., 212-13).

Verona admitted that MyGallons would always be paying more for gas than what their members had paid (given the assumption of ever-rising gas prices on which the marketing plan was based), but claims they would make up that difference through a no-cost hedging plan that if successful would take a neutral position on fuel such that his consumer fuel business would have no risk and would generate large profits on the membership fees.[5] (Ex. 1, p. 221-26, 230).

---

[4] If the members wanted to purchase a higher grade fuel or fuel that was above the average price of gas in their zip code at any given time, a mark-up was charged for any price difference exceeding ten cents and additional gallons would be deducted from their account to compensate for the higher price. (Ex. 1, p. 206-08, 230-31). If a member went to a gas station that was below their average zip code price, where the difference in cost was more than ten cents, the account would be credited with additional gallons to compensate for the cost savings. (*Id*., p. 206-08).

[5] However, he refused to provide a copy of the hedging plan, claiming that it is proprietary (*Id*., p. 222, 229), although Magistrate Judge Daniels has since ordered him to produce the plan. (*See* Doc. No. 81).

Notwithstanding his lack of experience, skepticism of friends, and lack of any meaningful capital investments, Verona pressed forward with his idea, and apparently began looking for a payment network in early 2008. Verona claims that he spoke to three executives at Voyager, Regan Hutton, Denis Maxson and Ken Kral, regarding his business idea and that he was ultimately referred to Phil Dorroll at K.E. Austin. (Am. Comp., ¶ 30; Ex. 1, p. 85-86). The Voyager executives deny having talked to him until long after March 2008. (Ex. 11, p. 24-25; Ex. 8, p. 49). In his deposition, Verona waffled regarding his contacts with these persons, and couldn't remember their names correctly referring to "David Maxson" and "Herb Kral," rather than Denis Maxson and Ken Kral. (Ex. 1, pp. 134, 324, 328-30, 335-47). Plaintiffs have not identified documentary evidence (such as phone records or emails) that Verona communicated with Voyager executives.

Verona claims that he then called Phil Dorroll of K.E. Austin in March, 2008. (Am. Compl, ¶ 30, 33; Ex. 1, p. 95). Like the Voyager executives, Dorroll denies receiving any phone calls from Verona in the relevant time period. (Ex. 5, p. 55; Affid. of Phil Dorroll in Support of K.E. Austin's Motion for Summary Judgment, ¶¶ 11, 54). Instead, the only record evidence (apart from Verona's testimony) reveals that the first contact between Voyager, K.E. Austin and Verona or Zenacon was the application for a Voyager commercial fleet account for Zenacon through the K.E. Austin website, on March 17, 2008. (*Id*.; Affid. of Kat Garzione in Support of K.E. Austin's Motion for Summary Judgment, ¶ 4; Exs. 20, 21).

The Zenacon application includes many terms and conditions including the following:

> 2. **SCOPE OF FLEET CARD PROGRAM**. Upon approval of Application of Business, Bank will issue Cards and establish related Accounts for Business, and if permitted by Bank, any affiliated entity as Business may designate in writing to Bank while this Agreement is in effect . . . The Fleet Card Program includes transaction processing, reporting and payment system with respect to purchases of motor fuels and other products and services by commercial and government organization fleet vehicle operations…
>
> ****
>
> 13. **LIMITATION OF LIABILITY.** IN NO EVENT SHALL BUSINESS PARTICIPANT(S), BANK, VOYAGER, OR ANY AFFILIATE OF BANK BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, SPECIAL, INDIRECT, OR PUNITIVE DAMAGES OF ANY NATURE.

---

Thus, there is presently no basis in the record to determine what MyGallons' hedging plan even was, much less that it would be effective and affordable.

(Ex. 23).

The Zenacon application signed by Verona is replete with false representations regarding the nature of the business, revenues, employees, and the drivers that would be using the Zenacon fleet cards. (Ex. 22). In reality, Zenacon has never had any employees, has no revenues, and was not going to be utilizing the cards for any drivers. (Ex. 1, p. 56, 349-57). Instead, the persons listed as drivers on the application were "friends and family" of Verona. (*Id.*, p. 96, 106). Given the tiny size of the commercial fleet and credit limit, the Zenacon application passed easily through Voyager's credit check, and Voyager supplied cards to Zenacon for use in its so-called "commercial fleet." (Ex. 9, pp. 40-45). The credit limit on the account was originally set at $4,000. (Ex. 24). Verona claims that he ordered cards for Zenacon simply to test if Voyager cards would work at the gas station without entering certain information such as odometer readings and this verification was necessary to the development of the MyGallons project. (Ex. 1, p. 106-08).

Verona alleges that he submitted a second on-line application under the name MyGallons LLC in May 2008. (Ex. 1, p. 173-74; Ex. 47). There is no evidence, however, that the application was ever received by K.E. Austin. (Garzione Aff., ¶27; Dorroll Aff., ¶17; Ex. 9, p. 67). There is no evidence of any kind that the application was received or approved by Voyager or USB, and in fact, K.E. Austin states that it never forwarded any application from MyGallons LLC to Voyager or USB. (*Id.*)

At one point, Dorroll told a mid-level Voyager employee named Aaron Loveridge that there was a plan to have MyGallons develop a program that would involve many members. (Ex. 9, p. 95-96). In mid-May, Dorroll asked Loveridge to "establish a new Level" and "call it . . . 'GoGas MyGallons.'", and to "move one account into this Level One.[6] The account is Zenacon LLC." (Ex. 66, USB 0077). Verona proceeded to work with K.E. Austin personnel to set up a Level 1 account under the MyGallons name.

_____

[6] The various "levels" refer to the type of information that is transmitted between the parties. The Level 1 account gets set up to report the Level 3 data and in some instances a customer will have many different Level 1 accounts to track data and performance of different brands. (Ex. 8, p. 82-84). "Level 3" refers to the more specific data transmision such as the station where gas is purchased, price per gallon, and number of gallons. (Ex. 14, p. 16-17).

(Ex. 9, p. 98-101) Loveridge testified that in his mind setting up a new Level 1 indicated a relationship that would be separate from the channel partner. (Ex. 9, p. 98-99).

Loveridge mistakenly believed that "many members" and establishment of the new Level 1 account meant MyGallons would have commercial fleet members, and explained to Dorroll that a special contract would need to be created for that purpose. (Ex. 9, pp. 70, 95-96, 141-43; Exs. 67, 68, 87). Dorroll told Verona and his attorney that a contract would have to be negotiated. (Ex. 5, p. 168).

Verona alleges that in June 2008 he spoke with Dorroll and explained his plans for a program that would provide fuel cards to consumers. (Ex. 1, p. 135-38). No one at Voyager knew prior to July 1, 2008, that Zenacon or MyGallons was intended to be a nationwide consumer-based program. (Ex. 8, p. 141-42; Ex. 9, p. 95-96). Aaron Loveridge had specifically told Phil Dorroll that "[w]e need to make sure Zenacon is not giving any fleet cards to consumers." (Ex. 66, USB 0076; Ex. 9, p. 94-95).

