UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO: 7:09-CV-057-BR

| | | |
|---|---|---|
| STEVEN VERONA, MYGALLONS LLC, and ZENACON LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | ORDER |
| | ) ) | |
| U.S. BANCORP, U.S. BANK VOYAGER FLEET SYSTEMS INC., and K.E. AUSTIN CORP., | ) ) ) ) | |
| Defendants. | ) | |

This matter is before the court on several dispositive motions as well as a motion to exclude plaintiff's proposed expert testimony and motions to seal and to strike. The parties have briefed the motions, and they are ripe for disposition.

## I. BACKGROUND

Plaintiff Steven Verona ("Verona") is founder and CEO of plaintiff Zenacon LLC ("Zenacon"), a company founded in Ohio and headquartered in Philadelphia, Pennsylvania, and of plaintiff MyGallons LLC ("MyGallons"), a company founded and originally headquartered in Florida but now also headquartered in Philadelphia. (Am. Compl., DE # 73, ¶¶ 19-21.) Verona was a resident of Pennsylvania or Florida at relevant times. (Id. ¶ 21.)

This action centers on Verona's creation of the MyGallons program and his attempt to secure a payment processing network for the program. Plaintiffs describe the MyGallons program as follows:

The MyGallons program was designed to allow consumers to

pre-purchase gasoline on the MyGallons website at current prices and have the gallons accrue in their MyGallons accounts. Consumers would be issued MyGallons cards, similar to debit cards. They could then redeem their gallons in the future at any service station where the MyGallons card was accepted, without regard to the future price of gasoline, thus protecting themselves from rising gasoline prices. MyGallons would use a portion of the prepaid gasoline revenues to hedge the price of gasoline in the financial markets, such that the company would break even on the gas, whether it rose or fell in price. MyGallons would charge consumers an annual membership fee, and also stood to earn interest on the portion of pre-paid gasoline revenues not needed to hedge the price of gasoline, as well as from advertisements on the MyGallons website.

(Pls.' Mem. Supp. Partial Summ. J., DE # 110, at 1-2 (footnotes omitted).)

According to plaintiffs, in the spring of 2008, Verona approached several executives at defendants U.S. Bancorp and Voyager Fleet Systems, Inc. ("Voyager") (collectively "USB"),[1] namely Ken Kral, Regan Hutton, and Dennis Maxson. (Verona Dep.[2] at 324, 328, 335-37.) Verona explained the MyGallons consumer program to them in an attempt to secure the use of USB's Voyager payment processing network in conjunction with the program; Maxson (and perhaps others at USB) directed Verona to work with defendant K.E. Austin Corp. ("GoGas"), represented to be a "reselling agent" of the Voyager network, as USB would not work directly with the program until it reached a certain size. (Id. at 90, 134, 322-32, 329, 344-45.)

GoGas is a North Carolina corporation headquartered in Wilmington, North Carolina. (Dorroll Aff., DE # 132, ¶ 2.) As USB directed, Verona called GoGas, speaking with Phil

---

[1]U.S. Bancorp is a Delaware corporation headquartered in Minnesota, (Am. Compl., DE # 73, ¶ 22; USB's Answer, DE # 75, ¶ 22), and its subsidiary Voyager Fleet Systems, Inc. ("Voyager") (designated in the caption as "U.S. Bank Voyager Fleet Systems, Inc.") is based in Texas, (USB's Mem. Supp. Summ. J., DE # 86, at 3). For the most part, the parties refer to these two defendants collectively. As such, and because it does appear necessary for purposes of the instant motions to refer to the defendants separately, the court will treat them as one, USB, except as otherwise noted.

[2]Verona's deposition excerpts may be found at DE # 87-2 and DE # 97-5.

2

Dorroll, the company's national fleet director. (Verona Dep. at 95, 133.) Verona explained to Dorroll that persons at USB told him to work with him (Dorroll), and they discussed the MyGallons program, specifically that it was a consumer program. (Id. at 95, 134.) Dorroll directed him to GoGas's website for a fleet card application. (Id. at 90, 95.) The parties agree that Verona completed a fleet card application in the name of Zenacon on GoGas's website. (Garzione Aff., DE # 133, ¶ 4 & Ex. 3.) Kat Garzione at GoGas verbally assisted Verona with completion of the application, including filling in projected, rather than actual, annual sales and total assets because the program was a "start-up." (Verona Dep. at 128-30.) Defendants deny that any of these conversations between Verona and USB executives and GoGas employees occurred. (See Kral Dep., DE # 88-1, at 49; Hutton Dep., DE # 88-4, at 24-25; Dorroll Aff., DE # 132, ¶¶ 8, 11, 13; Garzione Aff., DE # 133, ¶ 7; Maxson Decl., DE # 139.)

On 17 March 2008, Verona faxed the signed fleet card application in the name of Zenacon to GoGas. (See Garzione Aff., DE # 133, ¶ 6 & Ex. 3.) The parties agree that GoGas forwarded the application to USB, and USB approved the application, with a relatively small credit limit. (See id. ¶ 10; Pls.' Ex. 27, DE # 109-5.) In April 2008, fleet fuel cards in the name of "MyGallons.com" were issued to Verona. (Garzione Aff., DE # 133, ¶¶ 10, 13.) Fleet fuel cards such as those issued to Verona enable the card holders to purchase gasoline at stations which accept the Voyager card; payment to the gasoline station is settled (i.e., processed) through the Voyager network and GoGas provides the fleet customer with day to day customer support. (Dorroll Aff., DE # 132, ¶ 5.) Plaintiffs characterize the MyGallons.com cards as having been issued as part of a "pilot program" to ensure the MyGallons program would work administratively as intended. (See Verona Dep. at 106-08.) Verona distributed the cards to a handful of friends and family, who apparently used them at Voyager-approved gasoline stations,

as GoGas sent "MYGALLONS.COM" invoices for the purchases.  (<u>Id.</u> at 106; <u>see also</u> Pls.' Exs. 32-35, DE ## 101-2 to 101-5.)

"Verona decided to establish a new company– [MyGallons]– specifically branded to handle the MyGllons program, as Zenacon, the predecessor entity, was an existing company with various other ventures."  (Pls.' Mem. Supp. Partial Summ. J., DE # 110, at 6-7.)  MyGallons filed its articles of incorporation in Florida on 14 April 2008.  (Defs.' Ex. 27, DE # 89-4.) Verona intended to "transition" the fleet account from Zenacon to the newly formed entity MyGallons.  (<u>See</u> Verona Dep. at 140, 167-68, 170.)  On 20 May 2008, Verona submitted via fax a second fleet card application to GoGas, this application being in the name of MyGallons. (Verona Dep. at 172, 174; Pls.' Ex. 36, DE # 101-6; <u>see also</u> Pls.' Ex. 37, DE # 101-7 (5/7/08 email from Verona to GoGas stating, "I will submit an app [sic] to change to MyGallons LLC once I get settled in FL . . . .  I expect to be there within 2 weeks.").)  GoGas denies ever having received this application or forwarding it to USB for credit approval.  (Dorroll Aff., DE #132, ¶¶ 16, 17; Garzione Aff., DE # 133, ¶ 27.)  According to GoGas, the fleet account at all times was considered to be in the name of MyGallons.com, a d/b/a of Zenacon.  (Garzione Aff., DE # 133, ¶ 22.)

In the meantime, there were a number of communications between Verona and GoGas employees about testing of the MyGallons program; implementation of the "full" program, including whether USB would require collateral, the billing cycle, the transmission of data directly between MyGallons and USB servers; and logistical issues, such as billing, ordering of cards, card design, and use of the Voyager logo.  (Verona Dep. at 131-32, 135-45, 149-50.) During some of these communications, GoGas employees represented that USB had approved or authorized certain things.  (<u>Id.</u> at 132, 142-43, 145, 236-37, 361.)  Although there is one

4

communication directly between Verona and a USB employee, (see Pls.' Ex. 51, DE # 101-19 (regarding the transmission of data between MyGallons and USB servers)), it is apparent that Verona dealt primarily with GoGas and GoGas in turn communicated with USB.

