UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:09-CV-0057BR

STEVEN VERONA, MYGALLONS LLC,
and ZENACON LLC,

                Plaintiffs,

vs.

U.S. BANCORP, U.S. BANK VOYAGER
FLEET SYSTEMS INC., and K.E. AUSTIN
CORP.,

                Defendants.

**MEMORANDUM OF LAW IN SUPPORT
OF RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW OR
IN THE ALTERNATIVE, MOTION FOR
A NEW TRIAL ON DAMAGES, OR
FURTHER IN THE ALTERNATIVE,
MOTION FOR REMITTITUR**

## INTRODUCTION

The $4,000,000 award of defamation damages to MyGallons, LLC ("MyGallons") cannot

stand, no matter how Plaintiffs may seek to characterize or justify it. Based on the length of

deliberations and the fact that the jury announced at one point that they could not reach a

decision, this obviously was a compromise verdict. Defendants U.S. Bancorp and Voyager Fleet

Systems Inc. (collectively "Voyager") assert that it is a more-than-fair inference that had this

jury not heard alleged expert testimony regarding evidence of potential "lost profit" damages of

$208,000,000, there is no way they would have settled on defamation damages of $4,000,000 for

a company with no business history, no earnings history, no business reputation, and not enough

money in the bank to afford a $1,000 fee for an application with a possible replacement card

transaction processor -- all in the absence of any enforceable contract for a consumer gas club or

any conduct giving rise to promissory estoppel.

MyGallons did not, as required by controlling law, provide any competent evidence that

Voyager's statements denying the existence of a contractual relationship between Voyager and

MyGallons caused millions of dollars in special damages for defamation, nor did MyGallons supply the required evidence eliminating all possible alternative causes of such harm. Likewise, Mr. Verona's trial testimony regarding his personal out-of-pocket expenses, "sweat equity", and individual "distress" over publicity in early July 2008 are irrelevant to the calculation of any general defamation damages sustained by MyGallons. Such damages are measured by whether and to what extent the existing reputation of MyGallons – then a brand new company – was harmed.

Defendants assert there is no proof in the record substantial enough to support any reasoned verdict for MyGallons, and certainly not for a verdict of $4,000,000. Defendants U.S. Bancorp and Voyager therefore renew their motion for judgment as a matter of law, and in the alternative, request a new trial (solely on the issue of damages), or an appropriate remittitur.

## NATURE OF THE CASE AND STATEMENT OF FACTS

All claims by Plaintiffs Zenacon and Mr. Verona were disposed of at summary judgment, on motion in limine, or on motion for judgment as a matter of law at trial. Three claims only were submitted to the jury for MyGallons: breach of contract, promissory estoppel, and defamation. This motion concerns MyGallons' claim for defamation and resulting $4,000,000 verdict rendered by the jury on October 18, 2011.

The jury found that Voyager did not breach any contract with MyGallons relating to a consumer gas club program; the evidence categorically proved that no such contract ever existed. The evidence was uncontradicted that a MyGallons application allegedly prepared in May 2008 by Mr. Verona was never received by either GoGas or Voyager and was never considered or approved by Voyager. The jury likewise found that in the absence of any such contract, Voyager did not make any statement or statements upon which MyGallons relied to its detriment.

2

Nevertheless, the jury came to the inconsistent conclusion that Voyagers' desk statements denying that it had a contract with MyGallons to provide support for such a program were in some way defamatory.

At the time Mr. Verona testified at trial, defamation claims were alive as to all three Plaintiffs: Zenacon, MyGallons, and Mr. Verona individually. Mr. Verona testified that he made unsuccessful attempts to replace Voyager after Voyager discovered Mr. Verona's misrepresentations about the nature of Zenacon and the true nature of his consumer gas club plan and declined to have further discussions with Mr. Verona or MyGallons. But when Plaintiffs' counsel attempted to elicit testimony from Mr. Verona regarding the reasons why he did not engage a substitute card processor (in attempt to establish causation for lost profit damages), the Court properly disallowed such testimony as hearsay. (*See, e.g.* Transcript of Mr. Verona's trial testimony, Docs. 240, 241, pp. 138-141) (hereinafter "Tr.").