### *VERONA AND MYGALLONS JUMP THE GUN*

Verona pushed ahead with his plan to market and roll out MyGallons by the end of June, 2008. On June 30, 2008, MyGallons issued a press release stating "…the gas redemption program uses the Voyager fleet network, owned by USB, which is accepted at over 95% of gas stations nationwide." (Ex. 92, p. 5-6). The separate partner agreement envisioned between USB, K.E. Austin and MyGallons (which Loveridge and Kral of Voyager understood would be sub-marketing cards through K.E. Austin to smaller commercial fleets) had not been drafted. (Ex. 9, p. 110-11, 137-40). As of June 30, 2008, Verona admits that no letter of credit had been obtained, and no bank account had been set up at USB to "collateralize" the MyGallons program to protect the bank. (Ex. 1, p. 140-47). While Verona had been informed that significant financial information would be necessary to get credit approval if the program was expanded (Garzione Aff., ¶ 8), none of the information was provided.

Verona also acknowledges that prior to the June 30, 2008 press release there had been no "test" with an actual MyGallons card to verify whether the program would operate the way it was intended because no cards had actually been issued. (Ex. 1, p. 198-99). Loveridge testified that as of that date, there was significant unfinished "setup" yet to be completed:

> To my knowledge, a production or live end-to-end file had not been successfully transmitted from the MyGallons account to them on behalf of USB/Voyager. There were no cards that were uploaded to the account. There were no cards printed from the account. There was no credit facility or signed contract that was in place, to my knowledge.

(Ex. 9, p. 110-11).

After being alerted to the press release by third parties, USB representatives were quite surprised that MyGallons was described as a nationwide consumer fuel program authorized by Voyager, when in fact, Voyager had not agreed to participate in such a program, was not even aware of the nature of the program, and doing so would have presented major obstacles to Voyager. (Ex. 8, p. 145-47).

On July 1, 2008, when USB had determined that the true nature of the Zenacon/MyGallons business was not a *commercial* fleet, but a pilot program for what was to become a nationwide *consumer* program, USB demanded that Verona and his companies cease and desist from using its name and its cards. (Ex. 88). That same day Verona, Brent Levison (Verona's lawyer), Ken Kral, Phil Dorroll, Andrew Toftey, Rob Abele, and Aaron Loveridge participated in a telephone conference to discuss how best to handle the situation. (Ex. 8, p. 137-38). When Verona explained his "vision" for the MyGallons program, he was told that Voyager could not participate in his venture, for many reasons including that it did not have the infrastructure in place to handle consumer lending. (*Id.*, p. 139). During that call USB suggested to Verona that perhaps Visa or Mastercard would be a better platform. (*Id.*, p. 138). However, Verona never pursued that option with USB. (*Id.*, p. 138, 150-51, 172-74).

During the conference call the issue of a joint press release came up, however the language later drafted by Verona was unacceptable and USB ultimately determined a joint press release was not necessary. (Ex. 12, p. 117-18). Phil Dorroll and K.E. Austin did however sign off on the press release Verona wanted. (Ex. 5, p. 185-86)

Having been contacted by numerous media outlets USB created a "desk statement" that was released to the media when comment was requested. (Ex. 10, p. 38-39; Ex 12, p. 70-71). Carol Barkley, Senior Vice President of Marketing for USB, drafted the desk statement. (Ex. 12, p. 37, 71). The statement read:

U.S. Bank Voyager Fleet Systems does not have a contract with to do business with MyGallons.com. We did not authorize the use of our name in association with this venture and we are not affiliated with this company.

(Ex. 12, p. 91-93; Ex. 89). The initial desk statement was revised in the following days. (*Id.*, p. 91-93, 98-99; Ex. 90) Verona's lawyer, asked that the word "affiliated" be removed and the statement was revised to state:

Neither U.S. Bank National Association ND, nor Voyager Fleet Systems, Inc. have a contract to do business with MyGallons.com, LLC, and there are no ongoing negotiations to enter into any agreement with MyGallons.

(Ex. 12, p. 100-01, 106). The desk statement was revised again in response to additional information released to the media by MyGallons where Verona stated that "U.S. Banks [sic] refuses to honor the agreements made by an authorized reseller." (Ex. 12, p. 103-04; Ex. 91) To clarify the situation, USB released the following statement when media outlets sought comment:

Neither U.S. Bank National Association ND, nor Voyager Fleet Systems, Inc. have a contract to do business with MyGallons.com, LLC, and there are no ongoing negotiations to enter into any agreement with MyGallons. We did have a commercial fleet fuel card contract with Zenacon LLC through our partnership with third-party marketer GoGas Universal, however it was for the exclusive purpose of providing commercial fleet fueling and maintenance cards, not consumer cards.

(Ex. 12, p. 103-04; Ex. 91).

MyGallons received an "F" rating from the Better Business Bureau of Southeast Florida ("BBB"). (Am. Compl. ¶99). The BBB was concerned about the new start-up and the business model. (Ex. 82). However, Plaintiffs attempt to attribute this rating to USB as part of their "defamation" claim. (*Id.*, ¶100). The only evidence of any communication USB had with the BBB was to send the desk statement to the contact person. (Ex. 12, p. 111; Ex. 10, p. 44, 88). Although USB contemplated meeting with the BBB, ultimately they decided not to do so, treating the request like all other media inquiries. (Ex. 12, p. 111; Ex. 10, p. 95)).

### *VERONA'S SEARCH FOR ANOTHER BANK PROVES FUTILE*

In mid-July, without success, Verona made attempts to interest other payment networks in the MyGallons program. Through a business acquaintance Verona contacted Melody Wigdahl, an

independent contractor specializing in payment solutions for corporate clients, particularly in the e-commerce area. (Ex. 14, p. 8-9). She has worked in the payment processing business for more than 20 years. (*Id*., p. 92-93). Wigdahl had a conversation with Verona on or about July 19, 2008 and they asked her "to go into the market place and find a replacement card for them." (*Id*., p. 15, 22).

Wigdahl told Verona that MyGallons would be a very difficult project to place because it required a "restricted use"[7] with a processor capable of handling "level 3" data. (Ex. 14, p. 23-24). There was a very limited pool of banks and processors that could facilitate what MyGallons wanted to do. (Ex. 14, p. 72-73). Wigdahl informed Verona that in order to successfully move forward, the initial cost would be in the range of $300,000 to $700,000 to fund the program and pay for the initial card order. (*Id*., p. 24-26). During that first call, Verona represented to Wigdahl that MyGallons was "self-funded" and had a letter of credit to use for any necessary deposit. (*Id*., p. 26-27).