Verona, on behalf of MyGallons, entered into two additional agreements with GoGas: (1) a 10/11 June 2008 confidentiality agreement, (Pls.' Ex. 53, DE # 101-21; Dorroll Aff., DE # 132, ¶ 27), and (2) a 27 June 2008 rebate agreement, (Pls.' Ex. 54, DE # 101-22; Dorroll Aff., DE # 132, ¶ 43). All defendants contend that USB was in the process of drafting a separate, direct agreement between USB and MyGallons for use of the Voyager payment processing network (separate and apart from GoGas) and that Verona and/or his attorney were aware of that fact. (See Loveridge Dep., DE # 88-2, at 138-43; Dorroll Dep., DE # 87-6, at 168; Dorroll Aff., DE # 132, ¶¶ 25, 30, 37, 42 & Exs. 18, 23, 33, 34, 38.)

As the court understands it, plaintiffs' theory is that no direct agreement between USB and MyGallons was needed because of the existence of the 17 March 2008 Zenacon contract, the purported contract created by virtue of the 20 May 2008 MyGallons fleet card application, the confidentiality agreement, and the rebate agreement. As support for this theory, plaintiffs rely on the actions of USB and GoGas prior to 1 July 2008 which purportedly indicate the parties were moving forward with the MyGallons program, (Verona Dep. at 168, 174; see also Loveridge Dep., DE # 88-2, at 144 (the working relationship between Voyager and Zenacon or MyGallons continued while the partner agreement was being drafted); Dorroll Dep., DE # 87-6, at 167-68 (no one at Voyager asked Dorroll to halt the relationship with or cease working with MyGallons; he did not stop communicating with Verona while the partner agreement was being drafted)); and, the failure of anyone to communicate to Verona that a direct agreement with USB was required, (see Loveridge Dep. at 143, DE # 88-2 (no knowledge of anyone at Voyager

5

speaking with anyone at Zenacon or MyGallons regarding drafting of an agreement); Dorroll Dep., DE # 87-6 at 168 (no one at Voyager ever communicated to Verona that a partner agreement was being drafted)).

On 30 June 2008, Verona issued a press release announcing the launch of the MyGallons program. (Pls.' Ex. 57, DE # 101-25.) The press release stated that "the gas redemption program uses the Voyager fleet network" and described the program as a consumer-based membership program. (Id.) According to plaintiffs, 6,000 consumers entered into contractual relationships with MyGallons following the launch (i.e., became members). (Pls.' Mem. Supp. Partial Summ. J., DE # 110, at 27; see also Verona Dep. at 146.) Media interest also ensued. (See Pls.' Exs. 12-15, DE ## 97-8 to 97-11.)

According to USB, it did not become aware of the consumer, rather than commercial, nature of the MyGallons program until learning of the press release. (Kral Dep., DE # 88-1, at 135-37; Loveridge Dep., DE # 88-2, at 95-96.) On 1 July 2008, USB's counsel emailed Verona, stating in relevant part,

> This communication is to inform you that there is no agreement in place between MyGallons and U.S. Bank or Voyager for such a program as described on the MyGallons website. MyGallons had not communicated to Voyager that any potential program between MyGallons and Voyager was or is for consumer use. MyGallons also has no approval from U.S. Bank or Voyager to use Voyager's marks, or to issue a press release naming either U.S. Bank or Voyager.
> U.S. Bank therefore demands that you immediately remove all references to Voyager and U.S. Bank, including any trademarks or symbols, from MyGallons' website, as well as any future MyGallons statements or press releases. U.S. Bank further informs MyGallons that neither U.S. Bank nor Voyager will enter into any agreement with MyGallons as contemplated and described on MyGallons' website.
> We also understand you executed, as the president and chairman of a company called Zenacon, LLC, a GoGas Commercial Fleet Card application and agreement in April, 2008 (the "Agreement"). We

6

> further understand that Zenacon may be issuing cards to
> consumers, under a similar model to the program described on the
> MyGallons website. This constitutes an unauthorized use of
> commercial fleet cards, and a breach of the terms and conditions
> set forth in the Commercial Fleet Card. We are terminating this
> Agreement immediately.

(Defs.' Ex. 88, DE # 91-3.)

In a conference call later in the day on 1 July 2008, the parties discussed USB's inability
to participate in a consumer-based program and the possibility of a future contract between the
parties. (See Kral Dep., DE # 88-1, at 136-40, 153, 170-73.) In the following days, USB issued
several statements to the press and the Better Business Bureau ("BBB") regarding its business
relationship (or lack thereof) with MyGallons and Zenacon. (See Defs.' Exs. 89-91, DE ## 91-4
to 91-6.) Thereafter, the BBB assigned MyGallons an "F" rating, news of which the BBB
disseminated widely. (See Pls.' Exs. 78, 79, DE ## 106-18, 106-19.) According to plaintiffs,
MyGallons incurred PR costs and expenses in attempting to correct the information
disseminated, and it was forced to respond to subpoenas and/or inquiries from Attorneys General
of several states, among other things. (Am. Compl., DE # 73, ¶ 104.)

On 7 July 2008, GoGas authorized Verona to use the following statement:

> GoGas had agreements in place with Zenacon LLC and MyGallons
> LLC in order to provide support for the MyGallons program
> through the use of the Voyager payment processing network. We
> believe the MyGallons program is an innovative business and it
> could offer Americans relief at the pump. We were very excited
> that Steven Verona and his staff have developed a program that
> can help the American public and to give them a tool to manage
> their personal budget given the constant increase in prices at the
> pump. We wish MyGallons and their members all the best as they
> move forward with another payment network. We feel certain there
> are other networks able to support their needs.
>
> "We believe Steven Verona to be a man of integrity and honesty
> based on our dealings with him. In fact we truly enjoyed working
> with Steven and his staff." We are sorry that MyGallons and their

> launch have been harmed by the release of incorrect information and confusing statements resulting in negative press. GOGAS apologizes for any actions that may have resulted in any release of this incorrect information. MyGallons should be applauded for their ability to develop a program that is so positive for American drivers."

(Pls.' Ex. 40, DE # 101-10.) According to plaintiffs, this statement was not widely disseminated. (Pls.' Mem. Supp. Partial Summ. J., DE # 110, at 22.)

Plaintiffs claim that because MyGallons did not have access to the Voyager payment processing network and could not secure an alternative network, MyGallons issued refunds to over 6,000 customers and lost an additional 25,000-30,000 prospective customers (i.e., those persons who had submitted their names and contact information to MyGallons and requested notification of when they could become members). (Id. at 27; see also Verona Dep. at 146.) Although one or more of the plaintiffs apparently incurred out of pocket expenses, plaintiffs primarily claim future lost profits as a result of defendants' actions.

Plaintiffs initially filed this action on 22 August 2008 in the Eastern District of Pennsylvania. Upon GoGas's motion to dismiss for lack of personal jurisdiction, that court transferred the case to this court on 24 February 2009. With leave of court, plaintiffs filed an amended complaint on 4 December 2009, alleging claims for (1) breach of contract, (2) promissory estoppel, (3) tortious interference with contractual relations, (4) tortious interference with prospective contractual relations, (5) defamation, (6) disparagement/injurious falsehood, (7) publicly placing persons in a false light, and (8) violation of North Carolina's Unfair and Deceptive Trade Practices Act. On 4 January 2010, Voyager filed a counterclaim against MyGallons and Verona alleging defamation, and a counterclaim against Zenacon and Verona alleging breach of contract for failure to pay $1,486.84 in charges on gas cards. The parties have filed cross-motions for summary judgment. Defendants filed a joint motion to exclude plaintiffs'

8

proposed expert witnesses on damages.  Finally, the parties filed motions to seal and related motions to strike.

## II.  CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs move for summary judgment as to liability on all claims except promissory estoppel and publicity placing persons in a false light.  Defendants move for summary judgment on all of plaintiffs' claims.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The summary judgment inquiry . . . scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."  Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).  In evaluating a motion for summary judgment, facts and inferences must be viewed in the light most favorable to the non-movant.  Anderson, 477 U.S. at 255.

### A.  Breach of Contract

The terms and conditions of the 17 March 2008 Zenacon contract (and the 20 May 2008 MyGallons contract, if there was one) include a choice of law provision: "The validity, interpretation and performance of this Agreement will be controlled by and construed under the laws of the State of North Dakota (without giving effect to the conflict of law principles thereof)

and applicable federal laws."[3]  (Defs.' Ex. 23, DE # 88-16.)  Under North Dakota law, "the

prima facie elements of a breach of contract action are the existence of a contract, a breach of the

contract, and damages flowing from the breach of contract."  Abdullah v. North Dakota, 771

N.W.2d 246, 253 (N.D. 2009).

Defendants vigorously deny the existence of any contract with MyGallons and deny any

breach of the contract with Zenacon.  The factual disputes underlying these issues are numerous.