Mr. Verona therefore was limited to testifying primarily regarding the impact of negative publicity on him personally. (*See, e.g.*, Tr. at p. 109, in which Mr. Verona complains that he was portrayed in media as a "con artist"). He did not address in detail the impact of the media statements on MyGallons' business during the months and years following July 2008, much less did he provide any testimony indicating that MyGallons' inability to attract a substitute card processor was directly caused by a Voyager desk statement. (*See* Tr. at p. 159).

Plaintiffs offered no testimony from any potential substitute processors and no expert testimony on this issue. The only evidence presented by Defendants on this point was the testimony of Melody Wigdahl, the person MyGallons retained to locate a substitute processor. However, Ms. Wigdahl testified unequivocally that publicity relating to Voyager had nothing to do with MyGallons' failure to find a new payment processor, and had everything to do with facts

3

like MyGallons being so under-capitalized that it could not or would not pay a standard $1,000 application fee with other banks.[1]

## ARGUMENT

### I. VOYAGER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

#### A. STANDARD OF REVIEW.

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The motion may be denied only if, "viewing the evidence in the light most favorable to the [plaintiff], there is substantial evidence in the record to support the jury's findings." *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir. 1985), *cert. denied*, 475 U.S. 1016 (1986) (emphasis added). Judgment must be granted "if under the governing law there can be but one reasonable conclusion as to the verdict." *Goedel v. Norfolk & W. Ry. Co.*, 13 F.3d 807, 810 (4th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

#### B. THE ALLEGED DEFAMATORY STATEMENTS MADE BY VOYAGER WERE SUBSTANTIALLY TRUE.

At the dispositive motion stage of this litigation, the Court denied Voyager's motion for judgment as a matter of law on Plaintiffs' defamation claim based on a single fact issue: whether the statement that there was no agreement between Voyager and MyGallons was true. Specifically the Court stated that whether Voyager's statements were true "essentially turns on whether [Voyager]

---

[1] Having failed in multiple attempts to exclude Ms. Wigdahl's testimony, Plaintiffs resorted to the improper argument in closing that she should have testified "live" and they should have been able to "look her in the eye" at trial – even though they know that Ms. Wigdahl resides in the State of Ohio and could not have been compelled to appear live at trial. Plaintiffs' attorneys likewise chose long ago who from among them they wished to look Ms. Wigdahl in the eye at her deposition, which they attended and in which they participated.

4

had an agreement with MyGallons. In turn, that issue is a factual one which precludes the entry of summary judgment on the defamation claim." (Order, Doc. 169, p. 18) (Emphasis added).

The jury's finding that Voyager breached no contract with MyGallons for a MyGallons consumer gas club and the absence of any evidence of such a contract require the conclusion that no such contract ever existed. The jury also found that Zenacon breached a contract with Voyager, which of course shows that a contract did exist between Voyager and Zenacon, but that contract was limited by its terms to a small commercial fleet. The July 2008 Voyager desk statements to the effect that no contract or affiliation existed between Voyager and MyGallons were obviously directed to the nationwide consumer gas club announced by MyGallons on June 30, 2008, rather than to the existence of the small Zenacon commercial fleet contract (which in any event was terminated mid-day July 1, 2008, once Voyager realized that Mr. Verona was supplying those fleet cards to consumers in clear violation of the relevant contract).

The jury's findings make Voyager's statements that there was no agreement or affiliation with MyGallons substantially true. The fact issue that earlier prevented the Court from ruling as a matter of law on the defamation claim has been resolved in Voyager's favor, and Voyager is now entitled to judgment as a matter of law on Plaintiffs' defamation claim. Whether a statement is substantially accurate is a question of law, for the court. *Cohen v. Beachside Two-I Homeowners' Ass'n*, No. 05-706, 2006 WL 1795140, *3 (D. Minn. 2006); *Jadwin v. Minneapolis Star and Tribune Co.*, 390 N.W.2d 437, 441 (Minn. Ct. App. 1986).