As Wigdahl began networking to try to place the project, she uncovered significant misrepresentations made by Verona regarding MyGallons. Wigdahl became concerned about funding when Verona balked at paying a $1,000 application fee to one of the banks that was potentially interested. (*Id*., p. 27). She later learned that MyGallons had never secured a letter of credit. (*Id*., p. 26-27). She also learned that by "self-funded," Verona meant MyGallons would fund the program as consumers paid for memberships, rather than having any financial resources of its own. (*Id*., p. 27-28).

Wigdahl also learned that Verona's background was proving to be a significant barrier to finding a bank and payment processor. (Ex. 14, p. 39-40). Wigdahl concluded that in the Summer and Fall of 2008 it would have been impossible to place the MyGallons project:

> … we were looking at basically having to create a platform that really wasn't in the market place at that point in time, and that was a restricted use card that was capable of doing the level three data transfer that they needed or that they felt they needed at that time to conduct the MyGallons program as they had designed it . . . When all the dust settled, the primary issue with moving the project forward, it was really the lack of funding. There really was not the money available for the project. In all honesty, had I known during that first phone call that they were planning on funding this project out of

---

[7] "Restricted use" refers to limiting the card to fuel, for example a person could not purchase fuel and also buy coffee with the card. (Ex. 14, p. 16-17).

> sales of the MyGallons membership, I never would have touched it. That's the bottom line. Because you can't fund these projects solely out of the sale of the product. You've got to have money up front to walk in the door with the bank to pay for the program. That's all there is to it. When you add the negative things about Steve Verona's past in business on top of the lack of funding, the difficulties with the technology, it -- we just didn't have a project . . .

(Ex. 14, p. 75-77). Wigdahl explained that other banks asked about the situation with USB, but nothing

USB said or did was the determining factor as to whether another bank or processor would work with

MyGallons:

> Everyone wanted to make sure that they had the funds to move forward, and the U.S. Bank situation was brought up in probably every discussion because obviously anybody who did their due diligence would go online and see the press releases. Everyone asked why it was canceled, and once I explained that they [MyGallons] weren't really an appropriate candidate for it [the Voyager system] because they really weren't a fleet card, that really pretty much seemed to take care it. I mean, nobody ever really considered it a negative situation.

(Ex. 14, p. 84).

> Q.    …Apart from the press releases that you mentioned, did anyone that you worked with on behalf of MyGallons, be it a bank or a processor, ever tell you that they spoke with anyone from U.S. Bank or Voyager that said anything negative about MyGallons or Mr. Verona?
>
> A.    No.
>
>                          ****
>
> Q.    With respect to the personal issues, one of the claims in this lawsuit is a defamation claim by Mr. Verona against U.S. Bank. With respect to the personal claims, personal issues that your processors or bank contacts may have found related to Mr. Verona's background, are you aware of anyone that said that information came from either U.S. Bank or from Voyager?
>
> A.    Oh, no. It was online.

(Ex. 14, p. 141-43). Because of the many misrepresentations Verona made regarding the project, they

parted ways approximately six weeks after their initial call. (Ex. 14, p. 95-96). Verona has since called

Wigdahl twice, most recently in August or September of 2009 to ask if she would be interested in again

working with MyGallons. (*Id.*, p. 13-14, 54-55). She declined based on her past experience. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden may be satisfied by presenting specific evidence on a particular issue, or by indicating "an absence of evidence to support the non-moving party's case." *Id*. at 325. Once the movant has met this burden, the non-movant cannot simply rest on the bare allegations of the pleadings; rather, that party must set forth <u>specific</u>, <u>admissible</u>, <u>material</u> facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986).

## ARGUMENT

I. **PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW BECAUSE USB DID NOT BREACH THE ZENACON CONTRACT, THE ALLEGED CONTRACT VIOLATES THE STATUTE OF FRAUDS, AND NO CONTRACT EXISTED THAT WOULD HAVE SUPPORTED MYGALLONS' CONSUMER FUEL CARD PROGRAM.**

   A. **North Dakota Law Governs Plaintiffs' Substantive Law Claims.**

The Zenacon credit application – the only written agreement between Plaintiffs and USB – contains a choice of law clause in which the parties agreed to apply the law of the State of North Dakota to any and all disputes relating to the contract. (Ex. 23, ¶20). During his deposition Verona acknowledged that the terms and conditions of the Zenacon application govern this dispute. (Ex. 1, p. 177-78).

Thus, pursuant to the parties' agreement, North Dakota law should be applied to all contract-related claims (Counts I and II) asserted by Plaintiffs against USB and Voyager.

   B. **USB Did Not Breach The Zenacon "Contract."**

USB is a party to only one "contract" relevant to the claims against it in this case and Plaintiffs do not allege the Zenacon contract was breached. The contract resulted from Zenacon's on-line credit

application submitted to K.E. Austin, which application was then sent to Voyager for approval. (Ex. 22). The Zenacon application sought an account to service a small commercial fleet – not a nationwide consumer program -- with a very small credit limit.

Under North Dakota law "the prima facie elements of a breach of contract action are the existence of a contract, a breach of the contract, and damages flowing from the breach of contract." *Abdullah v. State*, 771 N.W.2d 246, 253 (N.D. 2009). "A breach of contract occurs when there is nonperformance of a contractual duty." *Id.*

There is no evidence in the record that USB breached the Zenacon contract. Although they try to morph the Zenacon application into a binding agreement related to MyGallons, Plaintiffs have not alleged a breach of the Zenacon contract. The record reveals that Verona applied online for a *commercial* fleet under the name Zenacon LLC, represented to be a "service" company. (Ex. 22). The requested credit limit was very small and required little verification apart from confirming that Zenacon LLC was a legitimate legal entity, which USB did before approving the contract. (Ex. 22). Verona signed the contract and personally guaranteed the credit line. (*Id.*) He warranted in the "Authorized Officer Statement" that "accounts will be used for business purposes and not personal, family, or household purposes." (*Id.*) Yet, he listed friends and family as the "drivers" on the commercial fleet account. (*Id.*) Cards were issued and fuel was purchased. USB has upheld its end of the bargain.

## C. There Is No Contract Between USB and MyGallons LLC.

The only written contract between USB and Zenacon was established as a result of the March, 2008 on-line application, but that contract does not mention MyGallons LLC and did not contain terms that would have supported the expansive consumer program Verona envisioned. Apart from Verona's assertion that a separate MyGallons application was submitted, there is no proof that it was received by K.E. Austin or that it was ever received by or approved by USB. Verona's testimony and his communications with K.E. Austin related to the "contract" speak only about the Zenacon application. (Ex. 1, p. 181-84). Plaintiffs' attempt to boot-strap the purported MyGallons application to the Zenacon contract is also unsupported by the record.