Key among them are: whether anyone at USB directed Verona to GoGas; whether anyone at

USB made any representations to Verona about GoGas's authority regarding the use of the

Voyager network; what representations GoGas employees made to Verona; whether the Zenacon

contract was transitioned to a contract with MyGallons; whether Verona submitted a fleet card

application in the name of MyGallons; whether any defendant acted in furtherance of an

agreement with MyGallons; the extent of USB's knowledge about the MyGallons program;

whether anyone acting on behalf of Zenacon or MyGallons knew USB was drafting a direct

agreement between USB and MyGallons; and whether GoGas caused any damages to any

plaintiff based on MyGallons's inability to use the Voyager network.  With the existence of these

material factual disputes, the court cannot grant summary judgment in favor of *any* party, unless

a purely legal basis exists to grant judgment in favor of a party.

In this vein, defendants contend that the statute of frauds bars plaintiffs' breach of

---

[3]The parties do not appear to dispute the enforcement of this choice of law provision.  The defendants clearly rely on North Dakota law, (USB's Mem. Supp. Summ. J., DE # 86, at 13; GoGas's Mem. Supp. Summ. J., DE # 99, at 13), while plaintiffs rely on North Dakota and North Carolina case law, (Pls.' Resp. USB's Mot., DE # 144, at 8; Pls.' Resp. GoGas's Mot., DE # 145, at 7, 9, 11).  In a diversity action, such as this, the court applies the forum state's choice of law rules to determine applicable law.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).  North Carolina generally upholds choice of law provisions in contracts.  See, e.g., Torres v. McClain, 535 S.E.2d 623, 625 (N.C. Ct. App. 2000) ("We have previously held that '[t]he parties' choice of law is generally binding on the interpreting court as long as they had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental public policy of the state or otherwise applicable law.'" (citation omitted)).

10

contract claim. Specifically, defendants argue that although the 17 March 2008 Zenacon

contract clearly satisfies the statute of frauds, there is no written agreement to support the

MyGallons program. (USB's Mem. Supp. Summ. J., DE # 86, at 15; GoGas's Mem. Supp.

Summ. J., DE # 99, at 14.) Defendants rely on two provisions of North Dakota's statute of

frauds, codified at N.D. Cent. Code § 9-06-04(1) and (4). The referenced provisions require

certain contracts to be in writing: "[a]n agreement that by its terms is not to be performed within

a year from the making thereof" and "[a]n agreement or promise for the lending of money or the

extension of credit in an aggregate amount of twenty-five thousand dollars or greater." N.D.

Cent. Code § 9-06-04(1), (4). The court agrees with plaintiffs that because any purported oral

agreement could conceivably be performed within one year, N.D. Cent. Code § 9-06-04(1) does

not bar its enforcement. See Delzer v. United Bank of Bismark, 459 N.W.2d 752, 754 (N.D.

1990) ("'[i]f there is any possibility that an oral contract is capable of being completed within

one year, the contract is not within the statute of frauds *even though it is clear that the parties*

*may have intended and thought it probable that the contract would extend over a longer period,*

*and even though the contract does so extend*.' Thus, the contract must be impossible to perform

within one year if it is to be proscribed by the statute." (citation omitted) (alteration and

emphasis in original)).

 Addressing defendants' argument that § 9-06-04(4) also bars enforcement of any oral

agreement pertaining to the MyGallons program, plaintiffs assert that the parties' agreement did

not involve a loan or extension of credit. According to plaintiffs, the parties agreed that the

MyGallons account was to be prepaid, meaning that MyGallons would have on deposit at USB

an amount equal to fleet fuel transactions during a set billing cycle, and thus, USB would not be

loaning MyGallons any funds or otherwise extending any credit. (Pls.' Resp. USB's Mot., DE #

11

144, at 9; Verona Dep. at 142-45, 233-37.) If one believes this version of events, then the purported oral agreement is not subject to the statute of frauds in N.D. Cent. Code. § 9-06-04(4).

More important, however, is plaintiffs' contention that the 20 May 2008 fleet card application in the name of MyGallons *is* the operative agreement between the parties. If one believes plaintiffs' version of the facts, then obviously the 20 May 2008 agreement is written, and the statute of frauds is satisfied. For these reasons, the court cannot grant summary judgment on plaintiffs' breach of contract claim on the basis of the statute of frauds.

In addition to the statute of frauds, USB claims it could not have entered into an agreement with MyGallons due to the program's incompatibility with Voyager's business model and due to the fact the program may violate the Commodity Exchange Act. (USB's Mem. Supp. Summ. J., DE # 86, at 17-18.) To be sure, an illegal contract, whether written or oral, is unenforceable. See Kolb v. Schatzman & Assocs., L.L.C., 563 S.E.2d 231, 235 (N.C. Ct. App. 2002) ("'Generally, contracts which are illegal are unenforceable.'" (citation omitted)); Meyer v. Hawkinson, 626 N.W.2d 262, 267 (N.D. 2001) ("This Court will not enforce contracts which have an unlawful purpose . . . ." (citations omitted)). However, that Voyager restricts its lending to the commercial setting so as to avoid having to comply with disclosures required for consumer lending or that it may have believed that the MyGallons program would not be permitted by the U.S. Commodities Futures Trading Commission and that consumer class action lawsuits would ensue, (USB's Mem. Supp. Summ. J., DE # 86, at 17-19), does not make the purported MyGallons agreement illegal and therefore unenforceable. If anything, such grounds bolster USB's position that it never entered into an agreement with MyGallons, but ultimately that issue is one the jury must decide.

Finally, with regard to plaintiffs' breach of contract claim, the court agrees with USB that

its liability, if any, cannot be based on breach of the rebate or confidentiality agreements.  GoGas and MyGallons are the only parties to those agreements.  At any rate, plaintiffs' position is that USB breached only the 17 March 2008 Zenacon contract and the 20 May 2008 MyGallons contract, (see Pls.' Resp. USB's Mot., DE # 144, at 4-6; Pls.' Reply to USB's Resp., DE # 147, at 2); plaintiffs do not contend that GoGas was acting as USB's "reselling agent" when GoGas entered into these agreements with MyGallons.  Finally, the court agrees that Verona as an individual does not have any breach of contract claim independent of either Zenacon or MyGallons, as he executed any contracts as an officer of behalf of those entities, and to the extent he alleges such claim, it must be dismissed.

### B.  Promissory Estoppel

The parties agree that North Dakota law governs plaintiffs' promissory estoppel claim. (See Pls.' Resp. GoGas's Mot., DE # 145, at 13 n.20; GoGas's Mem. Supp. Summ. J., DE # 99, at 20; USB's Mem. Supp. Summ. J., DE # 86, at 20-21 & n.9.)

> In order to invoke the doctrine of promissory estoppel, the following four elements must be established: "1) a promise which the promisor should reasonably expect will cause the promisee to change his position; 2) a substantial change of the promisee's position through action, or forbearance; 3) justifiable reliance on the promise; and 4) injustice which can only be avoided by enforcing the promise."
> . . . .
> The terms of the promise, under the doctrine of promissory estoppel, must be clear, definite, and unambiguous.  "Unsupported conclusory allegations are insufficient to withstand summary judgment."

County 20 Storage & Transfer Inc. v. Wells Fargo Bank, NA, No. 3:09-cv-104, 2011 WL 826349, at *3-4 (D.N.D. March 3, 2011) (citations omitted).  The same disputed issues of material fact regarding plaintiffs' alternative claim for breach of contract exist for the promissory estoppel claim.  The only issue which can be resolved on summary judgment is whether Verona

13

has a promissory estoppel claim independent of Zenacon and MyGallons. As with the breach of contract claim, he does not, and to the extent he alleges such a claim, it will be dismissed.

## C. Tortious Interference with Contract and Prospective Advantage

Plaintiffs allege that (1) USB interfered with MyGallons's contracts with GoGas; (2) all defendants interfered with MyGallons's contracts with 6,000 customers; and, (3) all defendants interfered with MyGallon's prospective contracts with 25,000-30,000 potential customers. (Am. Compl., DE # 73, at 35-37; Pls.' Mem. Supp. Partial Summ. J., DE # 110, at 26-27.) Thus, plaintiffs assert claims for tortious interference with contract and for tortious interference with prospective advantage.