In Minnesota and elsewhere, "[t]ruth and substantial truth are defenses to a defamation claim." *Cohen*, 2006 WL 1795140, *3 (citing *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980)). "[T]he plaintiff cannot succeed in meeting the burden of proving falsity by showing only that the statement is not literally true in every detail. If the statement is true in

5

substance, <u>inaccuracies of expression or detail are immaterial</u>." *Jadwin*, 390 N.W.2d at 441. A statement is substantially true when the gist is accurate. *Id.* (quoting *Williams v. WCAU-TV*, 555 F. Supp. 198, 202 (E.D. Pa. 1983)(emphasis added)).

For example, according to the plaintiff in *Cohen*, an association's treasurer defamed him by stating: 1) he had not paid dues for nine months; 2) multiple attempts to contact the plaintiff by mail and telephone were unsuccessful; and 3) he was unwilling to negotiate a settlement of the outstanding dues. *Cohen*, 2006 WL 1795140, at *2-4. The Court held that while each statement was not technically accurate, they were substantially true as a matter of law. Although plaintiff had not made payments for eight, rather than nine months, the Court held that the inaccuracy was immaterial. *Id.* at *3. Although the association's attorney had actually "reached" plaintiff twice, the association's statements were substantially true when considered in context, because "the vast majority of [the lawyer's] attempts did not result in contact with [the plaintiff]." *Id.* at *4. Finally, although plaintiff alleged he was willing to settle the dispute, the court found the statement regarding his willingness to negotiate a settlement was substantially true because "although [the plaintiff] had made a 'settlement offer,' [the association] was not willing to accept his offer, and there is no evidence that [the plaintiff] was willing to negotiate a settlement that included any payment for dues as well as fees." *Id.*

At trial, MyGallons focused its case on the initial press statement of July 1, 2008:

> U.S. Bank Voyager Fleet Systems does not have a contract to do business with MyGallons.com. We did not authorize the use of our name in association with this venture and we are not affiliated with this company.

(Tr., p. 103). Mr. Verona testified that the statement was later changed, in attempt to be technically more accurate. (Tr., p. 104).

6

Even if there were "inaccuracies of expression or detail" with the Voyager desk statements (*i.e.*, the use of "MyGallons.com" rather than "MyGallons, LLC"), their gist – that there was no agreement with MyGallons – was true. The point being made by Voyager was simply that MyGallons' June 30, 2008 press release, which described an allegedly-existing nationwide consumer gas club that was supported by Voyager fleet fuel cards, was not accurate. The evidence was clear at trial that Mr. Verona and MyGallons' attorney both knew that they had no such contract in place when they decided to launch MyGallons. Neither is a contract between Zenacon LLC and Voyager -- procured by Mr. Verona's fraud and misrepresentation -- an "affiliation" between Voyager and MyGallons LLC.[2] Similarly, if Voyager had no contract obligating it to participate in MyGallons' nationwide consumer gas club, it obviously had not authorized use of its name to further that program.

The jury's decision that Voyager was not obligated by contract or equity to support such a program shows that the gist of the statement was accurate. Just like in *Cohen*, although there may have been some inaccuracies of detail or expression, when the entire statements are considered in context, they are substantially true as a matter of law. It is irreconcilable that MyGallons could publish a blatant falsehood -- that it had a contract with Voyager -- without consequence, and Voyager be held liable for publishing a truthful statement in response: that no such contract existed.

---

[2]     *Black's Law Dictionary*, 63 (8th ed. 2004), defines an "affiliate" as a "corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation." Neither under that definition nor any reasonable definition of the term were Voyager and MyGallons ever "affiliated." At best, plaintiffs' proof would establish that MyGallons was in preliminary negotiations with Voyager. Substantially all of those negotiations were conducted through GoGas, however, and MyGallons was not fully forthcoming about the nature of the proposed "member" gas club program. Respectfully, it would be unconscionable to allow such very preliminary inquiries and negotiations, recognized as such by Mr. Verona and MyGallons' lawyer, to constitute an "affiliation" sufficient to support a $4,000,000 defamation judgment.

7

### C. MYGALLONS MADE NO SHOWING THAT VOYAGER'S DESK STATEMENTS CAUSED SPECIAL DAMAGES IN THE FORM OF LOST PROFITS OR GENERAL BUSINESS DECLINE.