Plaintiffs only "evidence" of the purported contract between USB and MyGallons is Verona's testimony that he sent an application for a commercial fleet contract to K.E. Austin. However, "[t]o avoid summary judgment, the plaintiffs must produce not 'merely colorable' but 'significantly probative' evidence." *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) (citation omitted). Even if Verona had sent an application to K.E. Austin for MyGallons, no contract would be created with USB unless that application was received and approved by Voyager. The application that Verona claims he sent to K.E. Austin was not even complete, and purported to relate to commercial fleets rather than the consumer program Verona envisioned. For all these reasons, Plaintiffs have failed to come forth with "significantly probative evidence" to support their breach of contract claims.

### D. Plaintiffs' Contract Claims Are Barred By The Statute of Frauds.[8]

In attempting to prove their contract claims Plaintiffs cannot get over the first hurdle – the statute of frauds. North Dakota's statute of frauds § 9-06-04 provides in part:

> The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by the party's agent:
>
> > 1. An agreement that by its terms is not to be performed within a year from the making thereof . . .
>
> > ****
>
> > 4. An agreement or promise for the lending of money or the extension of credit in an aggregate amount of twenty-five thousand dollars or greater.

(NDCC § 9-06-04. Contracts invalid unless in writing--Statute of frauds).

Defendants do not dispute that the Zenacon contract (for a small commercial fleet) satisfies the statute of frauds. However, there is no evidence in the record of any writing that would support the multi-million dollar nationwide consumer-based prepaid MyGallons program which Plaintiffs contend was entered into by K.E. Austin and approved by USB.

---

[8] Verona acknowledged that the terms and conditions of the Zenacon application govern this dispute and that if the MyGallons application was submitted as he alleges, Plaintiffs would be subject to any applicable terms and conditions. (Ex. 1, p. 177-78). Therefore, the same "Governing Law" term would apply to the hypothetical MyGallons contract, implicating the North Dakota Stature of Frauds.

Although Verona alleges he submitted a separate application for MyGallons LLC, there is no evidence it was received or approved by anyone. (Garzione Aff., ¶27; Dorroll Aff., ¶17; Ex. 9, p. 67). Moreover there is no writing verifying the scope of the agreement, the terms and conditions of the agreement, or addressing the credit limit, financial information to be submitted for approval, or the collateral requirements. For example, the Zenacon contract provided only a limited number of fuel cards to a small commercial fleet, subject to a very small credit limit. Unlike the Zenacon contract and subsequent approval, there are no emails or other correspondence related to the phantom MyGallons application and no one at Voyager or K.E. Austin ever received such application.

To the extent Plaintiffs rely on their "transition" theory wherein the elusive contract was created by the purported transitioning of the Zenacon account into a new "Level 1" account for Zenacon d/b/a MyGallons, again there is no writing sufficient to satisfy the statute of frauds. The only evidence of this "transition" is email communication talking about setting up a Level 1 account and the technical matters involved in doing so. There are no definite terms and conditions, applicable credit limit, financial information or defined collateral requirements that would support the broad-based consumer program MyGallons was allegedly going to be.

The fact that a "contract" was being drafted by USB to reduce to writing a separate agreement between the bank and Zenacon d/b/a MyGallons (albeit based on what was clearly a mistaken belief that the program involved commercial fleet members rather than consumers), is evidence that there was no enforceable contract between the parties. Verona admits he was aware that USB was working on an addendum to the yet to be drafted contract, although he tried to explain away that fact. (Ex. 1, p. 189-93). The email trail makes clear however, that Verona and his attorney were told that a contract was necessary. In an email dated June 13, 2008, Dorroll told Verona that USB "may want a 3 party agreement with you". (Ex. 39). Thereafter, on June 23, 2008, Dorroll emailed Verona that USB was "working on an addendum for you" and proposed to "check on the status of the addendum." (Ex. 40). Upon receipt of that email Verona's counsel, having understood that a separate contract was in the process of being created,

responded stating, "Please ask that Voyager incorporate this language in its agreement and we can also add this language in our rebate agreement." (Ex. 41).

There is no evidence that a contract existed between MyGallons and USB. Without an express writing, the alleged agreement between the parties violates the statute of frauds and Plaintiffs' contract claims fail as a matter of law.

### E. USB Is Not Party To, Nor Is It Bound By The Rebate and Confidential Disclosure Agreements.

Plaintiffs allege that USB "breached" the Rebate Agreement and Confidentiality Agreement between K.E. Austin and MyGallons, LLC. However, Plaintiffs have no evidence that K.E. Austin had the authority to bind USB to a nationwide consumer-based fuel program like MyGallons through these innocuous documents.

It is undisputed that USB is not a party to either agreement. (Exs. 43, 44). USB has no obligations pursuant to the Rebate or Confidential Disclosure Agreement. In fact, USB is not even mentioned in the Confidential Disclosure Agreement. (*Id.*) In addition, the Rebate Agreement was signed on June 27, 2008, after Verona's attorney had been made aware of, and acknowledged that the terms of any agreement with USB had not been finalized. (Exs. 40, 41). Plaintiffs' attempt to create a contract claim against USB through these purported agreements with K.E. Austin fails.

### F. Verona's MyGallons Scheme Was Not Compatible With Voyager's Business Model And Would Have Likely Violated Federal Commodity Laws.

North Carolina courts will not enforce illegal contracts. *See Cole v. Hughes*, 114 N.C. App. 424, 429, 442 S.E.2d 86, 89 (N.C. App. 1994) (affirming dismissal of counterclaim "because it sought to enforce a contract or joint venture which is illegal and against the public policy of North Carolina"). USB could not have entered into any agreement with Plaintiffs that involved a nationwide consumer based program using the Voyager Fleet Card Network, due to a variety of legal and compliance issues relating to Voyager's own business model, and the risky nature of the MyGallons program. For example, in general, Voyager does not have the infrastructure to be compliant with federal Regulation Z (Truth in Lending) which sets forth disclosures that must be made in the context of consumer lending. This is not a

problem because Voyager restricts its lending for business/commercial purposes only and does not issue cards to consumers, thereby avoiding the need to comply with federal regulations that require certain disclosures and applications for consumer lending. Ken Kral testified that upon learning the consumer nature of the MyGallons program, Voyager was immediately concerned because Voyager is a "business to business" based company and is not "set up for the commercial rules and regulations for unsecured lending. We do not have the processes or the documentation in place for the consumer lending." (Ex. 8, p. 138-39).