The elements of a *prima facie* case of tortious interference with contract are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

Holleman v. Aiken, 668 S.E.2d 579, 589-90 (N.C. Ct. App. 2008) (quotation and citation omitted).[4] "The only difference in these elements for a tortious interference with prospective economic advantage claim is that instead of an existing contract, there must be a contract that would have been entered into but for the defendant's conduct." National Welders Supply Co. v. Roberts Oxygen Co., No. 3:07-CV-350, 2008 WL 1837251, *1 (W.D.N.C. April 22, 2008) (citing Beck v. City of Durham, 573 S.E.2d 183, 191 (N.C. Ct. App. 2002)).

The court examines first plaintiffs' claim that USB interfered with MyGallons's contracts

---

[4]In briefing on their tortious interference claims, plaintiffs cite North Carolina law, (Pls.' Mem. Supp. Partial Summ. J., DE # 110, at 25),while defendants cite North Carolina, Florida, and Minnesota law, (USB's Mem. Supp. Summ. J., DE # 86, at 22 & n.11; GoGas's Mem. Supp. Summ. J., DE # 99, at 22-23). No one suggests that the relevant laws differ substantially between these three states. Therefore, the court will apply the law on which plaintiffs rely.

with GoGas.  According to plaintiffs, USB interfered with three different agreements between MyGallons and GoGas: (1) the 20 May 2008 agreement for MyGallons's use of the Voyager network, (2) the 10/11 June 2008 confidentiality agreement, and (3) the 27 June 2008 rebate agreement.  (Am. Compl., DE # 73, ¶¶ 123, 136; Pls.' Mem. Supp. Partial Summ. J., DE # 110, at 26.)  With respect to the first agreement, the parties' dispute centers on whether a valid contract even existed between MyGallons and GoGas.  Because, as discussed previously, a genuine issue of material fact exists as to whether an agreement for MyGallons to use the Voyager network was created, the court must also deny summary judgment as to the tortious interference claim based on that purported agreement.  However, because it is not alleged that either Verona or Zenacon was a party to the 20 May 2008 agreement, they may not assert a tortious interference claim based on that agreement, and to the extent they do so, such claim will be dismissed.

As to the other agreements between MyGallons and GoGas, that is, the confidentiality and rebate agreements, plaintiffs have not cited any *evidence* to show that USB was aware of these specific agreements.  (See Pls.' Mem. Supp. Partial Summ. J., DE # 110, at 12-13, 26-27; Pls.' Reply to USB's Resp., DE # 147, at 8; Pls.' Resp. USB's Mot., DE # 144, at 7, 14.)  Furthermore, the court agrees with USB that the confidentiality agreement cannot support any tortious interference claim.  Plaintiffs do not contend that GoGas used or disclosed any of MyGallons's confidential information in violation of the confidentiality agreement.[5]  In other words, plaintiffs do not suggest that GoGas breached or otherwise did not perform the confidentiality agreement.  If GoGas did not breach or performed in accordance with the confidentiality agreement, then obviously USB could not have interfered with that agreement.

_____

[5]For the agreement's specific terms, see Pls.' Ex. 53, DE # 101-21.

Regarding MyGallons's contracts with 6,000 customers and prospective contracts with another 25,000 to 30,000 customers, plaintiffs have no evidence that any of the defendants intentionally induced those customers (actual or potential) to not perform their existing contracts with MyGallons or to refrain from entering into membership contracts with MyGallons. Rather, it was *MyGallons*, not its customers, who had to renege on the contracts and refund fees; the defendants did not intentionally induce those customers to breach or not perform under their contracts for membership. See Stephenson v. Warren, 525 S.E.2d 809, 813 (N.C. Ct. App.) ("Plaintiff should note that the third element of this claim requires that the defendant intentionally induce a *third person* not to perform the contract– not that the defendant intentionally induced the *plaintiff* not to perform the contract." (emphases in original)), review denied, 543 S.E.2d 883 (N.C. 2000). Likewise, it was *MyGallons* who was unable to or refrained from entering into membership contracts with potential customers. The defendants did not intentionally induce the potential customers not to enter into membership contracts with MyGallons.

In addition, the court is unwilling to find that the "intense media attention" upon MyGallons's 30 June 2008 launch evidences the defendants' knowledge of any contracts between MyGallons and customers. (See Pls.' Resp. USB's Mot., DE # 144, at 15.) Without knowledge of the contracts, the defendants could not have interfered with them.

Another basis to dismiss these claims, at least as to Verona and Zenacon, is that plaintiffs do not allege Verona or Zenacon was a party to any existing membership contract or that any prospective contract would have ensued between Verona or Zenacon and any potential customer. Therefore, to the extent Verona or Zenacon asserts a claim for tortious inference based on any member's contract or prospective member contract, they have failed to state such a claim.

16

### D. Defamation and Related Claims

Plaintiffs allege defamation and related claims against USB based on statements purportedly made to the press and the Better Business Bureau ("BBB"). Specifically, plaintiffs assert claims for (1) defamation, (2) disparagement/injurious falsehood, and (3) publicity placing one in false light. (Am. Compl., DE # 73, ¶¶ 142-62.) The parties do not seriously dispute the applicability of Minnesota law to these claims as Minnesota is the state where the statements forming the basis of the claims were allegedly made,[6] and therefore, the court will apply that substantive law to these claims.

> To establish a defamation claim, a plaintiff must prove three elements: (1) the defamatory statement is communicated to someone other than the plaintiff, (2) the statement is false, and (3) the statement tends to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community. If the defamation affects the plaintiff in his business, trade, profession, office or calling, it is defamation per se and thus actionable without any proof of actual damages.

Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 919-20 (Minn. 2009) (quotations, citation, and alterations omitted).

---

[6]In their brief in support of their motion for summary judgment, plaintiffs cite solely to North Carolina law. (Pls.' Mem. Supp. Partial Summ. J., DE # 110, at 27-28.) In their subsequent briefs, however, plaintiffs cite to Minnesota law, (Pls.' Resp. USB's Mot., DE # 144, at 16-17, 19; Pls.' Reply to USB's Resp., DE # 147, at 9), other than a passing reference in a footnote to Pennsylvania law, (Pls.' Resp. USB's Mot., DE # 144, at 20 n.22). USB cites primarily to Florida and Minnesota law. (See USB's Mem. Supp. Summ. J., DE # 86, at 24, 27.)

"A federal court sitting in diversity must apply the choice-of-law rules from the forum state." Wells v. Liddy, 186 F.3d 505, 521 (4th Cir. 1999) (citation omitted), cert. denied, 528 U.S. 1118 (2000).

> North Carolina follows the lex loci delicti rule (law of the situs of the claim) in resolving choice of law for tort claims. The law of the place where the injury occurs controls tort claims, because an act has legal significance only if the jurisdiction where it occurs recognizes that legal rights and obligations ensue from it.

Hensley v. National Freight Transp., Inc., 668 S.E.2d 349, 351 (N.C. Ct. App. 2008) (quotations and citations omitted), aff'd, 675 S.E.2d 333 (N.C. 2009) (per curiam). In North Carolina, "[t]he plaintiff's injury is considered to be sustained in the state 'where the last act occurred giving rise to [the] injury.'" Harco Nat'l Ins. Co. v. Grant Thornton LLP, 698 S.E.2d 719, 724 (N.C. Ct. App. 2010) (citation omitted) (alteration in original), review denied, 2011 WL 444848 (N.C. Feb. 3, 2011). Although the court could not locate a North Carolina case directly on point, the general rule for defamation claims is the place of harm is the place of publication. See Wells, 186 F.3d at 521-22 (applying Maryland's lex loci delicti rule). Applying the rule here leads to the application of Minnesota law.

Plaintiffs point to three statements USB made which, they claim, were false and harmed them:

> 1. "U.S. Bank Voyager Fleet Systems does not have a contract with to do business with MyGallons.com [sic]. We did not authorize the use of our name in association with this venture and we are not affiliated with this company."  USB Ex. 89.
> 2. "Neither U.S. Bank National Association ND, nor Voyager Fleet Systems, Inc. have a contract to do business with MyGallons.com, LLC, [sic] and there are no ongoing negotiations to enter into any agreement with MyGallons."  USB Ex. 90; Risen Decl. Ex. 87.
> 3. "Neither U.S. Bank National Association ND, nor Voyager Fleet Systems Inc. has a contract to do business with MyGallons LLC, and there are no ongoing negotiations to enter into any agreement with MyGallons.
> We did have a commercial fleet fuel card contract with Zenacon LLC through our partnership with third-party marketer GoGas Universal, however it was for the exclusive purpose of providing commercial fleet fueling and maintenance cards, not consumer cards."  USB Ex. 91.