Minnesota law typically imposes a reputational harm prerequisite in defamation actions. In other words, before damages for defamation may be sought, a plaintiff must show general damage to reputation. *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 28 (Minn. 1996). However, in cases alleging defamation *per se*, "general damages" are presumed. *Stuempges*, 297 N.W.2d at 255. The practical effect is that when a claim for defamation *per se* is made, the "reputational harm prerequisite" is assumed and the plaintiff is allowed to seek damages without the initial burden of meeting the "actual harm" threshold. *Id.* at 259; *see also Longbehn v. Schoenrock*, 727 N.W.2d 153, 160 (Minn. Ct. App. 2007).

Unlike the threshold standard, however, the burden required in Minnesota for <u>special damages</u> under defamation and defamation *per se* does not change. Regardless of whether a plaintiff advances a claim for defamation *per se* or not, the plaintiff must prove that the pecuniary harm sought as special damages was legally caused by the defamatory statement. *Longbehn*, 727 N.W.2d at 160; *Stuempges*, 297 N.W.2d at 258-59 (citing Restatement (Second) of Torts § 622, Comment a (1977)) (holding the general rule regarding special damages is that the plaintiff can recover only if he proves actual or pecuniary loss); *and see* Restatement (Second) of Torts § 622A, Comment a (1977) ("[t]here can be no recovery for the special harm unless the defamation is the legal cause of it").

To recover for pecuniary harm, a plaintiff is thus required to prove the defamation was a <u>substantial cause</u> of harm, and that the harm <u>could not have been caused by other factors</u>. *Longbehn*, 727 N.W.2d at 160; *and see Advanced Training Sys., Inc. v. Caswell Equip. Co.*, 352 N.W.2d 1, 7-8 (Minn. 1984) (holding defamation is the legal cause of special harm only

8

when it is a direct factor in bringing about the harm and only if other potential causes have been eliminated). "For the defamation to be a legal cause of the special harm, it is necessary that it be a substantial factor in bringing about the harm ... this means that the defamation must be a necessary antecedent of the harm, which would not have occurred without it." Restatement (Second) of Torts § 622A, Comment b (1977).

The foregoing authorities are consistent with this Court's Order on the parties' cross-motions for summary judgment, in which the Court correctly defined "special damages" available for defamation as harm "in the form of pecuniary loss directly attributable to defendant's false statements." (Order, Doc. 169, pp. 18-19) (quoting *Advanced Training*, 352 N.W.2d at 7-8); *see also LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1490 (D. Minn. 1996). This Court also correctly noted that "where plaintiff cannot show loss of specific sales, the modern view allows plaintiff to prove a general decline in business, <u>so long as it is shown to be the result of defendant's disparaging statements and other possible causes are eliminated</u>." (Order, Doc. 169, pp. 18-19) (emphasis added); *see also Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1503-04 (8th Cir. 1992) (where plaintiff did not distinguish between amount of damages sustained due to business disparagement, as opposed to other claims asserted, evidence of lost profits for disparagement was insufficient as a matter of law). MyGallons failed completely to produce such evidence or proof at this trial.

Decisions of federal district courts interpreting lost profit type damages for defamation claims reinforce the principle that the simple fact of a business downturn following the making of defamatory statements is insufficient to establish legal causation. *See Best W. Intern., Inc. v. Furber*, No. CV-06-1537, 2008 WL 4182827, *13-14 (D. Ariz. Sept. 5, 2008) (granting summary judgment with respect to damages based on membership loss when plaintiff failed to

9

show "reasonable connection" between defamation and loss of members). For example, in *Workman v. Kroger Ltd. P'ship I*, No. 5:06-cv-00446, 2007 WL 2984698, *8 (S.D. W.Va., Oct. 11, 2007), the court held that testimony about a plaintiff's "feeling" that business declined as the result of defamatory statements was insufficient as a matter of law: "A mere feeling, absent expert testimony, proof of causally related lost income, or former clients' testimony that they refuse to do business with [the company] because of the posting, is not enough to support a claim for special damages." *Workman*, 2007 WL 2984698 at *8. Accordingly, proof that alleged defamation caused lost profits typically requires expert testimony. *U.S. Tech Solutions, Inc. v. Cognition IT, Inc.*, No. 06-3027, 2007 WL 2702649, *1 (D. N.J., Sept. 12, 2007); *see Furber*, 2008 WL 4182827 at *11 (noting plaintiff had no expert on causation).