Voyager's concerns regarding the consumer program were echoed during the Pricelock deposition. Plaintiffs allege that USB breached their purported agreements because of a relationship with Pricelock, a company that according to Plaintiffs wanted to offer a similar program to consumers. (Am. Compl., ¶83). However, Pricelock has never developed a consumer gas card program of the type envisioned by MyGallons, because it has learned from its attorneys and from federal regulators that a consumer-based program would not be permitted by the United States Commodity Futures Trading Commission. Robert M. Fell, CEO of Pricelock, recalled the following communications with Pricelock's General Counsel (Gary Magnuson) in the context of emails sent to USB at the time MyGallons began its marketing, which illustrates Pricelock's belief that MyGallons' scheme was illegal:

> Q.    And were you aware at the time they were sent that they were being sent?
>
> A.    No. I had said to Gary, when I saw the program, I said, can MyGallons do this legally, since we had been advised by both Baker Botts and Sullivan and Cromwell that to go directly to the consumer, as ostensibly MyGallons was doing without clearing it with the CFTC was something that could put us in legal jeopardy. So our Board had made the decision to only go through businesses first before we went directly to the consumer. So I had said to Gary -- and I remember asking him, how can they do this legally? And he said, I don't believe they can. And that was really the -- I'm just giving you the sum and substance of my conversations vis-à-vis MyGallons.
>
> Q.    Did Pricelock's business plan ever at one time include the possibility of going directly to consumers?
>
> A.    Originally we thought about going directly to the consumers, but as I just mentioned to you, we were advised by both Baker Botts and Sullivan and Cromwell that such a solution would not be legal at this point in time. Indeed I, with Sullivan, and Cromwell went to visit the CFTC twice and asked about this. And they said at this

point in time, because they were afraid that the consumer could be misled, that they would not support a no action letter for anyone to go to the consumer.

(Ex. 13, p. 66-68).

Section 4 of the Commodity Exchange Act, 7 U.S.C. § 6, makes it "unlawful for any person to deliver … any offer to make … any contract of sale of commodity for future delivery on or subject to the rules of any board of trade in the United States, or … to make or execute such contract of sale, … except … where such contract is made by or through a member of a board of trade which has been designated by the Commission as a 'contract market.'" The "memberships" MyGallons wished to sell for "pre-purchases" of gasoline (a commodity) may well have violated the Commodity Exchange Act, because MyGallons was to be an association of persons engaged in the business of buying a commodity, without authorization by the Commodity Futures Trading Commission. *Compare CFTC v. Co Petro Marketing Group, Inc.*, 700 F.2d 1279 (9th Cir. 1982). Even aside from commodities laws, the risk of consumer class action lawsuits is obvious in a program promising consumers they would save money, but using hidden fees and consumer "pre-payments" to fund part of the operations, launched at a time where gas prices actually dropped, meaning that consumers were likely to lose money. Since MyGallons was not capitalized and had no financial backing, it is quite obvious who the targets would have been of such class actions – USB and potentially K.E. Austin as well.

## II. USB MADE NO PROMISES TO PLAINTIFFS, NOR WERE PLAINTIFFS JUSTIFIED IN RELYING ON ANY SUCH ALLEGED PROMISES.

As an alternative to their breach of contract claim, Plaintiffs allege promissory estoppel, arguing that USB made binding promises to provide a payment network for the MyGallons scheme. Plaintiffs' promissory estoppel claim is quite out of place as to USB. There were very few communications between USB or Voyager personnel and Verona; none which would be material or supportive of a promissory estoppel claim. Verona and his attorney were told a written contract was required with USB, yet none was in draft form at the time he decided to prematurely roll out MyGallons on June 30, 2008.

Promissory estoppel implies a contract in law where no contract exists in fact. In order to invoke the doctrine of promissory estoppel the plaintiff must establish the following elements: "1) a promise

which the promisor should reasonably expect will cause the promisee to change his position; 2) a substantial change of the promisee's position through action, or forbearance; 3) justifiable reliance on the promise; and 4) injustice which can only be avoided by enforcing the promise." *Russell v. Bank of Kirkwood Plaza*, 386 N.W.2d 892, 896 (N.D. 1986).[9] Plaintiffs' promissory estoppel claim fails to meet any of these required elements.

"A promissory estoppel claim requires a promise with definite, clear, and unambiguous terms." Unsupported conclusory allegations are insufficient to withstand summary judgment." *University Hotel Development, L.L.C. v. Dusterhoft Oil, Inc.*, 715 N.W.2d 153, 157 (N.D. 2006). *See also, Lohse v. Atlantic Richfield Co.*, 389 N.W.2d 352 (N.D. 1986) (rejecting promissory estoppel claim finding that preliminary negotiations and discussions or agreements to negotiate the remaining terms of a contract in the future are not sufficient to prove claim).

In this instance, there was little or no communication between Plaintiffs and USB; much less promises made that would support deviating from the existing written contract which related only to Zenacon and was confined to a minimal credit limit. Plaintiffs allege that USB gave continual reassurance that the MyGallons project was a "go." Plaintiffs also try to twist the design of the card into a "promise" to support the multi-million dollar, nationwide, consumer fuel program. However, the record makes clear that any work USB was doing on the back-end related only to the Zenacon account, which was understood to be a d/b/a moniker of MyGallons and was part of a program based on commercial fleet members.

First, Plaintiffs' alleged representations are far too vague to constitute clear and definite promises to move forward with a consumer fuel card program. *University Hotel Development,* 715 N.W.2d at 157

---

[9] Plaintiffs' promissory estoppel claim is quasi-contractual and is likely governed by the North Dakota choice of law provision cited above. However, even if North Carolina or Florida law governs, Plaintiffs' promissory estoppel claim fails because neither jurisdiction permits the affirmative use of promissory estoppel to substitute for a contract claim or to avoid the application of the statute of frauds. *See Dealers Supply Company, Inc. v. Cheil Industries, Inc.*, 348 F. Supp. 2d 579, 586-87 (M.D.N.C. 2004) (offensive use of promissory estoppel unavailable in North Carolina); *Merlo v. United Way of America*, 43 F.3d 96, 102-03 (4th Cir. 1994) ("Florida courts have specifically rejected the use of the common law doctrine of promissory estoppel to defeat the effect of the legislative rule contained in the State's Statute of Frauds.").

(granting summary judgment on promissory estoppel claim where the alleged promise was not reduced to writing, there was no written documentation of a definite, clear, and unambiguous promise, and the only evidence in the record established at best preliminary negotiations between the parties). It is undisputed that Plaintiffs had not entered into the contract that had not yet been drafted by USB. (Ex. 1, p. 189-93; Exs. 39-41). At most the parties were in negotiations to enter into an agreement (although USB was unaware that Plaintiffs' plan involved a nationwide consumer program). North Dakota law provides that a "promise to negotiate in the future and 'work something out' is essentially an agreement to agree in the future, which lacks essential terms and is insufficient to support an enforceable contract or to invoke the doctrine of promissory estoppel." *Clooten v. Clooten*, 520 N.W.2d 843, 848-89 (N.D. 1994) (citing *Union State Bank v. Woell*, 434 N.W.2d 712, 717 (N.D. 1989); *Lohse*, 389 N.W.2d at 355-357).