(Pls.' Resp. USB's Mot., DE # 144, at 16-17 (quoting USB's Mem. Supp. Summ. J., DE # 86, at 10 (alterations in original)).)  Not surprisingly, USB contends that all these statements are true. Resolution of this issue essentially turns on whether USB had an agreement with MyGallons.  In turn, that issue is a factual one which precludes the entry of summary judgment on the defamation claim.

To prevail on a claim of product disparagement, a plaintiff must prove that the defendant published a false or disparaging statement concerning the plaintiff's product(s) and that special damages resulted from the publication.  Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1337 (8th Cir. 1997) (Minnesota law).  Special damages mean "in the form of pecuniary loss directly attributable to defendant's false statements.  Where plaintiff cannot show loss of specific sales, the modern view allows plaintiff to prove a general decline of business, so long as this is shown to be the result of defendant's disparaging statements and other possible causes are eliminated."

Advanced Training Sys., Inc. v. Caswell Equip. Co., 352 N.W.2d 1, 7-8 (Minn. 1984) (citations omitted).

As the basis for the disparagement claim, plaintiffs rely on the same three statements that support their defamation claim. (Pls.' Resp. USB's Mot., DE # 144, at 19.) As with that claim, there are factual issues, namely whether the statements were false, which preclude the court from entering summary judgment in favor of any party on the disparagement claim.

As for plaintiffs' false light claim, it is not a recognized cause of action under Minnesota law, Parniani v. Cardinal Health, Inc., Civil No. 06-2514, 2007 WL 2219373, *6 (D. Minn. June 29, 2007) (relying on Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231 (Minn. 1998)), adopted in part, 2007 WL 2219368 (D. Minn. July 27, 2007), aff'd, 305 Fed. Appx. 301 (8th Cir. 2008), cert. denied, 130 S. Ct. 1708 (2010), and thus, that claim will be dismissed.

### E. North Carolina's Unfair and Deceptive Trade Practices Act

Plaintiff alleges violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, against all defendants. "To prevail on [a UDTPA] claim, a plaintiff must prove (1) that defendant committed unfair or deceptive acts, (2) that defendant's action was in or affecting commerce, and (3) that the act proximately caused injury to the plaintiff." Eli Research, Inc. v. United Commc'ns Grp., LLC., 312 F. Supp. 2d 748, 757 (M.D.N.C. 2004) (citing Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001)). As the North Carolina Court of Appeals has recognized,

> [u]nder N.C.G.S. § 75-1.1, a trade practice is unfair if it "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." A trade practice is deceptive if it "has the capacity or tendency to deceive." It is well recognized, however, that actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1. We agree with the Fourth

19

> Circuit Court of Appeals which, in construing N.C.G.S. § 75-1.1,
> stated that "a plaintiff must show substantial aggravating
> circumstances attending the breach to recover under the Act, which
> allows for treble damages."

Branch Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 700 (N.C. Ct. App.) (citations

omitted), review denied, 421 S.E.2d 350 (N.C. 1992).

### 1. *Territorial Scope of the UDTPA*

The parties' primary arguments center on the extraterritorial application of the UDTPA.

They all cite The 'In' Porters, S.A. v. Hanes Printables, Inc., 663 F. Supp. 494 (M.D.N.C. 1987),

to support their respective positions. In that case, the plaintiff, a French corporation, sued a

Maryland corporation with Illinois as its principal place of business and a Delaware corporation

with North Carolina as its principal place of business for violation of the UDTPA, among other

things. Id. at 495, 496. The action concerned the termination of an exclusive distributorship

between the plaintiff and the North Carolina-based corporation. Id. at 496. Although the parties

negotiated the distributorship agreement primarily in North Carolina, the actions forming the

basis of the suit occurred in Europe. See id.

Prior to analyzing the UDTPA's extraterritorial reach, the court framed the issue as

"whether section 75-1.1 is available to a foreign plaintiff suing a resident defendant over alleged

foreign injuries having a negligible effect, if any, on North Carolina trade or commerce." Id. at

501. The court stated:

> Looking at the intended scope of section 75-1.1, the court
> notes that before 1977 the section was specifically limited to
> dealings "within this state." The General Assembly deleted this
> geographical limitation in 1977, and the courts have determined
> that the General Assembly sought thereby to expand the coverage
> of section 75-1.1 to the limits of section 1-75.4(4) of the North
> Carolina long-arm statute. Section 1-75.4(4) allows personal
> jurisdiction over defendants in a case involving foreign acts *if an
> injury* to person or property *occurs within North Carolina* and, at

20

> or about the time of the injury, the defendants were either working
> in North Carolina or had products in the North Carolina commerce
> through the ordinary course of business. Thus, section 1-75.4(4),
> as applied to defining the reach of 75-1.1, requires an in-state
> injury to plaintiff before plaintiff can state a valid unfair trade
> claim.

Id. at 501 (citations omitted) (emphases in original). The court went on to evaluate whether the

Sherman Act, 15 U.S.C. § 45(a)(1), and the Constitution impose any limitations on the UDTPA

as applied to foreign conduct having an effect on North Carolina trade or commerce. The court

ultimately found that requiring a "substantial effect on [a] plaintiff's in-state operations" is

consistent with the Sherman Act and the Constitution, specifically the commerce and due

process clauses. Id. at 502.

> Before North Carolina's substantive law can be applied, North
> Carolina must have a sufficient state interest in the litigation such
> that application of North Carolina's law is "neither arbitrary nor
> unfair." Section 75-1.1 is broadly worded and arguably
> encompasses "any conduct that a court of equity would consider
> unfair." In addition, a victorious plaintiff under this section could
> receive treble damages and attorney fees. Such a sweeping,
> punitive cause of action should not be given an extended
> extraterritorial reach, lest notions of fairness be clipped. To extend
> the Act's coverage to every occasion where foreign conduct has an
> effect in North Carolina is potentially to subject defendants, quite
> unaware of the Act[']s existence and punitive punch, to unfair
> treatment. For these reasons, limiting the section[']s reach to cases
> involving a substantial effect on plaintiff's operations in North
> Carolina comports with the notion of fairness under the due
> process clause.

Id. (citations omitted). Because the plaintiff admitted that its business operations were solely in

France and that it had no operations in North Carolina, the court concluded the "claim falls

outside the reach of 75-1.1[.]" Id. at 502-03.

A number of cases have followed 'In' Porters' line of reasoning to dismiss UDTPA

claims by foreign entities.[7] See, e.g., In re Genetically Modified Rice Lit., 666 F. Supp. 2d 1004, 1017-18 (E.D. Mo. 2009) (granting summary judgment in favor of corporations allegedly involved in contamination of U.S. rice supply on Missouri rice producers' UDTPA claims, noting that, although some of defendants' decision-making occurred in North Carolina, "the claims of plaintiffs cannot be said to arise mainly from those North Carolina activities" and "[p]laintiffs have not shown that their claims have a sufficient effect on North Carolina business for them to benefit from this act intended to protect North Carolina commerce"); Merck & Co. v. Lyon, 941 F. Supp. 1443, 1462-63 (M.D.N.C. 1996) (dismissing UDTPA claim of foreign corporations based on hiring away of foreign corporations' former employee and alleged disclosure and use of trade secrets by North Carolina corporation where the foreign corporations failed to allege a substantial effect on any in-state business operations); Dixie Yarns, Inc. v. Plantation Knits, Inc., No. 3:93CV301-P, 1994 WL 910955, *2-3 (W.D.N.C. July 12, 1994) (holding foreign corporation did not state claim under UDTPA against corporation with North Carolina manufacturing facility because the product at issue proved defective in a state outside of North Carolina, thus a foreign injury occurred, and foreign corporation could not show it had any North Carolina business operations).

These decisions bear comparison to those decisions where the court has declined to dismiss a foreign party's UDTPA claim. In Hardee's Food Sys., Inc. v. Beardmore, No. 5:96CV508-BR(2), 1997 WL 33825259, *1, 2 (E.D.N.C. June 6, 1997), a North Carolina-based franchisor moved to dismiss its Nebraska-based franchisees' UDTPA claim "as beyond the extraterritorial scope of the Act." Relying on Broussard v. Meineke Discount Muffler Shops,

_____

[7]By referring to a "foreign" entity or party in this section, the court means an entity or party not based in or resident of North Carolina.