Based on the evidence submitted at trial, and applying the requirements of defamation damages set forth above, Voyager is entitled to judgment as a matter of law: MyGallons is not entitled to special damages. The record in this case includes <u>no evidence</u> that the alleged defamatory statements by Voyager caused <u>any</u> harm, let alone lost profit damages, to <u>MyGallons</u>.

Plaintiffs failed to offer any expert opinion regarding pecuniary damages tied to defamation. Clearly, the expert reports offered by MyGallons were not created to quantify the amount of damages resulting from <u>defamation</u>. As debated in the context of earlier motions to exclude, MyGallons' expert reports stated that the lost profit damages were caused by <u>breach of contract</u>. The most Mr. Seitz could offer at trial was an attempt to bootstrap MyGallons' inability to find an alternate payment processor to his collateral conclusion that MyGallons' lost profits should not be reduced for "failure to mitigate" – but his observations on that point were even more ephemeral than the "general receding of business" argument which was held

10

insufficient in *Best Western*. These expert reports never even mention defamation; they are absolutely devoid of any attempt to analyze whether other banks declined to provide fuel cards to MyGallons as a result of some alleged defamation and, therefore, respectfully, they should never have gone to the jury.

Even aside from the experts, there was no evidence that MyGallons, a start-up company, lost profits or experienced a business decline as a result of media statements, as opposed to other obvious causes, such as not having an agreement with a card processor and the myriad other problems with MyGallons' business organization and business model. Although MyGallons initially was able to persuade a number of consumers to purchase memberships to its consumer gas club, it was incapable of providing the services it promised because it had not entered a contract with Voyager or anyone else to provide fuel cards and provide the necessary transaction processing. That is the primary reason the business failed, and to the extent MyGallons suffered any collateral adverse publicity for prematurely rolling out the program, that was a self-inflicted wound. If Voyager had made no statement at all regarding the non-existence of a contract or affiliation, that would not have changed the fact that MyGallons introduced its fuel club without first having in place a payment processing contract sufficient to support it. That fact, not Voyager's desk statements, is what doomed the MyGallons business model.

Finally, there was no evidence introduced that Voyager's media statements were the direct cause of MyGallons' inability to find a substitute card processor. The Court properly prevented Mr. Verona from testifying about the statements and opinions of other card processors, based upon hearsay and foundation objections. (Tr., at pp. 138-141, 159). MyGallons offered <u>no</u> testimony from representatives of other card processors as to why they actually declined to contract to provide fuel cards to MyGallons. The <u>only</u> evidence introduced on this point was

11

through Melody Wigdahl, who testified that the Voyager statements <u>were not</u> a cause of other card processors declining to provide fuel cards (and cataloged in detail the many other actual causes MyGallons was unable to find such a partner, such as MyGallons declining to pay a $1,000 application fee, insufficient capitalization, and Mr. Verona's own spotty reputation as a businessman).

For all these reasons, MyGallons failed to prove the alleged defamatory statements were a <u>substantial factor</u> in causing pecuniary damages, and also failed to <u>eliminate significant other factors</u> that prevented MyGallons from being able to support the services it promised to provide consumers. Accordingly, Voyager's statements were not a substantial cause of MyGallons' alleged lost profits. Because the $4,000,000 damage award is so large that it must have been based in large part on Plaintiff's lost profits estimate,[3] the Court should vacate the damage award as a matter of law.

## II. IN THE ALTERNATIVE, DEFENDANT'S MOTION FOR A NEW TRIAL ON DAMAGES SHOULD BE GRANTED FOR THE FOLLOWING REASONS:

### A. STANDARD OF REVIEW.

This Court has broad discretion to grant or deny a new trial. *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994). "On [a motion for new trial] it is the duty of the judge to set aside the verdict and grant a new trial if he is of the opinion that 1) the verdict is <u>against the clear weight of evidence</u>, or 2) is based on evidence which is false, or 3) will result in a <u>miscarriage of justice</u>, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. and Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996) (emphasis added).