Second, Plaintiffs cannot show that they substantially changed their position based on the alleged promise. *Dalan v. Paracelsus Healthcare Corp. of North Dakota, Inc.*, 640 N.W.2d 726, 732 (N.D. 2002) (granting summary judgment on promissory estoppel claim where plaintiff failed to show he gave up any other opportunities to remain with his employer and did not show a substantial change in his position). While Verona alleges he could have had a deal with Wright Express (Ex. 1, p. 87-88), there is no evidence of that fact in the record and Verona's attempt to find a bank and processor to date suggests otherwise.

Finally, Plaintiffs' promissory estoppel claim fails because they cannot prove they **reasonably** relied on the alleged promises. Plaintiffs were told that the deal required a contract with USB, and that contract was never even prepared much less signed by the time MyGallons decided to start marketing its program. Therefore, MyGallons cannot claim that it reasonably relied on any purported representations.

### III. USB DID NOT INTERFERE WITH PLAINTIFFS' ALLEGED CONTRACTUAL RELATIONSHIP WITH K.E. AUSTIN OR ITS "CUSTOMERS."

In Count III of their Amended Complaint, Plaintiffs allege that USB "intentionally disrupted and injured" MyGallons' existing contractual relationship with K.E. Austin by: "(a) refusing to cooperate with MyGallons' agents and/or representatives; (b) disabling K.E. Austin from performing its contractual

obligation to provide access to Voyager as an authorized reseller; and (c) demanding that K.E. Austin terminate the Contracts, and causing K.E. Austin to do so."

North Carolina and Florida law[10] both require that a plaintiff prove the following elements to prevail on a tortious interference with contract claim: (1) a valid contract between plaintiffs and a third person; (2) an outsider's knowledge of the contract; (3) the outsider's intentional inducement of the third party not to perform the contract; and (4) in doing so, the outsider acted without justification. *United Laboratories v. Kuykendall*, 322 N.C. 643, 661, 370 S.E. 2d 375, 387 (1988); *Palm Beach County Health Care District v. Professional Medical Education, Inc.*, 13 So. 3d 1090, 1094 (Fla. Dist. Ct. App. 2009).[11]

This claim is non-sensical. First, the claim fails because there was no contract between Plaintiffs and K.E. Austin to support the nationwide consumer-based program. *See* K.E. Austin's Motion for Summary Judgment. Plaintiffs have no evidence that the MyGallons application was ever submitted or approved. Plaintiffs must therefore rely on the Rebate Agreement. However, even if K.E. Austin understood the nature of the MyGallons program and entered into the Rebate Agreement with that knowledge, it is clear on this record that USB did not share that same understanding. Thus, USB had no knowledge of the contract which Plaintiffs now claim they interfered with. Without a true understanding of the MyGallons program, it is impossible for USB to have intentionally induced K.E. Austin not to perform under the alleged contract.

Moreover, it is undisputed that Plaintiffs could not gain access to the Voyager network through K.E. Austin without Voyager's approval. (Ex. 85, Amend. No. 1, ¶10). Thus, K.E. Austin could not have "performed its contractual obligation" to provide access if, as it turned out happened, USB determined they could not move forward with MyGallons. There was no contract between MyGallons and USB, and

---

[10] North Carolina courts rely on the principle of *lex loci* to determine choice of law in tort cases – that is, the law of the state where the injury allegedly occurred. *Stetser v. TAP Pharmaceutical Products, Inc.*, 165 N.C. App. 1, 16, 598 S.E.2d 570, 580 (2004). Plaintiffs' tortious interference claims allege that USB interfered with their business, MyGallons being a Florida company, or with their relationship with K.E. Austin, a North Carolina Company.

[11] If Minnesota law is deemed to apply, the elements of a tortious interference claim are the same. *See Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994).

there was no reason that USB could not halt any negotiations that had been in progress after learning the true nature of the scheme.

Counts IV and V make the same allegation with respect to interference with MyGallons' existing and prospective "customers" insinuating that USB "intentionally disrupted and injured" MyGallons' contractual relationships by: (a) refusing to cooperate with MyGallons' agents and/or representatives; (b) denying access to the payment processing network, Voyager; and (c) demanding that MyGallons remove logos and references to Voyager and US Bank from its website and promotional materials."

The same fatal flaw holds true with respect to Counts IV and V. It is questionable whether Plaintiffs even had valid contracts with their customers. Even so, to interfere with a contract, USB must have knowledge of that contract. The record here is clear that at the point MyGallons went "live" on or about June 30, 2008, USB had no understanding that MyGallons was going to be a nation-wide consumer-based program or that as of that date people had signed up for "memberships." Absent that understanding, USB could not induce Plaintiffs' customers not to perform the alleged contract. Without knowledge of the MyGallons scheme, USB cannot be found liable for having interfered with any existing or prospective contractual relations. To prove their claim, Plaintiffs must also establish that USB was not "justified" in taking the action it did. In this instance, USB's conduct was clearly justified because: (1) USB did not have a contract with MyGallons; and (2) the Fleet Card Program is not intended for consumer use (if K.E. Austin represented otherwise, that representation cannot be attributed to USB); and (3) USB had substantial concerns regarding the legality of the MyGallons scheme.

As for the "prospective customers" Plaintiffs allege would have flocked to MyGallons, this claim is entirely speculative. *See* Defendants' Motion to Exclude Proposed Expert Testimony of Anca Cristina Micu and Paul Seitz. Gas prices declined significantly in the second half of 2008. "The speculative hope of future business is not sufficient to sustain the tort of interference with a business relationship." *St. Johns River Water Management Dist. v. Fernberg Geological Services, Inc.*, 784 So. 2d 500, 505 (Fla. Dist. Ct. App. 2001). *See also, Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814-15 (Fla. 1994) (plaintiff may not recover where "business relationship" is based on speculative future sales).

It doesn't appear that North Carolina recognizes this tort. *See Burgess v. Busby*, 142 N.C. App. 393, 404, 544 S.E.2d 4, 10 (N.C. App. 2001).

Plaintiffs' tortious interference claims are simply their breach of contract claims with a different label. The premise is the same – USB allegedly failed to provide access to the Voyager Fleet Card system injuring Plaintiffs. Regardless what state's law is applied, Plaintiffs' tortious interference claims, like their contract claims, fail and USB is entitled to summary judgment.