Inc., 945 F. Supp. 901 (W.D.N.C. 1996), rev'd on other grounds, 155 F.3d 331 (4th Cir. 1998),

and Jacobs v. Central Transp., Inc., 891 F. Supp. 1088 (E.D.N.C. 1995), aff'd in part and rev'd in

part, 83 F.3d 415 (4th Cir. 1996) (table), this court found "[n]othing in the language of § 75-1.1

supports making the Act available only to plaintiffs whose in-state business operations have been

injured." Hardee's, at *3. The court recognized that in both Broussard and Jacobs, the courts

"applied § 75-1.1 where the out-of-state plaintiff conducts continuing business transactions with

an instate defendant and is injured by the defendant's in-state activities." Id. In Hardee's,

because the franchisees' injury resulted from the franchisor's "alleged misrepresentations and

misconduct, based on decisions which [the franchisor] made, in all probability, in North

Carolina," this court denied the franchisor's motion to dismiss.

More recently, in Ada Liss Group v. Sara Lee Corp., No. 06CV610, 2010 WL 3910433,

*1 (M.D.N.C. April 27, 2010), the court examined the Israeli plaintiff's UDTPA claim against a

North Carolina resident corporation[8] based on the parties' agreements concerning the plaintiff's

exclusive distributorship of some of the defendant's products in Israel.  The court distinguished

'In' Porters, and its analysis bears repeating in relevant part.

> The relevance of the *'In' Porters* case for the present matter is that
> it restricted the reach of the UDTP statute with respect to foreign
> plaintiffs. *'In' Porters* held that a plaintiff suing in North Carolina
> for an injury incurred in a foreign jurisdiction cannot maintain an
> action for UDTP without a showing of a "substantial state interest
> in the litigation such that application of North Carolina's law is
> 'neither arbitrary nor unfair.'"  More specifically, this meant that
> the plaintiff had to show "a substantial effect on the plaintiff's
> in-state operations" to meet the jurisdictional requirements of the
> state.
> . . . .
>         The *'In' Porters* court reviewed the UDTP claim through

---

[8]The plaintiff actually brought suit against two defendants; however, the court referred to the defendants
collectively as one entity.  See Ada Liss, at *2 n.1.

23

the lens of the particular subsection of North Carolina's personal jurisdiction statute, § 1-75.4(4), which covers personal jurisdiction issues related to acts committed outside North Carolina, but causing injury to a party within the State. . . .

The problem for the *'In' Porters* plaintiff was that the record showed exclusively foreign misconduct with damages to the plaintiff's exclusively foreign operations. Plaintiff could not prove in-state injury, a sufficient state interest, or an effect on its substantial in state operations. The distinction in the present case lies in the factual basis of the claims, which requires the application of different law than *'In' Porters*. In the present matter a significant portion of the alleged unfair or deceptive conduct, the predicate for the UDTP claim, took place in North Carolina. The jurisdictional basis for in-state wrongs is distinct from that analyzed in *'In' Porters*. The North Carolina long-arm statute explicitly confers jurisdiction (to the allowable limits under the U.S. Constitution) "[i]n any action claiming injury to person or property or for wrongful death within or without this State arising out of an act or omission within this State by the defendant." Section 1-75.4(3), which immediately precedes the section relied upon in *'In' Porters*, is entitled "Local Act or Omission."

Where the alleged conduct occurred within the State, and therefore falls under the clear mandate of the North Carolina long-arm statute, the only further limits on personal jurisdiction are those imposed generally by the due process clause.

In the present case, where [the defendant]– itself a North Carolina resident– is alleged to have committed fraud in North Carolina against [the plaintiff], the question of extra-territorial application of the UDTP statute, which was fatal to the UDTP claim in *'In' Porters*, is simply not at issue. Because the conduct alleged took place in North Carolina, the court does not have to search for an impact on the Plaintiff's state operations or a strong state interest. There is no inquiry into the sufficiency of Plaintiff's relationship to North Carolina in a case involving local acts under 1-75.4(3). Instead the issue of jurisdiction is reduced to the traditional inquiry of whether the jurisdictional statute's provisions comport with the Due Process Clause.

The exercise of personal jurisdiction by a court in North Carolina for acts committed within the state by an in-state resident cannot reasonably be said to unduly burden interstate commerce, or to run afoul of traditional notions of fair play and substantial justice.

Id. at *12-14 (footnote and citations omitted).

The courts' rationale in Ada Liss, Hardee's, Broussard, and Jacobs, albeit articulated

24

somewhat differently in each case, is applicable here as to plaintiffs' UDTPA claim against

GoGas. As previously noted, GoGas is a North Carolina corporation. GoGas's communications

with plaintiffs emanated from North Carolina. More importantly, the alleged "unfair and

deceptive acts also took place in and emanated from GoGas' headquarters in Wilmington, North

Carolina." (Pls.' Resp. GoGas's Mot., DE #145, at 18.) The application of the UDTPA to a

domestic corporation who is subject to the laws of this state and who committed the alleged

predicate acts within this state does not implicate notions of unfairness or arbitrariness nor does

it unfairly burden interstate commerce. See Ada Liss, at *14. That MyGallons, a foreign

corporation, might have ultimately suffered injury in the form of lost revenues outside of North

Carolina does not alter the court's analysis. The court will not dismiss plaintiffs' UDTPA claim

against GoGas as being beyond the reach of the Act.

It is a different matter, however, as to USB. As previously noted, U.S. Bank is a

Delaware corporation headquartered in Minnesota, and Voyager is based in Texas. See supra

n.1. Plaintiffs do not argue that USB committed any unfair or deceptive acts in North Carolina.

Rather, plaintiffs attempt to show USB's conduct had a substantial effect on MyGallons's in-

state operations in accordance with 'In' Porters. Their sole argument is as follows.

> [T]he actions of the Voyager Defendants have had a substantial
> effect on MyGallons' North Carolina operations. One hundred and
> ninety (190) of MyGallons' paying customers during its first few
> days of operations were residents of the State of North Carolina.
> Those membership contracts, formed between MyGallons and
> North Carolina consumers – which MyGallons was forced to
> breach following the Voyager Defendants' wrongdoing –
> constitute North Carolina-based assets of MyGallons. And those
> assets were substantially affected by the Voyager Defendants'
> refusal to honor its contracts with MyGallons.

(Pls.' Resp. USB's Mot., DE # 144, at 21 (footnote omitted).) The court declines to extend the

UDTPA to these circumstances and finds plaintiffs cannot demonstrate a substantial effect on

their business operations in North Carolina.  Therefore, plaintiffs' UDTPA claim against USB must be dismissed.

### 2. *Unfair or Deceptive Acts*

Because the court has determined that the territorial reach of the UDTPA does extend to GoGas's alleged actions, the court considers GoGas's alternative argument, that is, plaintiffs' evidence does not support a UDTPA claim.  Specifically, it argues that plaintiffs' "core allegation is breach of contract" and, as such, is not actionable under the UDTPA without substantial aggravating circumstances.  (GoGas's Mem. Supp. Summ. J., DE # 99, at 25.)  As recognized previously, when a UDTPA claim centers on a breach of contract, the plaintiff must show substantial aggravating circumstance attending that breach to recover under the UDTPA.

Here, however, plaintiffs' UDTPA claim is not based on breach of contract.  Rather, plaintiffs contend, assuming there was in fact no agreement between MyGallons and GoGas for use of the Voyager network, GoGas's deceptive and unfair conduct was its misleading Verona and MyGallons to believe that such an agreement was in place.  (Pls.' Resp. GoGas's Mot., DE # 145, at 20-21.)  In response to this contention, GoGas points to the 27 June 2008 telephone conversation that Phil Dorroll of GoGas had with MyGallons's general counsel Brent Levison, during which Dorroll "made it very clear that Voyager wanted a direct agreement with MyGallons and was in the process of preparing that agreement."  (Dorroll Aff., DE # 132, ¶ 42.)  GoGas claims this undisputed testimony undoes the UDTPA claim as it dispelled any illusions that GoGas had the authority to enter into an agreement granting access to the Voyager network and that any such agreement was final.  (GoGas's Reply, DE # 149, at 7.)  Although plaintiffs have not refuted Dorroll's testimony about his conversation with Levison, the picture is not so clear as GoGas would have it.  There are issues of fact regarding whether the parties were

negotiating some sort of addendum, rather than a direct agreement between MyGallons and USB, and whether GoGas's actions indicated performance of an existing agreement with MyGallons. Because genuine issues of material fact exist as to whether GoGas's conduct was unfair or deceptive, the court will not dismiss the UDTPA claim.