---

[3]     Plaintiffs' lawyers appear to agree, based on a recent interview in the November 7, 2011 edition of North Carolina *Lawyers Weekly*.

12

## B. THE $4,000,000 AWARD EXCEEDS ANY REASONABLE GENERAL DAMAGE TO REPUTATION.

"General damages are recoverable for injury to the plaintiff's 'reputation, his wounded feelings and humiliation, ... as well as estimated future damages of the same kind.'" *Longbehn*, 727 N.W.2d at 160 (quoting *Richie*, 544 N.W.2d at 27). Without proof of damages, "general damages are limited to harm that 'would normally be assumed to flow from a defamatory publication of the nature involved.'" *Longbehn*, 727 N.W.2d at 162 (quoting Restatement (Second) of Torts § 621, Comment a (1977)).

In *Longbehn*, the appellate court remanded the case for a new trial on general damages, because the $233,000 award far exceeded the amount of past and future harm to plaintiff's reputation, mental distress, humiliation, and embarrassment that would normally flow from a publication of the kind at issue, given other potential factors of the claimed harm. *Id.* at 163. The court cited with approval United States Supreme Court authority for the proposition that even though juries may have discretion in certain types of defamation claims to award general damages without a strict causation showing, there is no reason for the States to allow "gratuitous awards of money damages far in excess of any actual injury." *Id.* at 162-63 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974)). That admonition is equally applicable here.

There is no support for an award of $4,000,000 in general damages given MyGallons' fledgling reputation and other reputational problems unrelated to Voyager. It certainly is possible and even likely, given the outcome, that the jury improperly considered Mr. Verona's testimony regarding his own personal feelings and distress regarding adverse publicity. However, the only Plaintiff ultimately permitted to assert a defamation claim here was MyGallons – leaving the only form of general damage measured by a diminishment of MyGallons' existing reputation. But when the alleged defamatory statements were made

13

(starting July 1, 2008), MyGallons had built no pre-existing public reputation. It was a brand new business, first announced to the public on June 30, 2008. Not surprisingly, there was no particular evidence or expert testimony offered at trial regarding what reputation MyGallons had at any point in time (other than it received lots of media attention in the beginning of July 2008 – some positive, some negative). It is logically impossible for a new company with no pre-existing reputation to suffer millions of dollars in general reputational damages from statements of the kind at issue (regarding the non-existence of a particular contract or corporate affiliation).

MyGallons may argue that, in addition to lost profits, the jury could have considered the out-of-pocket expenses or "sweat equity" about which Mr. Verona testified at trial, but that would be equally inappropriate. The measure for general damages in defamation is harm to the plaintiff's reputation – not expenses allegedly incurred in the time prior to the alleged defamation. *Longbehn*, 727 N.W.2d at 160.

Further, the notion of humiliation or harmed feelings to MyGallons is nonsensical: corporations, although legal entities, do not experience humiliation or hurt feelings. The more common claim for corporations seeking lost profits under these circumstances would be product disparagement – a claim which MyGallons effectively abandoned during trial. That leaves only general harm to MyGallons' existing reputation. However, it is ludicrous to suggest that the reputation of a business which literally "started up" the day before the allegedly-defaming statements were begun can reasonably be measured in the millions of dollars when that same business chose to represent it was ready to serve the public without having in place a contract for the single most important element of its business: the ability to process transactions at gas stations and provide sales and billing information to MyGallons. Add to this a questionable business model, questionable management talent, inadequate capitalization, and no proven way

14

to hedge the retail price of gas (despite the preposterous claim that the proprietary Verona hedging plan was a secret akin to the recipe for Kentucky Fried Chicken), and it is clear that substantially true statements from Voyager did not cause the damages that MyGallons complains of.

For all these reasons, the damage award is unsupported by the record in this case and the Court should order a new trial on general defamation damages.

### C. MYGALLONS SHOULD NOT HAVE BEEN ALLOWED TO PRESENT TESTIMONY SEEKING $208,000,000 IN LOST PROFIT DAMAGES.

For the reasons previously argued in this motion and at trial, Defendants respectfully renew their argument that evidence of MyGallons' lost profits damages should not have been submitted to the jury.