**IV.  USB'S PUBLIC STATEMENTS WERE ACCURATE AND DID NOT DEFAME OR OTHERWISE INJURE PLAINTIFFS.**

**A.  Plaintiffs' Defamation Claim Fails As A Matter Of Law Because Statements Made By USB Were True.**

Either Florida or Minnesota law must apply to Plaintiffs' defamation claims, Florida being where MyGallons is located or Minnesota being where the statements were made. Under Florida law, "defamation has the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). In Minnesota, to prevail on a defamation claim "a plaintiff must prove three elements: (1) the defamatory statement is communicated to someone other than the plaintiff, (2) the statement is false, and (3) the statement tend[s] to harm the plaintiff's reputation and to lower [the plaintiff] in the estimation of the community." *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919-20 (Minn. 2009). Truth is a defense to any defamation claim. *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. Dist. Ct. App. 1978) ("the truth of the publication is a good defense, assuming that it was made with good motives"); *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980) ("Truth, however, is a complete defense, and true statements, however disparaging, are not actionable.")

The only official public statements made by USB regarding Plaintiffs occurred in July 2008, following the "cease and desist" letter by which USB demanded that Zenacon LLC cease using the

Voyager cards issued in April, 2008 for Zenacon's small commercial fleet. Those statements included the following points in reference to MyGallons LLC's consumer program:

    (a)      USB/Voyager had no contract or affiliation with MyGallons LLC;

    (b)      USB/Voyager had not given permission to MyGallons LLC to use its name in connection with the program;

    (c)      USB/Voyager were not in negotiations with MyGallons LLC;

    (d)      USB/Voyager had a commercial fleet fuel card contract with Zenacon LLC through K.E. Austin exclusively for commercial fleet fueling and maintenance cards, not consumer cards.

All of the above statements are true.

USB had agreed to draft a proposed three-way agreement involving both K.E. Austin and MyGallons, but a first draft of that agreement had not even been completed, much less circulated for comment or signature. After July 1, no further work was done on that contract and the parties did not engage in further negotiation (rather, MyGallons sued USB, Voyager and K.E. Austin in August). While a low-level Voyager employee emailed the Voyager logo to K.E. Austin in May, 2008, that was done at a time in which Voyager understood that business was being done under the terms of the existing Zenacon contract (i.e., for commercial fleets), not a nation-wide consumer program. There may have been a misunderstanding between the parties regarding the nature of the program, but Plaintiffs have no evidence that USB knowingly gave their permission to use the USB or Voyager name and/or logo in connection with MyGallons' consumer-based program to be launched nationally.

It should be emphasized that if anyone is to blame for what is at most a misunderstanding between the parties, it is Verona himself. The Zenacon application contains incorrect estimates of Zenacon's net annual sales, total assets, and misstates the "industry category" as "service." (Ex. 22). The terms and conditions of the application expressly state that that all "Accounts established and Cards issued hereunder shall be used solely for business purposes…" and Verona agreed that "Accounts will be used for business purposes and not personal, family, or household purposes." (*Id.*) USB had no reason to think Plaintiffs were using the Zenacon agreement to launch a nationwide consumer program.

Because there is no contract beyond the Zenacon application and no ongoing negotiations after July 1, 2008, USB was perfectly correct in issuing a press release on July 1, 2008 stating that there was no contract or affiliation with MyGallons. The statements regarding use of the logo and the explanation of the Zenacon contract are based on fact. As such, there is no evidence of a false published statement. Plaintiffs' defamation claims fail as a matter of law.

### B. Plaintiffs' Defamation Claims Fail Because They Cannot Prove An Injury Related To Any Statement Made By USB.

Plaintiffs' have no evidence that any statement made by USB has "injured" their purported business. The only evidence in the record is the testimony of Melody Wigdahl, who unequivocally stated that none of the other banks or processors she spoke with to place the MyGallons project ever said anything about derogatory comments made by USB. (Ex. 14, p. 84, 141-43). There is simply no proof that Plaintiffs' failure to get MyGallons off the ground has anything to do with statements made by USB. To the contrary, there are three obvious reasons why MyGallons hasn't proven successful -- falling gas prices, the complete lack of funding, and Verona's questionable financial and business history.

Even if Plaintiffs could establish some technically defamatory statement, their damage claim is entirely speculative, unsupported, and subject to summary judgment. *See* Section V, *Infra*; and Defendants' Joint Motion to Exclude the Proposed Expert Testimony of Anca Christina Micu and Paul Seitz. USB is entitled to summary judgment on Plaintiffs' defamation claims for these additional reasons.

### B. Counts VII and VIII of Plaintiffs' Complaint Must Be Dismissed.

Plaintiffs also allege "Disparagement / Injurious Falsehood" and "Publicity Placing Persons in a False Light." North Carolina does not recognize either of those claims as independent causes of action. *See Jolly v. Academy Collection Service, Inc.*, 400 F.Supp.2d 851, 865 (M.D.N.C. 2005) (the phrase is infrequently used in certain slander and libel cases to describe those causes of action); *Renwick v. News and Observer Pub. Co.*, 310 N.C. 312, 323, 312 S.E.2d 405, 412 (N.C. 1984) (holding publicity by defendant which places a plaintiff in a false light before the public does not give rise to a claim for which relief can be granted upon a theory of invasion of privacy; a plaintiff must recover in such situations, if at

all, in an action for libel or slander). Minnesota and Florida have also declined to recognize the tort of "placing persons in a false light*." See Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998) ("We decline to recognize the tort of false light publicity at this time."); *Jews For Jesus, Inc.,* 997 So. 2d at 1114 ("we decline to recognize a cause of action for false light invasion of privacy.")

The injurious falsehood claim also fails under the law of Minnesota and the law of Florida. The common law torts of product disparagement and publishing an injurious falsehood are set forth in the Restatement (Second) of Torts and provide:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
> (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
>
> (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

*LensCrafters, Inc. v. Vision World, Inc.*, 943 F.Supp. 1481, 1490 (D. Minn. 1996) (citing Restatement (Second) of Torts § 623A (1977)). "To recover under the product disparagement doctrine, however, a plaintiff must be able to prove special damages "in the form of pecuniary loss directly attributable to defendant's false statements. If the plaintiff cannot show a loss of specific sales, it may still satisfy this burden by proving a general decline of business, provided that the decline can be shown to have resulted from the defendant's disparaging statements, and not because of other possible causes." *Id.* (internal citations omitted). *See also, Funny Cide Ventures, LLC v. Miami Herald Pub. Co.*, 955 So. 2d 1241, 1242 (Fla. Dist. Ct. App. 2007) (to recover for a claim of injurious falsehood "pecuniary loss recoverable is restricted to that which results directly and immediately from the falsehood's effect on the conduct of third persons and the expenses incurred to counteract the publication. This requires the damages to have been foreseeable and normal consequences of the alleged wrongful conduct, and the conduct must be a substantial factor in bringing about the losses.") (internal citation omitted).