### 3. *Claims of Verona and Zenacon*

GoGas contends Verona and Zenacon do not have a UDTPA claim independent of MyGallons. (GoGas's Mem. Supp. Summ. J., DE # 99, at 35.) The court agrees. It was MyGallons who plaintiffs ultimately claim was to have access to the Voyager network, and therefore, for the UDTPA claim, it was MyGallons who was purportedly injured. Verona's and Zenacon's UDTPA claim against GoGas will be dismissed.

### F. Damages of Lost Profits

The 17 March 2008 Zenacon contract (and the 20 May 2008 MyGallons contract, assuming its existence) contains an exclusion of damages provision, which reads:

> **13. LIMITATION OF LIABILITY.** IN NO EVENT SHALL
> BUSINESS, PARTICIPANT(S), BANK, VOYAGER, OR ANY
> AFFILIATE OF BANK BE LIABLE TO THE OTHER PARTY
> FOR ANY CONSEQUENTIAL, SPECIAL, INDIRECT, OR
> PUNITIVE DAMAGES OF ANY NATURE.

(Defs.' Ex. 23, DE # 88-16.) Defendants argue that this provision precludes plaintiffs' recovery of lost profits. (GoGas's Mem. Supp. Summ. J., DE # 99, at 26-27; USB's Mem. Supp. Summ. J., DE # 86, at 29.) Plaintiffs acknowledge that "the limiting clause may not be unconscionable per se." (Pls.' Resp. GoGas's Mot., DE # 145, at 22-23.) Yet, they contend that the provision is unenforceable due to GoGas's bad faith; plaintiffs do not suggest that the provision is unenforceable as to USB. (Compare Pls.' Resp. USB's Mot., DE # 144, at 22-26 with Pls.' Resp. GoGas's Mot., DE # 145, at 22-23.) Plaintiffs do not define bad faith in this context or

point to any evidence of what purportedly is GoGas's bad faith.  They do cite to a number of cases for the proposition that "'a defendant may be estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad faith.'" (Pls.' Resp. GoGas's Mot., DE # 145, at 23.)  None of the cases, however, apply North Dakota law; all concern sales contracts under the Uniform Commercial Code; and, all, except one, involve the situation of an exclusive remedy clause (such as product repair and replacement) which may have or has failed of its essential purpose.  See, e.g, Long Island Lighting Co. v. Transamerica Delaval, Inc., 646 F. Supp. 1442, 1458 (S.D.N.Y. 1986).

Absent case law more directly on point and given that this was a commercial transaction at arm's length, with no suggestion of unconscionability or of fraudulent conduct on the part of any defendant, the court will enforce this exclusionary provision of the written contract(s) and plaintiffs may not recover consequential damages, such as lost profits, flowing from any breach of contract.  The court notes that enforcement of this provision does not preclude the recovery of other damages, such as out-of-pocket expenses, or, at a minimum, nominal damages, see Hummel v. Mid Dakota Clinic, P.C., 526 N.W.2d 704, 709 (N.D. 1995) ("A party who proves a breach of a contractual duty, but who fails to prove damages resulting from the breach, is entitled to nominal damages only." (citation omitted)).  In addition, the exclusion of consequential damages only applies to the breach of contract claim.

In large part, defendants' remaining arguments regarding lost profits damages mirror those arguments raised in their motion to exclude plaintiffs' proposed expert witness testimony, which is discussed below.   Defendants contend that because the experts' opinions are analytically flawed, the lost profit projections are speculative.

A party is entitled to recover lost profits if they may be calculated with reasonable

certainty. See Langer v. Bartholomay, 745 N.W.2d 649, 660 (N.D. 2008) (breach of contract);

BNT Co. v. Baker Precythe Dev. Co., 564 S.E.2d 891, 897 (N.C. Ct. App.) (tort), review denied,

569 S.E.2d 283 (N.C. 2002); Swain v. Harvest Stats Corp., 469 N.W.2d 571, 575 (N.D. 1991)

(recognizing lost profits may be awarded in tort or for breach of contract); Olivetti Corp. v.

Ames Bus. Sys., Inc., 356 S.E.2d 578, 585 (N.C. 1987) (refusing to recognize "new business

rule" which precludes recovery of lost future profits by a damaged party which has no recent

record of profitability). In the case of a new business, the plaintiff has a high burden in this

regard but not an insurmountable one.

    At this point in the proceeding, the court is unwilling to conclude as a matter of law that

plaintiff cannot prove MyGallons's lost profits with reasonable certainty. Defendants are free to

renew their arguments at trial.

### III. DEFENDANTS' MOTION TO EXCLUDE

    As an additional ground for excluding lost profits damages on *any* of plaintiffs' claims,

defendants move to exclude the testimony of plaintiffs' proposed experts Anca Micu, Ph.D. and

Paul Seitz. Plaintiffs intend to offer the testimony of Dr. Micu on the number of people who

would have signed up for MyGallons memberships during its first three years of operation.

(Pls.' Resp. Mot. Exclude, DE #136, at 2.) Plaintiffs intend to offer the testimony of Seitz, a

Certified Public Accountant and Certified Valuation Analyst, on the issue of lost profits; Seitz

relied on Dr. Micu's projected number of memberships in estimating lost profits. (Id. at 2, 3.)

    The admissibility of expert testimony is determined by reference to federal, rather than

state, law. See Bryte ex rel. Bryte v. Amercian Household, Inc., 429 F.3d 469, 476 (4th Cir.

2005), cert. denied, 547 U.S. 1129 (2006). As the Fourth Circuit recognizes:

> The introduction of expert opinion testimony is governed
> by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Expert testimony is admissible under Rule 702 if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the trier of fact to understand or resolve a fact at issue. The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable– that is, whether it is supported by adequate validation to render it trustworthy. The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue.

> A district court considering the admissibility of expert testimony exercises a gatekeeping function to assess whether the proffered evidence is sufficiently reliable and relevant. The inquiry to be undertaken by the district court is "a flexible one" focusing on the "principles and methodology" employed by the expert, not on the conclusions reached. In evaluating the admissibility of the testimony, the court should consider a variety of factors, including whether the method used is generally accepted in the scientific community; the rate of error, if known; the existence and maintenance of standards; and whether the expert's work has been subjected to peer review. The court need not determine that the proffered expert testimony is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to testing by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."

United States v. Moreland, 437 F.3d 424, 430-31 (4th Cir.) (citations omitted), cert. denied, 547

U.S. 1142 (2006).

> Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are "so unrealistic and contradictory as to suggest bad faith" or to be in essence an "apples and oranges comparison," other contentions that the assumptions are unfounded "go to the weight, not the

admissibility, of the testimony." A district court has discretion under Federal Rule of Evidence 703 "to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony."

Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996).

Although they acknowledge that Dr. Micu has "expertise in 'marketing accountability,'" defendants claim Dr. Micu lacks "critical business qualifications" necessary to opine on whether MyGallons could in fact have achieved the level of memberships she estimates. (Defs.' Mem. Supp. Mot. Exclude, DE # 83, at 2.) Specifically, defendants cite to Dr. Micu's lack of expertise in studying sales; her failure to analyze whether consumers would be willing to pay for a MyGallons membership; her lack of "expertise in whether a company employs management with sufficient experience to perform the work necessary to meet a membership or sales projection;" her lack of knowledge and experience regarding business capitalization needs; and, her lack of knowledge of the failure rate of internet start-up companies. (Id. at 7-8, 10-11.) Because she lacks these business qualifications, defendants argue, Dr. Micu did not analyze important factors, such as the utility of the MyGallons product or the viability of MyGallons's business plan, in reaching her opinions, and therefore her opinions are unreliable. (Id. at 11.)

While these shortcomings with Dr. Micu's testimony are certainly important, they are not of the magnitude to warrant exclusion of the testimony. Her opinions were based on her experience in the effectiveness of marketing communications, review of company-related documents, discussion with Verona and his attorneys, and research of pertinent academic and trade literature, particularly in reference to internet-based, membership businesses. (Defs.' Ex. 71, DE # 90-2; Micu Dep., DE # 87-7, at 36, 38-41.) Defendants' objections to Dr. Micu's proffered testimony go to the weight her testimony should be accorded, not the admissibility of such testimony. The court finds that Dr. Micu is qualified to render the proffered expert

31

testimony and that her opinions have a factual basis and are sufficiently reliable.