First and foremost, Plaintiffs' experts offered no evidence to link their lost profit opinions to the defamation claim. Paul Seitz agreed at trial that his report (which necessarily formed the basis of his trial testimony) states that lost profit damages were caused by Defendants' breach of contract (rather than defamation):

> MyGallons' economic loss in the form of lost profits associated with the defendants' alleged breaches for failure to honor contracts and agreements granting MyGallons access to the Voyager network is approximately $199.3 million.

(Sietz Report, p. 3, Doc. 90-2 ["Exhibit 70"]). At trial, Plaintiffs offered no evidence about specific individuals or entities that refused to do business with MyGallons as a result of any alleged defamation. Absent such evidence, the jury could only speculate on the issue of causation.

In addition, Mr. Seitz's lost profit opinion was grounded in sales projections of Plaintiffs' marketing expert, Dr. Micu, who admitted in open court that her expertise was _not_ in sales and

15

that she had no experience in sales and no prior experience in making sales projections, yet whose report did precisely that: she estimated the number of memberships MyGallons allegedly would have sold had MyGallons been able to launch as planned.

The court's gatekeeper role is particularly important in cases like this, where an expert's damage estimate conveys a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it. *See Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 145 (4th Cir. 1994) (citations omitted); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2nd Cir. 1996) ("Where lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future ... prospects"). Dr. Micu made no attempt to determine whether MyGallons had the resources or experience necessary carry out its own inflated sales projections or to otherwise validate the MyGallons business plan, a particularly egregious fault given the stiff burden any new business has in showing lost profits. *See Amerinet*, 972 F.2d at 1510 ("Aside from the fact that [plaintiff's expert] projections have a fairy-tale-like tone to them, those projections are clearly mere speculation because they assume not only that Amerinet would produce profits from two *new* businesses, but tremendous profits from those new businesses"). Mr. Seitz did little more than take assumptions provided by Mr. Verona and the projections provided by Dr. Micu, plug them into an Excel spreadsheet, and hit "compute."

Clearly, the jury's consideration of this information is not a "no harm, no foul" call as it affects Voyager: the jury was allowed to consider a drastically inflated view of the kind of damages that could be reasonably recovered in this case, making it easy for an initially sharply divided jury to award $4,000,000 as a compromise verdict. The admission of expert testimony concerning the $208,000,000 lost profit damage claim entitles Voyager to a new trial on the issue

16

of defamation damages. *See Tyger*, 29 F.3d at 140-143 (district court abused discretion in admitting baseless expert testimony).

## III. IN THE ALTERNATIVE, VOYAGER IS ENTITLED TO AN APPROPRIATE REMITTITUR OF DAMAGES.

The question of whether a verdict is excessive is one left largely to the discretion of the trial court. *Page v. Trustees of Sandhills Cmty. Coll.*, No. 3:96CV00358, 1999 WL 1937475, *8 (M.D.N.C.) (M.D.N.C.,1999) (citing *Gill v. Rollins Protective Servs. Co.,* 836 F.2d 194, 196 (4th Cir.1987). A verdict is excessive if it "shocks the conscience" so as to create the impression that the jury has been influenced by passion or prejudice or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion. *Harvey v. Atl. Coast Line R.R. Co.*, 69 S.E. 627, 634 (N.C. 1910) (citation omitted); *and see Hoffman v. Wal-Mart Stores, Inc.*, No. 98-2278, 1999 WL 710350 (4th Cir. 1999). To determine whether a verdict is excessive, a court must compare the factual record and the verdict to determine their compatibility. *Atlas Food,* 99 F.3d at 594.

Federal Rule of Civil Procedure 59(e) allows a court to alter or amend a judgment in when appropriate. Although Rule 59(e) does not establish a standard for when such a motion should be granted, the United States Court of Appeals for the Fourth Circuit has recognized that one circumstance under which a Rule 59(e) motion may be granted is when it is necessary "to correct a clear error of law or prevent manifest injustice." *Page*, 1999 WL 1937475, *8, fn. 4 (quoting *Collison v. Int'l Chem. Workers Union, Local 217,* 34 F.3d 233, 236 (4th Cir.1994)). "Moreover, if a court determines that the verdict is excessive, the court has the option of 'ordering a new trial nisi remittitur.' A remittitur involves the 'process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive

17

jury award.'" *Id.* (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998); and quoting *Atlas Food,* 99 F.3d at 593).