USB did not make a false statement regarding MyGallons. Again, the only evidence in the record on this subject is Wigdahl's uncontroverted testimony that no contacts she made with other banks and

processors revealed that they "passed" on the project because of anything USB said. Rather, Plaintiffs inability to adequately fund the project to get it off the ground in the first instance, combined with Verona's background, proved to be the deal breakers.

## V. PLAINTIFFS' UNFAIR AND DECEPTIVE TRADE PRACTICES ACT CLAIM FAILS AS A MATTER OF LAW

Plaintiffs allege that there were intentional misrepresentations of K.E. Austin's authority, Plaintiffs' access to the Voyager network, the state of the contracts as represented to the media and Better Business Bureau and favoritism related to Pricelock. (Am. Compl. ¶ 164). To establish a claim for unfair trade practices North Carolina law requires a plaintiff to show that "(1) defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff." *Wilson v. Dryvit Systems, Inc.*, 206 F. Supp. 2d 749, 756 (E.D.N.C. 2002) (citing *Dalton v. Camp*, 353 N.C. 647, 548 S.E.2d 704, 711 (2001); and *Pleasant Valley Promenade*, 120 N.C. App. 650, 464 S.E.2d 47 (N.C. App. 1995) (to establish prima facie case for unfair trade practices, plaintiff must show it suffered actual injury as a proximate result of defendant's misrepresentations)).

Plaintiffs' claim fails because North Carolina Statute § 75-1.1 does not have extraterritorial application – i.e. where the claimed injury occurs outside the state involving an out of state corporation. *The "In" Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494 (M.D.N.C. 1987); *Ada Liss Group v. Sara Lee Corp.*, No. 1:06CV610 (M.D.N.C. Sept. 30, 2009) (Morris Aff., Ex. B).

None of the Plaintiffs, nor USB or Voyager are North Carolina companies or residents. North Carolina has no interest in "protecting" out-of-state corporations from injuries allegedly imparted by other out-of-state businesses. In *Porters*, the court explained that substantial injury to a plaintiff must occur within the state of North Carolina in order to state a valid cause of action under the statute:

> Application of the Act in cases having only an incidental local effect not only would be contrary to the Fourth Circuit's interpretation of the Act, but also would render the Act constitutionally suspect. The commerce clause mandates that the Act's extraterritorial application be justified by local concerns and not be excessively burdensome on interstate commerce. The court believes that limiting the scope of the act to cases involving

substantial effect on a plaintiff's in-state business operation is consistent with, and perhaps required by, the commerce clause.

663 F.Supp. at 502.  Plaintiffs had no "in-state" business operation.

North Carolina courts have also expressly held that the exercise of contractual rights is not an unfair trade practice under the statute.  *In re Nantahala Village, Inc.*, 976 F.2d 876, 882 (4th Cir. 1992).  Therefore, even if Plaintiffs had a valid claim under the statute, which they don't, Plaintiffs cannot maintain claims allegedly based in contract and an unfair trade practice claim.  The allegations supporting the unfair trade practice claims are the same as those asserted in connection with the contract, promissory estoppel, tortious interference and defamation claims.  For the reasons addressed at length above, Plaintiffs cannot maintain those causes of action and the unfair trade practices claim fails where there was no "unfair or deceptive act or practice."

## VI.     PLAINTIFFS HAVE NO ADMISSIBLE EVIDENCE OF DAMAGE UNDER ANY LIABILITY THEORY.

The terms and conditions of the Zenacon contract specify that no party could recover consequential, punitive and other types of damages.  Thus, the only contract that Plaintiffs can claim to have been breached expressly precludes Plaintiffs' damage claim as a matter of law (aside from perhaps a small out-of-pocket expense claim).  In addition, Plaintiffs' damages expert relies completely on the opinion of their marketing expert whose opinion is inadmissible.  *See* Defendants' Joint Motion to Exclude the Proposed Expert Testimony of Anca Christina Micu and Paul Seitz.

"In order to recover damages for lost profits, a complainant must prove that, absent the breach of contract, profits would have been realized in an amount provable with "reasonable certainty." *Blis Day Spa, LLC v. Hartford Ins. Group*, 427 F. Supp. 2d 621, 630 (W.D.N.C. 2006). "The burden of proving damages is always on the party claiming injury." *Iron Steamer, Ltd. v. Trinity Restaurant, Inc*., 110 N.C.App. 843, 848, 431 S.E.2d 767, 770 (N.C. App. 1993).

North Carolina courts grant summary judgment where plaintiff's evidence of damages is too speculative.  *See Media Network, Inc. v. Long Haymes Carr, Inc.,* 678 S.E.2d 671 (N.C. App. 2009) (affirming summary judgment finding plaintiff's damages calculation based on speculative assumptions).

In this case, Plaintiffs' damages are completely speculative.  First, the alleged "contract" bars anything but out-of-pocket expenses.   Second, as Magistrate Judge Daniel recognized in his recent Order (Document No. 81, p. 4), Plaintiffs' damages theory is based on numerous assumptions including that this start-up company was a sound business model with a hedging plan producing the desired results.  As Judge Daniel points out, even Plaintiffs' own experts can't support that assumption because they were not provided with the elusive hedging plan. (Document No. 81, p. 4).

Plaintiffs claim millions of Americans would have signed up for MyGallons, but have no affirmative proof of this, apart from an expert report (that is inadmissible) which assumes that MyGallons would have had the same success as Amazon.com or eHarmony.com.  Finally, and most obvious is the fact that mid-July 2008 saw the height of gas prices in the U.S.  Because prices fell dramatically in the remainder of 2008, Plaintiffs' projections defy common sense.

## CONCLUSION

Plaintiffs' multiple claims against USB fail for the numerous reasons explained above. Additionally, USB is entitled to summary judgment on the basis that Plaintiffs' claims fail because their damages cannot be proven with "reasonable certainty."

For the foregoing reasons, U.S. Bancorp and Voyager Fleet Systems, Inc. respectfully request that the Court grant their Motion for Summary Judgment as to all claims asserted by Plaintiffs.

Respectfully submitted this 16th day of February 2010

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**

**By**   /s/ Johnny M. Loper
Johnny M. Loper  (NCSB No. 15533)
P. O. Box 831
Raleigh, NC 27602
919-755-2116
919-755-6056 (fax)
jloper@wcsr.com

**BASSFORD REMELE A Professional Association**
Lewis A. Remele, Jr. (MN License #90724)
Christopher R. Morris (MN License #230613)
Paula M. Semrow (MN License #0339131)
33 South Sixth Street, Suite 3800
Minneapolis, MN  55402-3707
(612) 333-3000
(612) 333-8829 (fax)
lremele@bassford.com
cmorris@bassford.com
psemrow@bassford.com

*ATTORNEYS FOR DEFENDANTS U.S. BANCORP AND*
*U.S. Bank VOYAGER FLEET SYSTEMS, INC.*