Defendants also take issue with Dr. Micu's methodology. She used a "funnel approach" to estimate how many members would sign up with MyGallons in the first year of operation. (Defs.' Ex. 71, DE # 90-2, at 4.) She explains, "Using the available market size as a starting point, the number was then narrowed down to the actual number of paying members based on advertising effectiveness and online consumer behavior data." (Id.) To estimate membership in subsequent years, she used benchmarked growth and attrition rates. (Id.) Defendants contend that, instead, she should have extrapolated MyGallons's actual experience during the six days it signed up members. (See Defs.' Mem. Supp. Mot. Exclude, DE # 83, at 4, 8.) According to defendants, extrapolating actual experience would have resulted in a much lower membership estimate. (Id. at 8.)

Defendants have not suggested that the "funnel approach" is not generally accepted. Dr. Micu testified that internet-based businesses grow exponentially rather than linearly, (Micu Dep., DE # 87-7, at 53-54), and therefore, it is not unreasonable for Dr. Micu to base her estimate on a narrowing down of market size, applying benchmarked growth and attrition rates, rather than assume MyGallons's membership would grow at the same level as in the first six days in operation, i.e. 1,000 memberships per day.

It is significant to note that Dr. Micu did not completely ignore MyGallons's actual experience during its limited period of operation. In estimating membership during the first year, Dr. Micu considered the rate at which the number of persons who visited MyGallons's website actually signed up as members (and other internet membership-driven businesses, Costco and Amazon Prime, as benchmarks) to determine the "conversion" rate. (Defs.' Ex. 71, DE # 90-2, at 6-7.) Defendants fault her use of MyGallons's actual experience in this fashion

and her use of the conversion rates of Costco and Amazon Prime as benchmarks.  They suggest

the conversion rate she used is too high because fuel prices were at their peak during the time

consumers signed up as MyGallons members and because the benchmarks she used are not start-

up internet businesses.  (See GoGas's Mem. Supp. Summ. J., DE # 99, at 32; Defs.' Mem. Supp.

Mot. Exclude, DE # 83, at 5, 7, 8.)  How Dr. Micu arrived at the conversion rate is an

appropriate topic for cross-examination.

      In addition, defendants claim Dr. Micu's misstatement of what is contained in an article

on which she relied destroys the reliability of her methodology.  (Defs.' Mem. Supp. Mot.

Exclude, DE # 83, at 11.)  In estimating the number of visitors to MyGallons's website, Dr. Micu

relies on a Jupiter Research study to support the proposition that 66 percent of persons who learn

about a brand from offline advertising will access the brand's website.  (Defs.' Ex. 71, DE # 90-

2, at 6.)  Dr. Micu notes that the Jupiter Research study is reported in an article published in

*ManageSmarter*.  (Id. at 6 n.10.)  That article states that the Jupiter Research study "showed that

66 percent of those who responded to an offline advertisement visited the Website or a search

engine to learn more . . . ."  (Defs.' Ex.  77, DE # 90-8.)  When questioned about this statement,

Dr. Micu agreed that the group of people responding to an advertisement is a subset of the total

group aware of the brand.  (Micu Dep., DE # 87-7, at 77.)   Dr. Micu acknowledged that she had

not read the Jupiter Research study itself.  (Id. at 76.)   Despite the apparent discrepancy between

her interpretation of the article and what the article actually says, Dr. Micu nevertheless

maintains her opinion that 66 percent of those persons aware of MyGallons would access its

website.  (Id. at 78.)  As with the other objections defendants raise to Dr. Micu's proffered

testimony, the issue is one of credibility, rather than admissibility.

      Because the court has determined there is no basis on which to exclude Dr. Micu's

estimation of MyGallons's memberships, the court will likewise not exclude testimony from Seitz, who relied on Dr. Micu's estimation.

## IV. MOTIONS TO SEAL AND TO STRIKE

On 27 August 2010, the court denied without prejudice a number of motions to seal directed at various documents submitted in connection with the instant motions for summary judgment. The parties filed the pending motions to seal and strike pursuant to that order.

GoGas moves to strike certain unredacted exhibits originally filed with the affidavits of Phil Dorroll, Exhibits 3, 4, 10, and 28 (DE # 98-1) and Kat Garzione, Exhibits 1 and 3, (DE # 98-2). GoGas has refiled the complete affidavits and all exhibits, with the noted exhibits appropriately redacted pursuant to Fed. R. Civ. P. 5.2. (DE ## 132, 133.) The court will allow the motion to strike, and for simplicity's sake, the court will order the originally filed affidavits and exhibits striken in their entirety.

USB filed a similar motion to strike concerning unredacted exhibits (DE ## 88-13, 88-15, 89-10), which have now been filed with proper redactions pursuant to Fed. R. Civ. P. 5.2 (DE ## 116-18.) The court will allow the motion to strike.

USB moves to seal copies of its agreement, including addendum, with GoGas (DE ## 92, 109-3, 109-4) and Fuel Card Program Agreements with Pricelock Incentive Solutions, Inc. (DE ## 109-9 to 109-11). Although these documents were filed in support of the motions for summary judgment and reviewed by the court, the court did not rely upon them in reaching its decision. Accordingly, the court will not presume a public right of access to the documents and will allow the motion to seal. See In Re Policy Mgmt. Sys Corp., Nos. 94-2254, 94-2341, 67 F.3d 296 (4th Cir. 1995) (table) (declining to find First Amendment or common law right of access applies where documents are filed with a motion to dismiss and trial court did not

consider the materials).

Plaintiffs move to seal several documents. First, they request that copies of MyGallons Business Plan and Executive Summary of the same (DE ## 109-1, 109-2) be sealed. The court did not rely upon these documents in ruling on the summary judgment motions, and therefore, the court will allow them to be filed under seal. Second, plaintiffs request that copies of a group of documents produced by USB, which contains the 17 March 2008 Zenacon application *without* redaction of Verona's social security number and date of birth and Zenacon's tax identification number (DE # 109-5) be filed under seal. The court notes that although it did rely upon the Zenacon application in reaching its summary judgment decision, a redacted version of that document has been filed pursuant to Fed. R. Civ. P. 5.2. Thus, the court will allow the unredacted version to be filed under seal. Third, plaintiffs request that an unredacted version of their memorandum in support of their motion for partial summary judgment (DE # 110) be filed under seal. On page 15 they quote from a document GoGas designated as confidential. The material quoted is not in any way confidential, and for this reason, the court will not allow an unredacted version of the brief to be filed under seal. Finally, they ask that MyGallons's pro forma financial statements, submitted in opposition to defendants' motion to exclude expert testimony (DE # 137) be filed under seal. The court did not rely upon these documents in ruling on the motion to exclude, and therefore, the court will allow them to be filed under seal.

## V. CONCLUSION

Plaintiffs' motion for partial summary judgment (DE # 93) is DENIED. Defendants' motions for summary judgment (DE ## 85, 98) are GRANTED IN PART and DENIED IN PART. Defendants' motion to exclude expert testimony (DE # 82) is DENIED. GoGas's motion to strike (DE # 163) is GRANTED. USB's motion to seal (DE # 164) is GRANTED.

Plaintiffs' motion to seal (DE # 165) is GRANTED IN PART and DENIED IN PART.  USB's motion to strike (DE # 168) is GRANTED.

The Clerk is DIRECTED to strike from the record documents contained at docket entry numbers 88-13, 88-15, 89-10, 98-1, and 98-2.

The Clerk is DIRECTED to maintain the following docket entry numbers under seal: 92, 103, 105,[9] 109-1, 109-2, 109-3, 109-4,109-5, 109-9, 109-10, 109-11, 137.   All other documents of record shall be unsealed.

The following claims are DISMISSED:

- Verona's breach of contract claim

- Verona's promissory estoppel claim

- Verona's and Zenacon's claim for tortious interference with contract against USB

- Plaintiffs' claim for tortious interference with contract based on existing membership contracts between MyGallons and its customers

- Plaintiffs' claim for tortious interference with prospective contract

- Plaintiffs' claim for publicity placing one in false light

- Plaintiffs' claim for violation of the UDTPA against USB

- Verona's and Zenacon's claim for violation of the UDTPA against GoGas

The following claims remain:

- Zenacon's and MyGallons's breach of contract claim

- Zenacon's and MyGallons's  promissory estoppel claim

- MyGallons's claim for tortious interference with contract against USB

---

[9]Judge Daniel allowed documents at docket entry numbers 103 and 105 to be filed under seal.

based on the 12 May 2008 contract with GoGas

- plaintiffs' claim for defamation against USB

- plaintiffs' claim for disparagement against USB

- MyGallons' UDTPA claim against GoGas

- Voyager's counterclaims

Trial is hereby SET for 3 October 2011.

This 29 March 2011.



_____
W. Earl Britt
Senior U.S. District Judge