The $4,000,000 damage award is excessive under the circumstances of this case, and at a minimum, Voyager should be entitled to a reduction. As discussed above, media statements to the effect that Voyager had no contract or affiliation with MyGallons were substantially true. To the extent there were "inaccuracies of expression or detail" in those statements, those inaccuracies should be considered in the context of Voyager management being placed in the position of having to investigate and respond on very short notice to the MyGallons press release claiming a relationship with Voyager and the media inquiries which followed, when substantially all communications by MyGallons regarding its proposed consumer gas club had been with representatives of GoGas, not Voyager. In any event, there is no rational basis to conclude that a business first announced to the public on June 30, 2008 suffered multiple millions of dollars in reputational damage from a media statement uttered the next day denying the existence of a certain contract or affiliation but otherwise not commenting on MyGallons' products or business.

For reasons explained above, MyGallons was not entitled to special damages because it presented no evidence of causation. All that is left are general damages, and general damages require consideration of MyGallons' baseline reputation (which, as a start-up was non-existent and as to which, in any event, no evidence was offered). It was inevitable that MyGallons would experience adverse publicity in July, 2008 once its members discovered that no fuel cards were actually available, nor would any be forthcoming soon -- precisely because there was no Voyager-MyGallons contract. This very predictable outcome would have been obvious to anyone with any business experience whatsoever, yet Mr. Verona and his management team decided to launch the

18

business anyway. The Voyager desk statements are not a "but for" to any reputational harm MyGallons suffered.

Unfortunately, a divided jury reached a compromise verdict. In light of the evidence of $208,000,000 in lost profits which MyGallons was allowed to assert (even without presenting the required evidence of causation), it was perhaps easy to make a damage award of multiple millions of dollars as an alternative to further deliberations. In the event this Court concludes that Voyager is not entitled to judgment as a matter of law, or a new trial on the issue of defamation damages, it can nevertheless correct the jury result through an appropriate remittitur. Under the circumstances, no more than nominal damages are conceivably warranted.

## CONCLUSION

Based upon the foregoing Voyager respectfully requests that the Court grant its motion for judgment as a matter of law. In the alternative, Voyager requests a new trial on the issue of defamation damages, or an appropriate remittitur.

Respectfully submitted this 11th day of November 2011.

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

**/s/ Johnny M. Loper**
Johnny M. Loper (NCSB No. 15533)
150 Fayetteville Street, Suite 2011
P. O. Box 831
Raleigh, NC 27602
919-755-2116 (direct dial)
919-755-6056 (fax)
jloper@wcsr.com

**AND**

19

**BASSFORD REMELE**
**A Professional Association**
Lewis A. Remele, Jr. (MN License #90724)
Christopher R. Morris (MN License #230613)
33 South Sixth Street, Suite 3800
Minneapolis, Minnesota 55402-3707
(612) 333-3000
lremele@bassford.com; cmorris@bassford.com

*ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE
## CM/ECF – Mixed Service

I hereby certify that on *November 11, 2011*, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

- **Marcus Samuel McGee**
  smcgee@ncadvocates.com
- **Andrew Kent McVey**
  amcvey@murchisontaylor.com
- **Michael Murchison**
  mmurchison@murchisontaylor.com
- **Lewis A. Remele, JR**
  lremele@bassford.com
- **Douglas M. Risen**
  drisen@bm.net
- **Sherrie R. Savett**
  ssavett@bm.net
- **Jacob Polakoff**
  jpolakoff@bm.net
- **Christopher R. Morris**
  cmorris@bassford.com
- **Russell D. Paul**
  rpaul@bm.net
- **Gary W. Jackson**
  gjackson@ncadvocates.com


/s/ Johnny M. Loper
Johnny M. Loper, NC State Bar No. 15533